

**FILED**

JUN - 2 2008
Jun 2 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

United States of America ex rel.          )
JAMES KLUPPELBERG (N50320),              )      **08CV3168**
                                          )
          *N50230*        )      **JUDGE MAROVICH**
    Petitioner,                      )      **MAG.JUDGE KEYS**
                                          )
    vs.                              )
                                          )      Case Number of State Court
TERRY McCANN, Warden                      )      Conviction: 88 CR 1662
                                          )
                                          )
    Respondent.                      )

## PETITION FOR WRIT OF HABEAS CORPUS

1.  Name and location of court where conviction entered: Circuit Court of Cook
    County, Criminal Division

2.  Date of judgment of conviction: March 22, 1990

3.  Offense(s) of which petitioner was convicted:
    Murder: 88 CR 166201 (6 counts)
    Arson: 88 CR 166225 (3 counts)

4.  Sentence(s) imposed:
    Murder: Natural Life
    Arson: 14 years

5.  What was your plea?
    (A) Not guilty ( X )
    (B) Guilty (   )
    (C) Nolo contendere (   )

If you pleaded guilty to one count or indictment and not guilty to another count or
indictment, give details:

N/A

## PART I – TRIAL AND DIRECT REVIEW

1.  Kind of trial:                Jury (   )   Judge only ( X )

2.  Did you testify at trial?     YES (   )  NO ( X )

3.  Did you appeal from the conviction or the sentence imposed?
    YES ( X )  NO ( )

    (A)  If you appealed, give the

        (1)  Name of court: Appellate Court of Illinois, First Judicial District

        (2)  Result: Conviction Affirmed

        (3)  Date of ruling: December 23, 1993

        (4)  Issues raised:

            Issue #1:   Mr. Kluppelberg was improperly denied the right to a new
                        trial after evidence was presented at the post-trial motion
                        that proved that the State's key witness, Duane Glassco, lied
                        on the stand because he could not have seen Mr.
                        Kluppelberg enter 4448 S. Hermitage, the building that
                        caught on fire.

            Issue #2:   Mr. Kluppelberg was denied effective assistance of counsel
                        under the Sixth and Fourteenth Amendments where his trial
                        attorney failed to impeach Duane Glassco with evidence that
                        would have conclusively refuted Mr. Glassco's testimony
                        that he saw Mr. Kluppelberg enter 4448 S. Hermitage on the
                        night of the fire.

            Issue #3:   The trial court committed reversible error when it denied
                        Mr. Kluppelberg's Motion in Limine to preclude Duane
                        Glassco and Dawn Gramont from testifying at trial. The
                        police only learned of Mr. Glassco and Ms. Gramont (who
                        had no genuine knowledge of the crime) after they beat Mr.
                        Kluppelberg so severely that he was urinating blood and
                        then took an illegally-obtained statement from him.

            Issue #4:   Mr. Kluppelberg's rights to Due Process and Confrontation
                        under the Fifth, Sixth and Fourteenth Amendments
                        respectively were violated when the trial court improperly
                        limited Mr. Kluppelberg's ability to cross-examine
                        Detective Rolston and Duane Glassco.

            Issue #5:   The trial court erred in not allowing Mr. Kluppelberg's
                        Exhibits Eight and Fifteen (foundation base maps that show
                        that Duane Glassco could not have seen Mr. Kluppelberg
                        enter 4448 S. Hermitage because there was a building

2

blocking his line of sight) to be entered as evidence at the motion for new trial.

Issue #6: Mr. Kluppelberg was denied his right to a fair trial when the prosecution asked Dawn Gramont about her prior inconsistent testimony before the Grand Jury and then failed to offer evidence of that prior testimony.

Issue #7: Mr. Kluppelberg's *pro se* motion for substitution of judge for cause should have been granted.

Issue #8: Mr. Kluppelberg's rights were violated when the prosecution failed to establish that the fire was caused by arson and the court credited Duane Glassco, a convicted felon who received a deal on his pending charges.

Issue #9: The trial court's material mistakes of facts -- mischaracterization of the evidence Duane Glassco gave regarding Mr. Kluppelberg -- denied Mr. Kluppelberg a fair trial under the Fourteenth Amendment.

(B) If you did not appeal, explain briefly why not: N/A

4. Did you appeal, or seek leave to appeal, to the highest state court?
YES ( X ) NO ( )

(A) If yes, give the

(1) Result: Petition Denied

(2) Date of ruling: April 6, 1994

(3) Issues raised: All issues in 3(A) were raised except Issue #7 (Defendant's *pro se* motion for substitution of judge for cause)

(B) If no, why not: N/A

5. Did you petition the United States Supreme Court for a writ of *certiorari*?
YES ( ) NO ( X )

If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

## PART II – COLLATERAL PROCEEDINGS

1.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?
    YES ( X )   NO ( )

With respect to *each* post-conviction petition give the following information:

A.  Name of court: Circuit Court of Cook County, Criminal Division

B.  Date of filing:
    October 6, 1994 (*pro se* post-conviction petition)
    September 2, 1999 (1st amended post-conviction petition)
    September 26, 2002 (2nd amended post-conviction petition)

C.  Issues raised:

Issue #1: Mr. Kluppelberg was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel because his trial counsel:

      a.  Failed to introduce evidence to impeach the State's arson expert, Francis Burns, who testified that the fire was an arson.

      b.  Failed to communicate in any meaningful way with Mr. Kluppelberg to prepare Mr. Kluppelberg's defense.

      c.  Failed to properly object to the impeachment of Dawn Gramont with notes of Dawn Gramont's purported Grand Jury testimony

      d.  Failed to effectively impeach Duane Glassco with evidence that would have demonstrated that Mr. Glassco could not have seen Mr. Kluppelberg going back and forth to 4448 S. Hermitage because there was a building blocking Mr. Glassco's line of sight.

      e.  Failed to give an offer of proof when his cross-examination of Detective Leonard Rolston and Duane Glassco was improperly curtailed.

Issue #2: Mr. Kluppelberg was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel because his post-trial counsel failed to raise trial counsel's ineffectiveness in his post-trial motion.

Issue #3: Mr. Kluppelberg was denied his Sixth and Fourteenth Amendment right to effective assistance of appellate counsel because appellate counsel:

      a.  Failed to raise trial counsel's ineffectiveness on direct appeal.

b. Failed to present to the court proper descriptions of the crime scene.
c. Failed to file a motion to transfer the appeal to another division since Justice DeVito was the trial judge on another one of Mr. Kluppelberg's cases and therefore could not be fair and impartial.
d. Failed to file a motion for rehearing notifying the appellate court of its failure to address certain issues Mr. Kluppelberg raised on appeal.

Issue #4:  Mr. Kluppelberg was denied his Sixth and Fourteenth Amendment right to a jury trial.

Issue #5:  Mr. Kluppelberg was denied the right to testify in his own defense as guaranteed by the Fifth, Sixth and Fourteenth Amendments.

D.   Did you receive an evidentiary hearing on your petition?
     YES ( )   NO ( X )

E.   What was the court's ruling? Dismissal

F.   Date of court's ruling:  January 14, 2004

G.   Did you appeal from the ruling on your petition? YES ( X )   NO ( )

H.   (a)   If yes,

          (1)   What was the court's ruling: Dismissal affirmed.

          (2)   Date of court's ruling:
                December 29, 2006: Dismissal affirmed.
                February 6, 2007: Appellate court denied petition for rehearing.

     (b)   If no, explain briefly why not: N/A

I.   Did you appeal, or seek leave to appeal this decision to the highest state court?     YES ( X ) NO ( )

     (a)   If yes

          (1)   What was the result? Petition denied.

          (2)   Date of decision: May 31, 2007

     (b)   If no, explain briefly why not: N/A

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus? YES ( ) NO ( X )

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

    1. Nature of proceeding

    2. Date petition filed

    3. Ruling on the petition

    4. Date of ruling

    5. If you appealed, what was the ruling on appeal?

    6. Date of ruling on appeal

    7. If there was a further appeal, what was the ruling ?

    8. Date of ruling on appeal

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**? YES ( ) NO ( X )

    A. If yes, give name of court, case title and case number:

    B. Did the court rule on your petition? If so, state
       (1) Ruling:

       (2) Date:

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition? YES ( ) NO ( X )
If yes, explain:

## PART III – PETITIONER'S CLAIMS

1. State briefly every ground on which you believe you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A)    Ground #1:    **Mr. Kluppelberg was denied the right to effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial attorney failed to impeach the State's arson witness with Bomb and Arson Unit and other police reports stating that the fire was an accident and that the cause and origin could not be determined because the building had been so severely damaged.**

Supporting Facts:

On March 24, 1984, a fire consumed the house at 4448 S. Hermitage, killing six people and injuring another. At the time of the fire, the Bomb and Arson Unit of the Chicago Police Department -- the official and only fire investigation unit in the City -- conducted an investigation. The detectives involved in the investigation concluded that "[d]ue to the extensive burning and the collapse of the building, the cause and origin of the fire could not be determined." See Police Reports, RD #F105510, at 7, attached as Exhibit A [hereinafter "Police Reports"]. In other words, the Bomb and Arson unit found that the physical evidence did not and could not support a scientifically defensible conclusion regarding the cause and origin of the fire, much less a determination that it was the result of arson. Further, tests of the debris from the fire to determine whether a fire accelerant was present came back negative. Therefore, in April 1984, the police department closed the case as "apparent accidental fire deaths." See Exhibit A, Police Reports, at 12.

There was no additional investigation into the fire for nearly four years -- until Duane Glassco was arrested and charged with burglary, theft and violation of probation. Mr. Glassco wanted to avoid prison and therefore cut a deal in exchange for his testimony inculpating Mr. Kluppelberg. Mr. Glassco considered Mr. Kluppelberg an enemy, in no small part because of Mr. Kluppelberg's relationship with Mr. Glassco's ex-girlfriend and the mother of three of his children, Dawn Gramont. Mr. Glassco spoke to the police about the fire in December 1987 and a State's Attorney a month later. Despite being admittedly high the night of the fire, and despite waiting nearly four years to come forward, Mr. Glassco told the police that he remembered seeing Mr. Kluppelberg go back and forth to 4448 S. Hermitage on the night of the fire. Mr. Glassco said that he witnessed Mr. Kluppelberg do so from an attic window at the home where both men were staying, but, in actuality, the view of 4448 S. Hermitage from that attic window was entirely blocked by another building. It was impossible for any one to see from the attic window to 4448 S. Hermitage. See Glassco Aff. ¶¶ 4-5, attached hereto as Exhibit B; Gramont Aff. ¶ 6, attached hereto as Exhibit C; Brittain Aff. ¶ 5, attached hereto as Exhibit D.

7

The same month that Mr. Glassco spoke to the State's Attorney, in January 1988, Mr. Kluppelberg was charged with arson and murder stemming from the 1984 fire at 4448 S. Hermitage. Commander Jon Burge announced the arrest to the public.

Mr. Kluppelberg has steadfastly maintained his innocence of the crime for which he was convicted. The evidence that the State used to suggest otherwise was weak at best: it consisted solely of testimony from Mr. Glassco and the state's arson expert, Francis Burns. Notably, the State never called any of the police officers from the Bomb and Arson Unit or Area 3, who actually investigated the fire, since they had determined that the fire was an accident.

Indeed, at trial, the only "scientific" evidence that the State presented to prove that the fire was an arson was the testimony of Francis Burns. In March 1984 (the time of the fire at issue), Mr. Burns was part of an organization, the Office of Fire Investigation ("OFI"), that had yet to become operational. Mr. Burns went to 4448 S. Hermitage with several apprentice fire investigators and performed a training exercise. He did not conduct an official investigation of the fire; that was the purview of the Chicago Police Bomb and Arson Unit. See Letter from Commander Ray Kolasa to Ashley Schumacher, May 1, 2008, attached as Exhibit E. Mr. Burns took no notes and made no report of his findings. Yet, five years later he testified that he had, at the time, determined that the fire was an arson. Although he alleged that he told a detective that he believed the fire to be incendiary, that conversation was never memorialized in any police report or anywhere else. Indeed, the only report regarding the fire stated the opposite: that the fire was "accidental." See Exhibit A, Police Reports, at 12.

It was not until 1989, five years later, that Mr. Burns memorialized his "findings" by giving testimony in Mr. Kluppelberg's case. Mr. Burns testified from memory. His testimony was nothing short of incredible, and entirely contradicted by the reports from the official investigation of the fire done by the Chicago Police Department. Mr. Burns testified that based on his experience and on alleged burn patterns, the fire at 4448 S. Hermitage was an arson. But it is common knowledge within the field of fire dynamics that the alleged burn patterns to which Mr. Burns testified do not indicate arson. See, Report of Dr. Russell Ogle, May 23, 2008, at 6-7, attached hereto as Exhibit F [hereinafter "Ogle Report"].

Additionally, Mr. Burns testified that he could confirm that the fire was an arson because he eliminated all accidental causes of the fire since he could not find anything electrical in the area. Yet, Mr. Burns acknowledged that there was a space heater found in the rubble. Moreover, two of the photographs taken by the Chicago Police Department clearly depict BMX electrical cable.

In fires involving a total burn (i.e., destruction of the building), such as that at 4448 S. Hermitage, the magnitude of the destruction makes it extremely difficult to find, let alone examine physical evidence. In the absence of evidence, the scientific fire investigator must conclude that the cause cannot be determined. See Exhibit F, Ogle Report at 3, 8;

NFPA 921: Guide for Fire and Explosion Investigations, at 921 (2008), attached hereto as Exhibit G.

Indeed, that is exactly what the Bomb and Arson Unit concluded in this case. As such, Mr. Kluppelberg's counsel's failure to impeach Mr. Burns with the police reports from the Bomb and Arson and Detective Units was a fundamental error that severely prejudiced Mr. Kluppelberg's defense. Mr. Burns' testimony was the only evidence that the State presented that this fire was an arson. Yet, trial counsel failed to impeach Mr. Burns in any meaningful. Mr. Kluppelberg's counsel never questioned Mr. Burns about any of the police reports nor did he ever call anyone from the Bomb and Arson Unit to testify regarding their findings -- that the cause and origin of the fire was undeterminable and that tests revealed no traces of an accelerant. (He also did not have a fire expert testify on his behalf.) As a result, the court found that Mr. Burns' testimony went uncontradicted and that it "left no doubt in [her] mind that that fire was started by means of arson."

Trial counsel's failure to impeach Mr. Burn's was not trial strategy. See Weinberg Aff. ¶ 4, attached hereto as Exhibit H. Nor can it be said that it was harmless error: Had trial counsel properly cross-examined Mr. Burns, and impeached him with the police reports, it is likely that the court would have found that the State had not proven that the fire was an arson.

The court, in dismissing Mr. Kluppelberg's supplemental amended post-conviction claim of ineffective assistance of counsel, made unreasonable findings of fact and unreasonably applied clearly established federal law in concluding that the failure to present this evidence did not prejudice Mr. Kluppelberg. The Illinois Appellate Court and Illinois Supreme Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.[1]

---

[1]     Further compounding these errors, the courts did not have before them one of the key Bomb & Arson police reports when issuing their rulings. Neither Mr. Kluppelberg nor the State could locate the police reports relating to this case. As a result, post-conviction counsel subpoenaed the police reports during post-conviction discovery, but was told that the police reports relating to the fire at 4448 S. Hermitage had been destroyed. Mr. Kluppelberg received a similar response to his initial, 1996 Freedom of Information Act ("FOIA") Request for the same. Thus, the only police reports that were included in Mr. Kluppelberg's post-conviction petition were reports that were made part of the common law record and were therefore accessible to counsel. Because one of the key Bomb & Arson reports was missing from the common law record, Mr. Kluppelberg instead drew up an affidavit averring to his recollection of the contents of that report. It was only pursuant to a second FOIA request in 2008 that Mr. Kluppelberg received a redacted copy of that report, attached hereto as pages six through nine of Exhibit A.

**(B)     Ground #2:     Mr. Kluppelberg was denied the right to due process under the Fifth and Fourteenth Amendments where State utterly failed to prove that the fire was of an incendiary origin.**

Supporting Facts:

The *corpus delicti* of arson-murder is that there was a burning and that the burning was of an incendiary nature. It is undisputed that the fire at 4448 S. Hermitage constituted a burning, but there was no credible evidence presented at trial that the burning was incendiary. As a result, Mr. Kluppelberg's right to due process was violated.

The only testimony that the State offered and that the trial court considered on the issue of whether the fire was of an incendiary origin was that of Mr. Burns. As described above, Mr. Burns stated that "[b]ased on the experience that I have and in examining burn patterns normally found in arson fires, my personal opinion was this – the fire was a set fire as a result of arson." Although the court found that Mr. Burns' testimony left no doubt in her mind that the fire was an arson, the patterns on which Mr. Burns relied for his opinion have all been debunked by substantial advances in the science of arson. Indeed, closer examination reveals that there was absolutely no physical evidence that suggested that the fire was an arson.

Pattern #1: Mr. Burns testified that "large, shiny alligatoring" patterns demonstrated that the fire was of an incendiary origin.

"Large, shiny alligatoring" does not indicate an accelerated fire (arson). All it means is that the wood has burned for a long period of time. See Exhibit F, Ogle Report, at 6. Additionally, the alligatoring to which Mr. Burns specifically referred was on a structural component of 4448 S. Hermitage and not on exposed woodwork. Thus, even if Mr. Burns' premise were true (which it is not), the pattern would not have appeared on a structural beam that was protected from the incipient fire, but rather would have appeared on the exposed woodwork. See id.

Pattern #2: Mr. Burns alleged that the fire at 4448 S. Hermitage was arson because the fire burned through the floor and into the basement. Mr. Burns testified that this "burn through" could not have come from upper portions of the house falling down, but instead came from liquid fuel (an accelerant). (Notably, lab tests for the presence of an accelerant came back negative.)[2]

It is now well-established that liquid fuel cannot burn through a wood floor. See Exhibit F, Ogle Report, at 6. Contrary to Mr. Burns' testimony, however, fire testing has

---

[2]     The first floor apartment of 4448 S. Hermitage was vacant in March 1984. The State's theory was that the purported arsonist entered the first floor apartment and set the fire, which then consumed the building. Mr. Burns' opinions about drop-down fit with that theory because they ruled out an electrical malfunction in one of the two occupied apartments upstairs.

proven that solid fuels (such as materials from burning above dropping down) can burn holes in the floor. See id.

Moreover, Burns' theory about burn-through is particularly problematic in light of his testimony that the fire was started by igniting a pile of newspapers or rags. This newspaper theory coincidentally dovetailed perfectly with Duane Glassco's perjured testimony. At trial, Mr. Glassco elaborated on his story that he saw Mr. Kluppelberg go into 4448 S. Hermitage that night by saying that he repeatedly saw Mr. Kluppelberg carrying what "looked like a bundle of newspapers" into 4448 S. Hermitage.

That scenario, which Mr. Glassco has admitted was a lie, is scientifically impossible. Structural components of a house -- e.g., the floor -- are only exposed to flames after the outer wall fails. The fire resistance of a typical outer wall is about 20 to 30 minutes. Structural components then burn for a significant period of time -- from 15 to 30 minutes -- before they will fail. Thus, accepting Mr. Burns' fire scenaro, the fire had to burn for 35 to 60 minutes before the floor would burn through. A fire of that magnitude cannot be ignited by a gallon of gasoline or pile of newspapers because they burn up too fast. Rather, it would require a large quantity of solid fuel, such as upholstered chairs or mattresses. See id. at 6-7. But according to Mr. Burns' testimony, there was no fuel load on the first floor.

Pattern #3: Mr. Burns testified that there was a "V" pattern on the adjacent buildings, which demonstrated the point from which the fire had emanated in 4448 S. Hermitage. This statement fit with the State's theory that the purported arsonist entered the first floor apartment from the back door and set the fire inside.

The "V" patterns observed on the exposed surfaces of the adjacent buildings were inflicted by heat from the primary fire. All the patterns show is where the fire vented from 4448 S. Hermitage -- not where the fire originated. See Exhibit F, Ogle Report, at 7.

In addition to burn patters that Mr. Burns allegedly observed, as described in Ground Number One above, Mr. Burns testified that he eliminated all accidental causes of the fire because he could not find anything electrical in the area. Yet Mr. Burns acknowledged that there was a space heater found in the apartment. Further, two of the photographs taken by the Chicago Police Department clearly depict BMX electrical cable. See Exhibit F, Ogle Report, at 2, 7-8.

Thus, the Court's finding that Mr. Burns' testimony provided "overwhelming evidence that the fire was the result of arson," was clearly erroneous. Mr. Burns provided no credible evidence that the fire was incendiary in nature. Due process forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt. Mr. Kluppelberg's conviction and continued incarceration on the arson-murder charges violates his right to Due Process under the Fifth and Fourteenth Amendments.

The Illinois Appellate Court, in dismissing this claim, made unreasonable findings of fact and unreasonably applied clearly established federal law in concluding that the State had met its burden to prove each element beyond a reasonable doubt. The Illinois Supreme Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.

**(C)    Ground #3:    Mr. Kluppelberg was denied the right to effective assistance of appellate counsel under the Sixth and Fourteenth Amendments where his appellate counsel failed to argue on direct appeal that Mr. Kluppelberg's right to due process under the Fifth and Fourteenth Amendment was violated by the State's failure to prove an element of the crime.**

<u>Supporting Facts:</u>

On appeal, Mr. Kluppelberg's appellate counsel argued that the State failed to prove an element of the arson; namely, that the fire was incendiary. Mr. Kluppelberg believes that the framing of that claim by his appellate counsel was sufficient to fairly present this constitutional issue before the State court. To the extent, however, that this Court finds that Mr. Kluppelberg's appellate counsel did not raise the State's failure to prove an element of the charge in the context of the Fifth and Fourteenth Amendment, any such failure by his counsel denied Mr. Kluppelberg his Sixth and Fourteenth Amendment right to the effective assistance of appellate counsel.

**(D)    Ground #4:    Mr. Kluppelberg was denied the right to due process under the Fifth and Fourteenth Amendments where the State knowingly used perjured testimony from Duane Glassco to secure Mr. Kluppelberg's conviction. Mr. Glassco testified that he saw Mr. Kluppelberg going into the backyard and through the back door of 4448 S. Hermitage on the night of the fire from the attic window at 1748 W. 45th Street. The State possessed aerial photographs showing that Mr. Glassco could not have seen as much because the view of 4448 S. Hermitage from 1748 W. 45th Street was blocked by the house at 4450 S. Hermitage.**

<u>Supporting Facts:</u>

At trial, the sole inculpatory testimony was given by Duane Glassco. Mr. Glassco testified that he remembered seeing Mr. Kluppelberg going back and forth between 1748 W. 45th Street, the house in which both he and Mr. Kluppelberg were living at the time of the fire, to 4448 S. Hermitage. Mr. Glassco testified that each time he saw Mr. Kluppelberg, it was from the attic window at 1748 W. 45th Street.

Mr. Glassco admitted that on the night of the fire he was high and drunk, and that it took him nearly four years (and criminal charges of his own) to come forward. Indeed, Mr. Glassco's credibility was suspect: he is a career criminal, he was a drug addict at the time, his own mother's house burned down just days before the fire at 4448 S. Hermitage, and he was the ex-boyfriend of Mr. Kluppelberg's then-girlfriend, Dawn Gramont (and

not happy about being replaced). Indeed, Mr. Glassco and Mr. Kluppelberg had a "hate relationship." See Exhibit D, Brittain Aff. ¶ 7; see also Exhibit B, Glassco Aff. ¶ 3; Exhibit C, Gramont Aff. ¶ 4.

Moreover, Mr. Glassco testified pursuant to a deal with the State. When Mr. Glassco was arrested in November 1987 for burglary and theft, he was on probation and had two prior burglary charges. Despite this criminal history, upon his plea of guilty to the burglary and theft on February 9, 1988, the judge sentenced him to probation. Even after he violated that probation, all Mr. Glassco was sentenced to was time served. Mr. Glassco avoided what could have been lengthy incarceration in the Illinois prisons by cutting a deal with the State in exchange for his testimony against Mr. Kluppelberg.

That testimony, as Mr. Glassco has recently admitted under oath, was patently false -- and the State knew it. See Exhibit B, Glassco Aff. ¶¶ 4-6, 9. Prior to Mr. Kluppelberg's trial, the State had in its possession photographs that demonstrated that Mr. Glassco could not have seen what he claimed to have saw. Specifically, as Mr. Glassco has averred, the State had aerial photographs that showed that the view from 1748 W. 45th Street of 4448 S. Hermitage was blocked by a house at 4450 S. Hermitage. See id. ¶ 9. Yet, the State nonetheless proceeded with Mr. Kluppelberg's prosecution and called Mr. Glassco to the stand to testify to statements that it knew were perjured.

The State's knowing use of Mr. Glassco's perjured testimony was a violation of Mr. Kluppelberg's rights to due process under the Fifth and Fourteenth Amendments. Because Mr. Glassco provided the only evidence that tied Mr. Kluppelberg to the fire, it is indisputable that his testimony was material to the prosecution and affected the Judge's verdict. Indeed, the court stated that whether "Mr. Glassco could have seen what he testified here today that he saw" was "critical in [her] determination of the ultimate question." Had the court known that Mr. Glassco was perjuring himself on the stand in order to strike a deal on his outstanding charges, it would have ruled otherwise.

(E)     Ground #5:     **Mr. Kluppelberg was denied the right to due process under the Fifth and Fourteenth Amendments where the State withheld evidence that conclusively refuted Duane Glassco's testimony that he could see Mr. Kluppelberg going into the backyard and to the back door of 4448 S. Hermitage on the night of the fire from the attic window at 1748 W. 45th Street. The State had in its possession aerial photographs that demonstrated that Mr. Glassco could not have seen 4448 S. Hermitage from 1748 W. 45th Street because the house at 4450 S. Hermitage blocked the view.**

Supporting Facts:
       As described in Claim Number Four above, prior to trial, the State had in its possession aerial photographs that demonstrated that Mr. Glassco could not have seen from 1748 W. 45th Street into the backyard or back door of 4448 S. Hermitage because there was a building blocking his view. Despite being highly exculpatory -- indeed,

13

crushing the State's case against Mr. Kluppelberg -- these photographs were never disclosed to defense counsel. See Exhibit H, Weinberg Aff. ¶ 7.[3]

The State's failure to disclose the aerial photographs that directly refuted Mr. Glassco's testimony constituted a violation of Mr. Kluppelberg's right to due process under the Fifth and Fourteenth Amendments. Mr. Glassco was the only evidence that tied Mr. Kluppelberg to the fire and it is indisputable that his testimony was "critical" to the court's finding Mr. Kluppelberg guilty. Had Mr. Kluppelberg had the photographs directly refuting Mr. Glassco's testimony, he could have successfully impeached Mr. Glassco and undermined the entirety of the State's case.

**(F)     Ground #6:     Mr. Kluppelberg was denied the right to effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial attorney failed to impeach Duane Glassco, the State's key witness, with witnesses and physical evidence that would have conclusively refuted Mr. Glassco's testimony that he saw Mr. Kluppelberg going into the backyard and to the back door of 4448 S. Hermitage on the night of the fire from the attic window at 1748 W. 45th Street.**

Supporting Facts:
    Alternatively, Mr. Kluppelberg was denied the right to effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial attorney failed to impeach Duane Glassco with evidence -- the aerial photographs and third party witnesses' testimony -- that would have undermined Mr. Glassco's testimony.

As described more fully in Claims Number Five and Six, Mr. Glassco testified that he saw Mr. Kluppelberg going into the backyard and back door of 4448 S. Hermitage on the night of the fire. Mr. Glassco allegedly witnessed this from the attic window at 1748 W. 45th Street.

At the start of the trial, Mr. Kluppelberg's attorney stated that Mr. Glassco could not have seen what he was going to testify to having seen because his view from the attic window was blocked by another building. Yet, Mr. Kluppelberg's attorney utterly failed to present any evidence to prove this point. There was, however, significant evidence available to him had he performed any meaningful investigation. Indeed, Mr. Kluppelberg's post-trial counsel ultimately found aerial photographs -- which the State possessed prior to trial but failed to disclose -- and independent third party witnesses that conclusively refuted Mr. Glassco's testimony. Unfortunately, by that point, facing the significant hurdle of securing a new trial, it was too late.

---

[3]     This evidence was ultimately and independently located by Mr. Kluppelberg's post-trial counsel prior to proceedings on a motion for a new trial, but by that point it was too late. The trial court found that these photographs were not new evidence but rather only impeaching of Mr. Glassco.

Mr. Kluppelberg's attorney should have located the following evidence and presented it at trial:

- Aerial photographs: Aerial photographs would have demonstrated that Mr. Glassco's purported view of 4448 S. Hermitage from 1748 W. 45th Street would have been blocked by 4450 S. Hermitage. The aerial photographs show that the building at 4448 S. Hermitage was significantly shorter in length than the building at 4450 S. Hermitage. Because the houses at 4448 S. Hermitage and 4450 S. Hermitage were over a story taller than the house at 1748 W. 45th Street, it would have been impossible to see the rear of 4448 S. Hermitage from the attic window at 1748 W. 45th Street because 4450 S. Hermitage would have blocked the view.

- Charles Petrosus: Mr. Petrosus lived at 4446 S. Hermitage (the building next door to 4448 S. Hermitage, which also burned during the fire) on the date of the fire. Mr. Petrosus spoke to the police in 1984 gave them his address and phone number and remained at that address prior to and throughout the trial. According to Mr. Petrosus, both 4446 and 4450 S. Hermitage were approximately twice as long as 4448 S. Hermitage. Mr. Petrosus explained that 4448 S. Hermitage was a short building that extended only to the middle kitchen window of the building at 4446 S. Hermitage. Mr. Petrosus additionally explained that when his uncle lived at 1748 W. 45th Street, he looked out the attic window of the cottage and could not see 4448 S. Hermitage because the house at 4450 S. Hermitage blocked the view.

- Ronald Cerevic: Mr. Cerevic lived at 1748 W. 45th Street in the 1960s. During the hearing on Mr. Kluppelberg's motion for a new trial, Mr. Cerevic testified that it was impossible to see the rear of 4448 S. Hermitage from the attic window at his old house because 4450 S. Hermitage blocked the view.

- Fire Scene: Although the lots at 4448 and 4450 S. Hermitage were empty as a result of the fire, the foundations of the building remained even five years later. At Mr. Kluppelberg's motion for a new trial, a public defender went out and took photographs of the cement foundation and also of the view from 1748 W. 45th Street. Those photographs further corroborate that it would have been impossible for Mr. Glassco to have seen 4448 S. Hermitage from the attic window at 1748 W. 45th Street because 4450 S. Hermitage would have blocked his view.

Mr. Kluppelberg's attorney's utter failure to investigate the fire scene and present evidence that would have impeached the State's key witness was outside the wide range of professionally competent legal assistance. Moreover, Mr. Kluppelberg was prejudiced

by this failure, as Mr. Glassco's testimony was the sole evidence presented tying Mr. Kluppelberg to the fire. Had Mr. Kluppelberg effectively impeached Mr. Glassco, the State's entire case would have unraveled.

The trial court, in dismissing Mr. Kluppelberg's post-trial motion for ineffective assistance of counsel and the Illinois Appellate Court, in affirming that dismissal, made unreasonable findings of fact and unreasonably applied clearly established federal law in concluding that counsel was not ineffective. The Illinois Supreme Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.

**(G)    Ground #7:    Mr. Kluppelberg was denied the right to due process under the Fifth and Fourteenth Amendments where the State withheld evidence that another woman, who confessed to setting a fire just hours before and only two blocks away from the fire at 4448 S. Hermitage, also told police that she may have set the fire at 4448 S. Hermitage.**

Supporting Facts:
    The State not only withheld evidence that would have demonstrated that Mr. Glassco lied about seeing Mr. Kluppelberg on the night of the fire, it also withheld evidence that another person had confessed. In 1984, Isabel Ramos confessed to detectives that she may have set the fire at 4448 S. Hermitage. The State never disclosed this highly exculpatory evidence: it almost certainly would have changed the outcome at trial.

    Approximately 15 hours before the fire at 4448 S. Hermitage broke out, the house at 4504 S. Hermitage burned to the ground. Much like the fire at 4448 S. Hermitage, the fire at 4504 S. Marshfield not only consumed 4504, but also badly burned the buildings adjacent to it. The parallels between the two fires are striking.

    On March 24, 1984, several hours after the fire at 4448 S. Hermitage, Chicago Police Detectives Urbon and Nelson located Isabel Ramos, a tenant at 4504 S. Marshfield. Ms. Ramos confessed to having set the fire at 4504 S. Marshfield. See Police Report, RD # 104537, attached as Exhibit I [hereinafter "Ramos Police Reports"]; "Two tragic fires; six perish, many homeless," Back of the Yards Journal, March 28, 1984, at 1 and Javier Navarro, "Who is burning these houses?," Back of the Yards Journal, March 28, at 14, attached as Group Exhibit J [hereinafter "Ramos Newspaper Articles"]. Ms. Ramos told police that she started the fire because she was angry at her landlord and at the woman who lived in the first floor apartment next door to her building. She said that she spent the next 12 or more hours wandering around to different bars on Ashland Avenue. See Exhibit I, Ramos Police Reports. At one point, Ms. Ramos went back to her apartment building and saw that it had completely burned to the ground. Ms. Ramos told police that after seeing her building burned down, she continued walking around "a lot" until she somehow ended up at her aunt's apartment at 4640 S. Marshfield, where police picked her up around 10:00 a.m. on the 24th. See id. Ms. Ramos told the police

16

that "she may have set" the fire at 4448 S. Hermitage but "[b]ecause of her intoxicated condition" she could not remember specifically having set it. See id. Ms. Ramos was convicted of arson for the 4504 S. Marshfield fire. And, as a result of her confession, in March 1984, she was very much considered a suspect in the fire at 4448 S. Hermitage. See id.; Group Exhibit J, Ramos Newspaper Articles.

Despite the highly exculpatory nature of this information -- i.e., an alternative offender -- neither Ms. Ramos' existence nor the statements that she made were ever disclosed to Mr. Kluppelberg. See Exhibit H, Weinberg Aff. ¶ 6. This failure to disclose is all the more egregious given that a number of detectives investigated both fires, including Detectives Jenkins, McKinley, Micek, Nelson, Tuider and Urbon.

The State's failure to disclose information relating to Ms. Ramos was highly prejudicial. This is particularly so given that the evidence against Mr. Kluppelberg was very weak -- it consisted of testimony by (1) Duane Glassco, a career criminal who hated Mr. Kluppelberg and only came forward nearly four years after the fire in order to get a deal on his case and (2) Francis Burns, who purportedly investigated the fire in 1984 as a training exercise for a non-operational fire division and who took no notes and made no reports regarding his investigation, yet testified five years later from his memory that the fire was an arson. Given that backdrop, if Ms. Ramos' existence and her statements to the police had been disclosed, it would have altered the outcome at trial.

**(H)   Ground #8:   Mr. Kluppelberg was denied the right to effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial attorney failed to investigate and present evidence that another woman told police that she might have set the fire at 4448 S. Hermitage.**

Supporting Facts:
   Should the State contend that it disclosed information regarding Ms. Ramos to Mr. Kluppelberg, or should this court find that Mr. Kluppelberg's attorney should have investigated and known about Ms. Ramos, then Mr. Kluppelberg's attorney's failure to present this evidence at trial is a classic case of ineffective assistance of counsel.[4] There can be no possible trial strategy in failing to present evidence of a likely, alternative offender. Moreover, as stated above, failing to present this evidence resulted in prejudice

---

[4]   It is highly unlikely that the State will assert that it disclosed the information discussed in Claim Seven relating to Ms. Ramos to Mr. Kluppelberg: Mr. Kluppelberg's attorney has no recollection of ever having been given any information relating to Ms. Ramos, Mr. Kluppelberg had no knowledge of Ms. Ramos, or the 4504 S. Marshfield fire, until informed of her existence by counsel, there is no indication in the record that evidence relating to Ms. Ramos was ever disclosed, and a recent Freedom of Information Act request for police reports relating to Mr. Kluppelberg's case revealed no reports describing conversations that were had with Ms. Ramos regarding the fire at 4448 S. Hermitage.

to Mr. Kluppelberg. At trial, Mr. Kluppelberg's defense was simply that he did not do it and that the evidence was not sufficient to prove otherwise. Testimony that there was someone else who had conceded that she may have started the fire (and was admittedly wandering around drunk and angry at the time that the 4448 S. Hermitage fire started, having already set one fire nearby shortly before) would have sufficiently bolstered Mr. Kluppelberg's claim that he was not the offender and undermined the State's theory of the case.

(I)    **Ground #9:**  **Mr. Kluppelberg was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments where his appellate counsel failed to raise trial counsel's ineffectiveness in not presenting evidence that another woman told police that she might have set the fire at 4448 S. Hermitage.**

Supporting Facts:

As explained above in Claim Number 8, should the State contend that information relating to Ms. Ramos was disclosed, then Mr. Kluppelberg's counsel was woefully ineffective for failing to present that evidence at trial. In addition, appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to present evidence relating to Ms. Ramos' confession.

(J)    **Ground #10:**  **Mr. Kluppelberg was denied the right to due process and to confront witnesses in violation of the Fifth, Sixth and Fourteenth Amendments when the trial court improperly curtailed his cross-examination of Duane Glassco.**

Supporting Facts:

Mr. Glassco's credibility was crucial to this case: He was the only witness who placed Mr. Kluppelberg at the scene of the fire. During trial, Mr. Kluppelberg's counsel tried to question Mr. Glassco about his Treatment Alternatives for Safe Communities ("TASC") sentence. (TASC is an alternative sentencing program for drug offenders.) Mr. Glassco was unsuccessfully terminated from TASC after he lied to probation officials about his attendance at TASC. In addition, Mr. Glassco had repeatedly failed drug tests during the time of his November 1987 arrest and during the leadup to the trial. See TASC Report, 87 CR 11692-93 (Nov. 30, 1988), TASC Case Manager Letter to Judge Joseph Urso, Jan. 24, 1989, attached hereto as Group Exhibit K. As a result, Mr. Glassco was thereafter charged with a violation of probation.

The fact that Mr. Glassco had lied in the past to public officials undermined his credibility and went to his reputation for truth and veracity. Additionally, this information also touched upon Mr. Glassco's bias, interest and motive to testify falsely: Mr. Glassco received a deal on his violation of probation charge in exchange for his testimony -- i.e., he knew that if he cooperated and gave the prosecutors the evidence they needed, he would effectively be discharged from any criminal responsibility for his wrongdoing. Indeed, he has even admitted that that was the very reason why he gave false testimony against Mr. Kluppelberg. See Exhibit B, Glassco Aff. ¶ 10.

The Illinois Appellate Court, in dismissing this claim, made unreasonable findings of fact and unreasonably applied clearly established federal law. The Illinois Supreme Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.

**(K)     Ground #11: Mr. Kluppelberg was denied the right to due process and to confront witnesses under the Fifth, Sixth and Fourteenth Amendments where the State court permitted the impeachment of Dawn Gramont with notes allegedly taken by an Assistant State's Attorney during her Grand Jury testimony.**

Supporting Facts:

Dawn Gramont was Mr. Kluppelberg's girlfriend at the time of the fire at 4448 S. Hermitage (although not in 1988 when he was arrested). Ms. Gramont was also Mr. Glassco's ex-girlfriend and the mother of three of his children. Prior to the fire, Ms. Gramont had kicked Mr. Glassco out of her home and Mr. Kluppelberg had moved in and was living with Ms. Gramont. But when the house in which Mr. Glassco was then living burned down, Ms. Gramont allowed Mr. Glassco to move into the attic until he could get back on his feet. This, understandably, created a tense environment.

Four years later, in 1988, after the police spoke with Mr. Glassco and Mr. Kluppelberg, Ms. Gramont was taken to the police station and then detained until she went before the Grand Jury. By this time, Ms. Gramont and Mr. Kluppelberg had broken up. Ms. Gramont told the police officers that Mr. Kluppelberg could not have started the fire because he was with her that night. Police challenged her and told her that she had to inculpate Mr. Kluppelberg. When Ms. Gramont would not agree to go along with the officers' fabricated story, one of the detectives pushed her head against the door, and hit her with a flashlight. They also threatened to hurt her children. The officers then told her what they wanted her to say -- i.e., what Mr. Glassco had told them. Because she was scared, Ms. Gramont parroted back the officers' fabricated story to the States Attorney and to the Grand Jury. See Exhibit C, Gramont Aff. ¶ 10.

After she finished her testimony and was released from custody, Ms. Gramont immediately called the Office of Professional Standards ("OPS") to report what had happened. About a week later, she gave a statement to OPS attesting to the same. See C.R. #159563, Statement of Dawn Gramont, attached hereto as Exhibit L.

At trial, with the threats behind her, Ms. Gramont gave truthful testimony regarding the night of the fire. Ms. Gramont testified that Mr. Kluppelberg had nothing to do with the fire and was with her that night. Surprised at her testimony, the State's Attorney tried to impeach Ms. Gramont with her Grand Jury testimony. But the transcript of that testimony had burned in an unrelated fire at the court reporter's house so instead of using the transcript, the State's Attorney impeached Ms. Gramont with, apparently, notes of a State's Attorney who purportedly had conducted the Grand Jury.

The latter State's Attorney was never called to testify in Mr. Kluppelberg's trial as to Ms. Gramont's Grand Jury testimony. Particularly where Ms. Gramont denied and/or could not recall having made certain statements before the Grand Jury, the State's Attorney's impeachment and the court's allowance of that impeachment was undoubtedly improper.

The Illinois Appellate Court, in dismissing this claim, made unreasonable findings of fact and unreasonably applied clearly established federal law. The Illinois Supreme Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.

(L)     Ground #12: **Mr. Kluppelberg was denied the effective assistance of appellate counsel where his appellate counsel failed to argue on direct appeal that Mr. Kluppelberg's right to due process and to confront witnesses under the Fifth, Sixth and Fourteenth Amendments was violated by the improper impeachment of Dawn Gramont.**

Supporting Facts:

On appeal, Mr. Kluppelberg's appellate counsel argued that the State improperly impeached Dawn Gramont and made insinuations regarding her Grand Jury testimony without proof of the matter. Mr. Kluppelberg believes that the framing of that claim by his appellate counsel was sufficient to fairly present this constitutional issue before the State court. To the extent, however, that this Court finds that Mr. Kluppelberg's appellate counsel did not raise the denial of Mr. Kluppelberg's rights to a fair trial in the context of the Fifth and Fourteenth Amendments, any such failure by his counsel denied Mr. Kluppelberg his Sixth and Fourteenth Amendment right to the effective assistance of appellate counsel.

(M)     Ground #13: **Mr. Kluppelberg was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments when his defense counsel failed to properly object to the State's impeachment of Dawn Gramont with alleged notes taken by an absent third-party of Ms. Gramont's testimony.**

Supporting Facts:

When the State called Dawn Gramont as a witness against Mr. Kluppelberg it erroneously believed that her testimony would support Mr. Glassco's story. Instead, Ms. Gramont began telling the truth on the stand, as described above, that she and Mr. Kluppelberg were together the night of Mar. 24, 1984 and that she never saw him go anywhere near 4448 S. Hermitage. In an attempt to recover, the State then began impeaching Ms. Gramont by asking her questions about her Grand Jury testimony.

Mr. Kluppelberg's attorney objected to the form of the State's questions, and the Court briefly recessed to consider counsel's objection. In chambers, it became clear that the State did not have the Grand Jury transcript -- a fact neither the Court nor Mr. Kluppelberg's attorney had previously known. Because the Grand Jury court reporter's

notes had burned in an unrelated fire, no transcript existed. Although not entirely clear, the prosecutor explained that another State's Attorney had been at the Grand Jury a year and a half earlier and suggested that he was relying on that State's Attorney's notes of the proceedings for his impeachment.

Despite the fact that this method of impeachment was highly improper, Mr. Kluppelberg's attorney failed to object to it. Nor did Mr. Kluppelberg's attorney demand that the State turn over the purported notes or that the State call the State's Attorney in question to the stand.

Ms. Gramont's trial testimony was damning to the State's case because she directly contradicted each element of Duane Glassco's story. That Mr. Kluppelberg's counsel failed to properly curtail her impeachment was highly prejudicial to Mr. Kluppelberg. Indeed, in rendering its verdict, the Court stated that it chose to believe Mr. Glassco's trial testimony over that of Ms. Gramont because it found Ms. Gramont's Grand Jury testimony -- admitted to the court only in the form of the improper impeachment -- closer to the truth. Failure of Mr. Kluppelberg's attorney to properly object to the impeachment made an indisputable difference in the outcome at trial.

The court, in dismissing Mr. Kluppelberg's post-conviction claim of ineffective assistance of counsel, made unreasonable findings of fact and unreasonably applied clearly established federal law.

**(N)      Ground #14:  Mr. Kluppelberg was denied the right to effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial attorney failed to meaningfully communicate with him in preparation for his defense.**

Supporting Facts:
        The cornerstone of the constitutional right to effective assistance of counsel is meaningful discussion regarding the facts and realities of one's case. Here, Mr. Kluppelberg was facing the death penalty for serious charges: he was indicted on twelve counts of murder, six counts of felony murder, three counts of arson and seven counts of attempted murder stemming from the 1984 fire at 4448 S. Hermitage. Despite the seriousness of these charges, Mr. Kluppelberg's attorney never met privately with him before the trial so that they could discuss the case, as averred in Mr. Kluppelberg's post-conviction petition. The only times that trial counsel talked with Mr. Kluppelberg were when counsel visited him in the holding room, or "bull pen," behind the courtroom or when Mr. Kluppelberg called his trial counsel on the monitored phones from Cook County Jail. At least five to fifteen other people were present in the bull pen during each of counsel's visits, which never lasted more than a few minutes. Mr. Kluppelberg never saw his attorney take notes, or write anything down during their conversations. His attorney never discussed his trial strategy or what evidence he planned to present in Mr. Kluppelberg's defense.

Trial counsel's limited contact and consultation with Mr. Kluppelberg in such a serious case constituted inadequate representation. Had counsel consulted with Mr. Kluppelberg in a meaningful and private manner, he would have learned the substance of Mr. Kluppelberg's testimony, which greatly contradicted the version of events that was given by the State's only (and thereby star) occurrence witness, Duane Glassco. In addition, trial counsel's failure to adequately consult with Mr. Kluppelberg affected counsel's overall performance at trial: e.g., his failure to impeach the State's arson expert and to impeach Mr. Glassco with readily available documentary evidence and independent third party witnesses.

The court, in dismissing Mr. Kluppelberg's post-conviction claim of ineffective assistance of counsel, made unreasonable findings of fact and unreasonably applied clearly established federal law in concluding that the failure to consult with Mr. Kluppelberg was not prejudicial. The Illinois Appellate Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.

**(O)     Ground #15:  Mr. Kluppelberg was denied the right to testify and to the effective assistance of counsel in violation of the Fifth, Sixth and Fourteenth Amendments where his attorney refused to allow him to testify in his own defense.**

Supporting Facts:
In his post-conviction petition, Mr. Kluppelberg alleged that he was denied his constitutional right to testify. As stated in his affidavit, Mr. Kluppelberg repeatedly informed his counsel that he wished to testify on his own behalf, but counsel told him that he could not take the stand. Indeed, even after the trial had begun, Mr. Kluppelberg continued to press upon his attorney to let him testify: On July 14, 1989, after Mr. Glassco testified, Mr. Kluppelberg begged trial counsel to let him take the stand because Mr. Glassco had lied; once again, trial counsel told him he could not take the stand, "end of subject."

Had Mr. Kluppelberg testified, he would have corroborated Ms. Gramont's account of that evening and directly refuted Mr. Glassco's testimony, on which the court relied when it found Mr. Kluppelberg guilty. In addition, Mr. Kluppelberg could have explained further Mr. Glassco's bias: that he was a drug addict trying to avoid prison time and that he was angry with Mr. Kluppelberg because he believed that Mr. Kluppelberg had stolen his girlfriend and the mother of his children, Dawn Gramont.

The court, in dismissing Mr. Kluppelberg's post-conviction claim of the denial or the right to testify and ineffective assistance of counsel, made unreasonable findings of fact and unreasonably applied clearly established federal law. The Illinois Appellate Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.

**(P)     Ground #16:  Mr. Kluppelberg was denied the right to a jury trial in violation of the Sixth and Fourteenth Amendments.**

Supporting Facts:

      The right to a trial by jury is guaranteed by the Sixth Amendment, and only a defendant can decide whether to waive this right.  In his post-conviction petition, Mr. Kluppelberg attached an affidavit averring that he repeatedly informed his trial attorney that he wanted a jury trial but was told that he was not going to get a jury trial because there was no need for one despite the fact that Mr. Kluppelberg was facing the death penalty.  Indeed, on the eve of trial, counsel told him to sign a jury waiver.  When Mr. Kluppelberg protested, his attorney told him that "he was not going to pick a jury[,] that he was my attorney and I should trust him.  He told me to sign the jury waiver and keep my mouth shut in court.  He said it was either his way or he was going to withdraw from my case."  Out of fear of losing his attorney and being placed in the hands of someone who knew even less about his case (if that was even possible), on the eve of his capital trial, Mr. Kluppelberg signed the jury waiver.

      The court, in dismissing Mr. Kluppelberg's post-conviction claim of the denial of his right to a jury trial made unreasonable findings of fact and unreasonably applied clearly established federal law.  The Illinois Appellate Court likewise made unreasonable findings of fact and unreasonably applied clearly established federal law in affirming the dismissal of this claim.

**(Q)     Ground #17:  Mr. Kluppelberg was denied the right to due process under the Fifth and Fourteenth where all of the errors above cumulatively denied him the right to a fair trial.**

Supporting Facts:

      All of the facts described to support grounds one through sixteen above, even if individually insufficient to support a finding of a violation of Mr. Kluppelberg's constitutional rights, collectively demonstrate that Mr. Kluppelberg's trial was fundamentally unfair.

**(R)     Ground #18:  Mr. Kluppelberg was denied the right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the extent that his appellate counsel failed to argue on appeal that the trial court's numerous errors, described in Grounds One through Sixteen above, cumulatively denied Mr. Kluppelberg his Fifth and Fourteenth Amendment right to a fair trial.**

Supporting facts:

      As described in Grounds One through Sixteen above, Mr. Kluppelberg's counsel on appeal raised numerous errors by the trial court.  Mr. Kluppelberg's appellate counsel,

however, did not argue that these errors cumulatively denied Mr. Kluppelberg his Fifth and Fourteenth Amendment right to a fair trial. This failure denied Mr. Kluppelberg his Sixth and Fourteenth Amendment right to the effective assistance of counsel.

**(S)     Ground #19: Mr. Kluppelberg is actually innocent of the crime for which he was convicted such that failure of this Court to review his claims would result in a fundamental miscarriage of justice.**

Supporting Facts:

      As is set forth above, Mr. Kluppelberg is actually innocent of the arson and murders for which he was convicted. Mr. Kluppelberg has steadfastly maintained his innocence and as set forth in the Grounds above, has recently acquired new evidence to further prove that his conviction was an egregious injustice. That new evidence includes the recantation of Duane Glassco (corroborated by the affidavits of Dawn Gramont and Michelle Brittain), evidence relating to Isabel Ramos, a woman who confessed that she may have started the fire, and an expert report from Dr. Russell Ogle, which opined that there was no physical evidence indicating that this was an incendiary fire. As such, this Court's failure to review Mr. Kluppelberg's claims would result in a fundamental miscarriage of justice.

2.    Have all grounds raised in this petition been presented to the highest court having jurisdiction?
      YES ( )    NO ( X )

3.    If you answered **"NO"** to question (2), state briefly what grounds were not so presented and why not:

Grounds Two and Three: Grounds Two and Three relate to the State's failure to present evidence of an element of the arson charge. Ground Two was presented to the Illinois Supreme Court. To the extent, however, that this Court believes that Ground Two was not fairly presented as a constitutional question, the failure to do so was because of ineffective assistance of appellate counsel, as set forth in Ground Three.

Grounds Four and Five: Grounds Four and Five relate to the State's knowing use of perjured testimony and the State's failure to disclose aerial photographs that would have proven that Mr. Glassco was perjuring himself. Neither claim was presented to the highest court having jurisdiction.

The basis for both of these claims is the affidavit of Duane Glassco. Despite repeated attempts to talk with Mr. Glassco, Mr. Glassco only recently agreed to speak with anyone involved in Mr. Kluppelberg's defense. Then, in May 2008, Mr. Glassco recanted his trial testimony. In doing so, Mr. Glassco not only admitted that he did not and could not have seen Mr. Kluppelberg going back and forth from 1748 W. 45th Street to 4448 S. Hermitage, but also explained that the State knew that Mr. Glassco's testimony was a lie. Specifically, Mr. Glassco averred that prior to trial the State had in its possession aerial photographs that demonstrated that Mr. Glassco could not have seen from the attic

24

window at 1748 W. 45th Street to 4448 S. Hermitage.

The State's failure to disclose its knowledge that Mr. Glassco's testimony was perjured and to turn over the exculpatory, aerial photographs in its possession is cause for Mr. Kluppelberg's failure to raise these claims below. In addition, Mr. Kluppelberg could not have raised these claims earlier because Mr. Glassco only recanted his testimony in May 2008.

Ground Seven: Ground Seven relates to the State's withholding of exculpatory evidence; namely, evidence that Isabel Ramos confessed to having possibly set the fire at 4448 S. Hermitage. This claim was not presented to the State's highest court because Mr. Kluppelberg only recently learned of Ms. Ramos' existence (in April 2008); the State never disclosed this information to Mr. Kluppelberg.

Specifically, The Exoneration Project began representing Mr. Kluppelberg in January 2008. The Exoneration Project is a non-profit organization that represents prisoners asserting claims of actual innocence in state and federal court. The Exoneration Project operates a legal clinic in conjunction with the University of Chicago Law School. At the advice of Mr. Glassco, one of the law students working on Mr. Kluppelberg's case reviewed coverage of the fire at 4448 S. Hermitage in the Back of the Yards Journal. In doing so, the law student uncovered information relating to Ms. Ramos. The law student then looked up the arson for which Ms. Ramos was convicted, which is where she uncovered the police report in which Ms. Ramos' confession is memorialized.

The State's failure to disclose information it had in its possession relating to Ms. Ramos is cause for Mr. Kluppelberg's failure to raise these claims below.

Grounds Eight and Nine: Grounds Eight and Nine relate to Mr. Kluppelberg's trial attorney's failure to investigate and present evidence of Ms. Ramos at trial. Grounds Eight and Nine were not raised below because, as set forth above, Mr. Kluppelberg only became aware of these claims in April 2008 after a search by a law student of old newspapers and an old case file. Although Mr. Kluppelberg believes that this claim is more properly asserted as a violation of his due process under Brady v. Maryland, 373 U.S. 83 (1963), Mr. Kluppelberg has raised Grounds Eight and Nine in the alternative should the State contend that it disclosed information regarding Ms. Ramos to Mr. Kluppelberg, or should this court find that Mr. Kluppelberg's attorney should have investigated and known about Ms. Ramos.

Grounds Eleven and Twelve: Grounds Eleven and Twelve relate to the State's improper impeachment of Dawn Gramont. Ground Eleven was presented to the Illinois Supreme Court. To the extent, however, that this Court believes that Ground Eleven was not fairly presented as a constitutional question, the failure to do so was because of ineffective assistance of appellate counsel, as set forth in Ground Twelve.

Ground Thirteen: Ground Thirteen, which relates to Mr. Kluppelberg's trial counsel's ineffective assistance for failing to object to the improper impeachment of Dawn

Gramont, was not raised to the highest court having jurisdiction. This was due to post-conviction counsel's error.

Grounds Fourteen through Sixteen: Grounds Fourteen through Sixteen, which relate to Mr. Kluppelberg's denial of the right to effective assistance of counsel because his counsel failed to communicate, denial of the right to testify and denial of the right to a jury trial, were not raised to the highest court of the State. The failure to have done so was error of post-conviction counsel.

Grounds Seventeen and Eighteen: Although the separate issues comprising the general claim in Ground Seventeen were primarily raised before the highest court having jurisdiction, this Ground was not raised as a cumulative due process claim. This was due to ineffective assistance of appellate counsel and post-conviction counsel's error, as set forth in Ground Eighteen.

Ground Nineteen: Although many of the separate issues comprising the general claim in Ground Nineteen were raised before the highest court having jurisdiction, this ground was not raised in the specific format asserted here. In part, this failure is due to the fact that evidence demonstrating Mr. Kluppelberg's innocence was suppressed by the State or only recently acquired through no fault of Mr. Kluppelberg -- e.g., Mr. Glassco's recantation.

## PART IV – REPRESENTATION
Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing:
Marshall Weinberg
1021 West Adams, Suite 102
Chicago, IL 60607-2935

(B) At arraignment and plea:
Marshall Weinberg
1021 West Adams, Suite 102
Chicago, IL 60607-2935

(C) At trial:
Marshall Weinberg
1021 West Adams, Suite 102
Chicago, IL 60607-2935

(D) At post-trial motions and sentencing:
George Grzeca
Cook County Public Defender
2650 S. California, 8th Floor

Chicago, IL 60608-5146

Gregory W. O'Reilly
Cook County Public Defender
69 W. Washington, Ste. 16000
Chicago, IL 60602-3134

(E)   On appeal (direct appeal and PLA):
      Mary Arundel DuChatellier
      Cook County Public Defender
      16501 Kedzie Avenue
      Markham, IL 60428-5509

(F)   In any post-conviction proceeding:
      Iraj Jerry Namini (first supplemental petition)
      Cook County Public Defender
      2650 S California 7th Floor
      Chicago, IL 60608-5146

      Elyse Miller (second supplemental petition)
      Cook County Public Defender
      69 W. Washington St. 16th Floor
      Chicago, IL 60602-3162

      Deborah Isreal (first and second appeal)
      Currently not registered to practice law but at the time was working for the Office
      of the State Appellate Defender

      Barbara Kamm (post-conviction PLA)
      Office of The State Appellate
      203 North LaSalle, Suite 24FL
      Chicago, IL 60601-1267

(G)   Other (state): N/A

## PART V – FUTURE SENTENCE
Do you have any future sentence to serve following the sentence imposed by this
conviction?
YES ( )   NO ( X )

Name and location of the court which imposed the sentence:

Date and length of sentence to be served in the future

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: ___6/2/08___
　　　　　　(Date)

_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_____
(Signature of petitioner)

___N50230___
(I.D. Number)

___STATEVILLE C.C.___
(Address)

Revised: 7/20/05

ADDITIONAL VICTIMS:

Progress Report #1

Death Investigation/Fire - Real Property

LUPERCIO, Elva F/WH, age 28 yrs., 4448 S. Hermitage 2nd fl., phone unknown. Found by fire fighters 2nd fl. rear bedroom, pronounced Dead at Mercy Hospital at 0810 hrs. by Dr. SMITH.

LUPERCIO, Santos Jr. M/WH, age 9-10 yrs., 4448 S. Hermitage 2nd fl., phone unknown. His body was found by fire fighters in the 2nd floor bedroom. Pronounced Dead at Mercy Hospital at 0810 hrs., by Dr. SMITH.

LUPERCIO, SONIA F/WH, age 8 yrs., 4448 S. Hermitage 2nd fl., phone unknown. Her body was found in 2nd floor rear bedroom by fire fighters. Pronounced Dead at Mercy Hospital at 0810 hrs., by Dr. SMITH.

VICTIM NAME: LUPERCIO, Santos M/WH

STAR NO. 11828 DATE 25 Mar 84

EXHIBIT

A

060001

Page #2

ADDITIONAL VICTIMS Con't:

LUPERCIO, Crisabel F/WH, age 6 yrs., 4448 S. Hermitage 2nd fl., phone unknown. Her body wa found in the 2nd floor front bedroom by fire fighters. She was pronounced Dead at Mercy Ho at 0915 hrs., by Dr. Smith.

LUPERCIO, Anabel F/WH, age 3 yrs., 4448 S. Her 2nd fl., phone unknown. Her body was found in 2nd floor front bedroom by fire fighters. She pronounced Dead at Mercy Hospital at 0915 hrs. Dr. SMITH.

LUPERCIO, Yadira F/WH, age 4 yrs., 4448 S. Her 2nd fl., phone unknown. Her body was found in debris by fire fighters. She was pronounced De at 1130 hrs. by Dr. SMITH at Mercy Hospital.

VICTIM:



LUPERCIO, Santos M/WH, age 31, DOB 9 Apr. 52, 4 S. Hermitage, 2nd fl., phone unknown. Suffered burns to the back and a skull fracture, when he jumped or fell from the second floor window. H hospitalized in Critical condition at Holy Cros hospital.

DATE & TIME OF OCCURRENCE:

24 Mar. 84 at 0408 hrs.

DATE & TIME OF ASSIGNMENT:

24 Mar. 84 at 0430 hrs.

DATE & TIME OF ARRIVAL:

24 Mar. 84 at 0500 hrs.

BUILDING OWNER:

Unknown at this time

VICTIM TO BE INTERVIEWED:

DNA

INCIDENT:

Death Investigation - a 3 story frame building, occupied, located at 4448 S. Hermitage, ignited an unknown manner. Fire consumed the entire structure, causing the building to collapse. S persons died in the fire when they were unable escape. Their bodies were recovered by fire f ers after the fire had been extinguished.



CAUSE & ORIGIN:

Because of the complete burning and collapse of building able to conduct Cause & Origin examination as of this report.

DAMAGE:

Extensive - the complete structure collapsed, le only a pile of charred wood.

MOTIVE:

Unknown

.Death Investigation/4448 S. Hermitage                        RD #F 105-510

Page #3

WITNESSES:                           None found as of this report

WITNESSES TO BE INTERVIEWED:         DNA

OTHER PERSONS INTERVIEWED:           ALFARO, Leonardo B. M/WH DOB 2 Sep. 57, age 27 yr.
                                     4450 S. Hermitage 1st fl., 376-6995. Temporary
                                     shelter provided for him and 5 other members of h
                                     family by the Red Cross & the Dept. of Human Serv

                                     PENA, Guadulupe J. M/WH, age 51 yrs., DOB 12 Dec.
                                     4450 S. Hermitage 2nd fl., 376-5827. Temporary
                                     shelter provided to him and 11 other members of h
                                     family, by the REd Cross & Dept. of Human Services

                                     PETROSUS, Charles M/W, age 74 yrs., 4446 S. Hermit
                                     1st fl., 247-1462. Temporary address is unknown

FIRE DEPARTMENT 1st NOTIFIED BY:     HARAST, Frank M/W, age 21 yrs., 4452 S. Hermitage,
                                     523-4964

EXAMINATION GAS & ELEC OUTLETS:      DNA

SMOKE DETECTORS:                     Unknown        BOMB-ARSON

SPRINKLER SYSTEMS:                   DNA

INSURANCE INFORMATION:               Unknown at this time

WEATHER & LIGHTING:                  Mild & clear / Good artificial lighting supplied b
                                     streetlights.

EVIDENCE:                            E.I. #5696, approximately 10 color photos of the
                                     fire scene.

PERSONNEL ASSIGNED:                  Offs BARANSKI #5557 & McGUIRE #11973, beat 913
                                     Det. JENKINS #11828, B&A, beat 5812
                                     Det. GALL #12737, beat 5805, B&A
                                     Det. NELSON #16164 B&A, beat 5814
                                     Exp. Tech. ROHL #8856, beat 5802, B&A
                                     Det. TUIDER #5648, beat 8316
                                     Det. McKINLEY #12931, beat 8316

FIRE OFFICIAL IN CHARGE:             Deputy Fire Comm.      ALTMAN

NOTIFICATIONS:                       DNA

CUSTODY:                             DNA

.RESTING OFFICERS:                   DNA

Detective Division
Death Investigation/4448 S. Hermitage

25 Mar. 84
RD #F 105-510



BOMB-ARSON
CAUSE & ORIGIN   Page #4

000004

DATE, TIME, LOCATION OF ARREST:                    DNA

CHARGES:                                            DNA

COURT BRANCH & DATE:                                DNA

WANTED FOR QUESTIONS:                SHIELDS, Richard M/W age 13 yrs., 4329 S. Hermita
                                     3rd fl., 5'6", 100' Lt complexion, light brown ha

PRIOR FIRE HISTORY:                  No prior history

INVESTIGATION:                       Reporting detective assigned to a Death Investiga
                                     at a fire, located at 4448 S. Hermitage. Upon
                                     arrival observed that the building located at
that address had collapsed from the volume of fire. The fire had communicated to the build-
ings immediately adjacent on both sides. Neighbors interviewed indicated that when they fir
became aware of the fire, the building was already fully involved in flames. Because this
detective was unable to enter the building to conduct a Cause & Origin examination, color
photos of the exterior were taken. Beat officers interviewed at the scene stated in summary
that they recieved the radio assignment of a "Fire at 4448 S. Hermitage at 0408 hrs. They w
only a few blocks away and arrived on the scene at approximately 0409 hrs. When they arriva
the building was fully involved in flames and they observed the victim jump or fall from the
second floor window. They began giving assistance and help evacuate the familys from the
building immediately adjacent on both sides. They summoned an ambulance and sent the victim
Holy Cross hospital.

                                     Charles PETROSUS M/W, next door neighbor, was
interviewed and stated in summary that when he awaken, he could see bright red flames burnir
from the building immediately to the South. At about the same time, police wereknocking on
door informing him to exit the building. He dresses and exited the building along with othe
neighborhood residents. He could add nothing more to this investigation.

                                     Frank HARAST M/W was interviewed and stated in
summary that he was coming home from visiting friends when he first observed flames and smok
coming from the building. He entered his apartment and called the fire department. He did
not see anyone on the street at the time he first discovered the fire.

                                     While at the scene, a citizen informed the police
that while watching the fire, she overheard a M/W youth, inform his mother that he and a fri
had set this fire and the one earlier. The citizen further stated that at that time the mot
struck the youth in the chest and told him not to say anything more. The youth was later
identified as Richard SHIELDS M/W age 13 yrs., 4329 S. Hermitage 3rd floor. SHIELDS was lat
interviewed by this detective and Det. NELSON in the 009th District. SHIELDS stated in sum
that he was re-calling a television news items where the reporter stated that a woman was se
running thru the yard carrying a gasoline can just after a fire occurred the previous day
rshfield. He stated that he was saying that perhaps the woman who started that fire, may
ave also started this fire. His mother told him to shut-up because the woman may be standi
in the crowd. He denied any knowledge or involvments in any fire. His mother, Mrs. SHIELDS
was interviewed seperatly and stated that when they heard the fire engines, she and her fami

Page #5

INVESTIGATION Con't:

Reporting detective , went to Holy Cross hospita in an attempt to interview the victim, Santos LUPERCIO M/WH, but was informed that he was in critical condition, suffering from a skull fracture and burns to his back, and that he was unavailable for interview. It was learned, however, that he informed the doctors that he w awaken by his children screaming. He saw fire burning and he fall from the second floor window while trying to open it. The bodies of his wife and children were recovered by fire fighters after the flames had been extinguished. The bodies of his wife, Elva, his son San Jr. and daughter Sonia were found in the rear bedroom by fire fighters. The bodies of his daughters Crisabel & Anabel were found in the front bedroom, and the body of his daughter Yadira was found in the debris. All were transported to Mercy hospital where they were pronounced Dead by Dr. SMITH There were no other known injuries reported as of this report Residents from 4446 & 4450 S. Hermitage, were provided temporary shelter by the Red Cross and the Department of Human Services. No temporary addresses at this time. No further investigatives leads at this time, request this incident be reassigned to another Watch for further investigation.

Det. Geo. JENKINS #118
Bomb & Arson , Section

Approving Supervisor

SUPPLEMENTARY REPORT — TEMP.
PROPERTY/BUREAU OF INVESTIGATIVE SERVICES ONLY

F.I. 1 0 5 5 5 1 0

**BOMB-ARSON**

PROGRESS REPORT

24 Mar 84, 0409 hrs.

24 Mar 84, 0730 hrs.

24 Mar 84, 0800 hrs.

VICTIM: **PERMANENT RETENTION FILE**

**RECORD COPY**

NARRATIVE (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

DATE & TIME OF OCCURRENCE:

DATE & TIME OF ASSIGNMENT:

DATE & TIME OF ARRIVAL:

Admitted to _____ Hosp. with head and back injuries. ___ S Hermitage

_____ Hosp. D.O.A. Mercy Hospital. ___ S Hermitage

ADDITIONAL VICTIMS:

LUPERCIO, Elva F/WH/30yrs. DOB

LUPERCIO, Anabel F/WH. yrs. DOA Mercy Hosp.
LUPERCIO, Yadria F/MH. yrs. DOA Mercy Hosp.
LUPERCIO, CRISABEL F/WH. yrs. S Hermitage,
LUPERCIO, Sonia F/WH. yrs. DOA Mercy Hosp.
LUPERCIO, Santos Jr. M/WH. yrs. S Hermitage,

Hospital for smoke inhalation and released, relocated to 44 S Wood,

treated and released

treated for smoke inhalation at H sp. and released.

Photographs, Debris from first floor flooring in rear. E.I. 5667 Inv.079954

EVIDENCE:

PREPARED BY — SIGNATURE

APPROVED BY — SIGNATURE

STAR NO. 792   DATE 30 Mar 84

060606

26 Mar 84
RD F105510

BOMB & ARSON UNIT
DEATH INVESTIGATION/44█ █ S Hermitage

**BUILDING OWNER:**  ████████ M/WK/age unknown,
address ████

**INCIDENT:** Death Investigation - 44█ █ S Hermitage, a three story frame building, ██ and ██ floors occupied, 1st vacant, ignited in an unknown manner, fire caused the deaths of a mother and her five children, all found in the rubble from the building.

**CAUSE AND ORIGIN:** Due to the extensive burning and the collapse of the building, the cause and the origin of the fire could not be determined. What is known from witness's accounts of the fire, is that the fire originated in the rear of of the building, 1st floor or basement. Examination of the basement in the rear indi= cate that the fire did not originate in the basement since the burning is less than the rest of the building. There was low burning in much of the rear of the building, to the floor of the first floor apartment in the rear which can be accounted for from the falling, burning portions of the building. There is no indications of an extremely hot fire since no beading to the copper wiring in the building was found. Suspicious burn patterns were found in the adjacent building located to the south. These were later dismissed when it was learned from an occupant that the building did not ignite until the fire communicated from 44█ S. Hermitage.

EXTENSIVE - entire building consumed.

**DAMAGE:**

**WITNESSES:**  F/WH/ █ yrs.
M/WH/ █ yrs.

**PERSONNEL ASSIGNED:** Reporting detective, Kenneth Urbon #14261 and Det. Dennis GUEST #10600, Bomb & Arson. Detectives L. TUIDER 5648, McKINLEY #12931 Area #3 Violent Crimes. Dets. M. Gavin#16720 Bomb & Arson.

**INVESTIGATION:** Reporting detective was assigned to fire at 44█ S Hermitage where six deaths occurred By Sgt. Olivieri of the 2nd watch.

When reporting detective and Detective Dennis Guest arrived on the scene on 24 Mar 84, the debris was being searched for the missing body of one of the victims. Later, after the body was located, the scene was examined in an attempt to determine the cause and origin.

SgTEO.

060007

PERMANENT RETENTION FILE

BOMB-ARSON
CAUSE & ORIGIN

BOMB-ARSON
RECORD COPY

26 Mar 84
RD F105510

BOMB & ARSON UNIT
DEATH INVESTIGATION/44▇ S Hermitage

INVESTIGATION (cont.):

Due to the extensive damage and burning
the cause and origin could not be deter-

mined. **RECORD COPY**

who resided in the building.

Interviews were later made to the survivors

**PERMANENT RETENTION FILE**

▇▇, the resident of the ▇▇▇

▇▇▇ apartment and the ▇▇ of the deceased children, was interviewed in
Hospital by Det. Martin GAVIN, Bomb & Arson, and in summary he related that his
▇▇▇ awakened him and informed him of the fire. ▇▇ them went to the rear of the
building and observed a large amount of flame coming from ground level and he saw that
escape from the rear door was not possible due to the heat. He stated that he went to
the south window over the gangway and attempted to kick out the window and while doing
so, fell out the window. ▇▇ stated that he did not see anyone in the area at
that time. He stated that the first floor apartment was vacant and that there was no
accumulated garbage in the apartment. He stated that children in the neighborhood
would sneak into the apartment at times. ▇▇ stated that there were no
electrical problems in the building. He has not had any problems with anyone in the
neighborhood.

▇▇▇ 44▇ S Hermitage, ▇▇▇
was later located and interviewed and in summary stated that she and her ▇▇▇
were awakened by someone outside shouting "fire", and at that time she observed that
the fire was in the rear, shooting out the rear door, possibly emanating from the
first floor er the basement. She and her husband, ▇▇, then awakened the children
and escaped out the front door. She stated that shortly after the entire building
appeared to be ablaze and at that time ▇▇▇ of the ▇▇▇ 11 out the
window over the gangway. ▇▇▇ stated that the first floor was vacant
and that the doors to the apartment were not secure. She and her husband have not
had any problems with anyone in the neighborhood.

▇▇▇, the resident of the ▇▇
▇▇ apartment at 44▇ S Hermitage, was interviewed and in summary stated that he
was awakened by the heat and smoke from the burning building and then awakened his
family and they escaped out the rear door of his apartment. He stated that when they
first fled he observed the fire was in the rear of 44▇ Hermitage and that flames
were shooting out the basement windows and the first floor apartment in the rear.
His building was not affected at that time, the fire later communicated after he
had made two trips into his apartment to remove belongings.

Lt. ENNIS, CFD, Truck 33, was interviewed
and in summary stated that Truck 33 was the first unit on the scene. He said that before
they left the firehouse located at 43rd & Ashland, they observed the flames from the fire
in the sky. Before the first truck stopped, a 2-11 alarm was called. Lt. ENNIS
stated that the entire rear end of the building was involved. He went into the
living room of the first floor apartment and at that time observed a fireball in the
kitchen rolling toward the front of the house and then he exited out the front.
Lt. ENNIS stated that he then learned that a mother and five children were trapped
in the ▇▇▇ floor apartment and he attempted to climb the front stairs but was
stopped before he got a fourth of the way up the stairs. The rest of the building
then became involved in fire and collapsed.

**BOMB-ARSON** Sgt. O. **BOMB-ARSON**

CAUSE & ORIGIN

069008

Page 4

24 Mar 84
RD F105510

BOMB & ARSON UNIT
DEATH INVESTIGATION/44███S Hermitage

## PERMANENT RETENTION FILE

INVESTIGATION (CONT.):                    ████████████ and
                        who resides at ██████████████ was interviewed
and in summary stated that the first floor apartment had been vacant for some months
but had been cleaned up and there was nothing in the rear of the apartment. He stated
that he never had any problems with the tenants. He knows of no problems that anyone
in the building was having and he does not know of any reason why anyone would want to
set fire to the building.

                        This is an ongoing investigation.

# RECORD COPY

_Kenneth Urbon_
Det. Kenneth Urbon #14261

APPROVED ___Sgt. O.___

BOMB-ARSON

BOMB -ARSON
CAUSE & ORIGIN

105510

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was sensed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nicknames, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, racename, age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
## CHICAGO POLICE

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| | 4. DATE OF ORIG. OCCURRENCE—TIME |
|---|---|
| | DAY MO. YR. |
| | 24 Ma— 84 0408 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE | VERIFIED □ CORRECTED | SEAT OF OCCUR. |
|---|---|---|---|---|
| Death Investigation | 0910 | 4448 S Hermitage Ave | | 913 |

| I. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT □1 YES □2 NO | IF NO, CORRECT ALL VICTIM INFORMATION BOXES 20 THROUGH 27. | 5. FIRE RELATED □1 YES □2 NO | 7. BEAT./UNIT ASSIGNED |
|---|---|---|---|---|
| See Narrative | | | | 632 |

| 3. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 8. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Residence, 2 floor apartment | 0290 | 91x | |

CLOSED
AREA 3
VIOLENT CRIME

| 20. NAME (LAST—FIRST—M.I.) | 21. UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. REL. |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMP |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |

| 80. NARRATIVE | | |
|---|---|---|

Coroners Case#

DECEASED: #525 #1. LUPERCIO, Elva F/WH 28 years old, 4448 S Hermitage, 2 floor, no phone. Housewife.

#526 #2. LUPERCIO, Santos Jr. M/WH 10 years old, 4448 S Hermitage, 2 floor, no phone.

#527 #3. LUPERCIO, Crisabel F/WH 6 years old, 4448 S Hermitage, 2 floor, no phone.

#528 #4. LUPERCIO, Sonia F/WH 8 years old, 4448 S Hermitage, 2 floor, no phone.

#529 #5. LUPERCIO, Yadira F/WH 4 years old, 4448 S Hermitage, no phone.

#530 #6. LUPERCIO, Anabel F/WH 3 years old, 4448 S Hermitage, 2 floor, no phone.

POSTED BY: Dr. Choi posted all the remains. 25 March 84

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | 04 15 84 | 0970 | SGT OWEN | 94 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | | TIME |
|---|---|---|---|---|---|
| Det. L. Ryder | 5648 | EXHIBIT "B" | | | |

C60010

ML-105510

Page Two

Death Investigation                                                    F-105510

CAUSE OF DEATH:    All of the deceased dies as the result of extensive burns.

PRONOUNCED:        Deceased:
                   #1. Dr. Smith, Holy Cross Hospital at 0800 hours on the 24 March 1984.
                   #2. Dr. Smith, Holy Cross Hospital at 0810 hours on the 24 March 1984
                   #3. Dr. Smith, Holy Cross Hospital at 0810 hours on the 24 March 1984.
                   #4. Dr. Smith, Holy Cross Hospital at 0830 hours on the 24 March 1984.
                   #5. Dr. Smith, Holy Cross Hospital at 1130 hours on the 24 March 1984.
                   #6. Dr. Smith, Holy Cross Hospital at 0810 hours on the 24 March 1984.

NOTIFIED:          Medical Examiner Ruddy, on the scene, remains to the Fishbein Institute.

LOCATION:          2 floor of the building located at 4448 S Hermitage, building completely
                   destroyed by the fire.

EVIDENCE:          No evidence of arson as of this writing.

DATE/TIME:         24 March 1984, discovered at 0408 hours.

WEATHER/LIGHTS:    Fair, darkness.

IDENTIFIED:        All of the deceased were identified by dental charts. Office of the medical
                   examiner.

INTERVIEWED:       #1. LUPERCIO, Santos Sr. M/WH dob. 9 April 52, 32 years old. 4448 S Hermitage,
                   2 floor; no phone. Husband and father of the deceased people.
                   #2. MARTINEZ, Fernando S. M/WH 22 Oct 1928, 4452 S Hermitage 2 floor, tele #523 496
                   Heard someone outside on the street yelling fire. Woke up saw the fire next
                   door. got out of the building. Could not add anything else.
                   #3. HARAST, Minerva F/WH 5 Feb. 1961. 4452 S Hermitage, 1 floor, tele #523 4964.
                   Woke up when she heard some yelling fire, left the building. Knows nothing
                   else.
                   #4. SHIELDS, Richard M/W 13 years old. 4329 S Hermitage, telephone #523 2926.
                   Lives with parents. Heard and saw nothing.
                   #5. SANCHEZ, Marie Ellen F/WH 25 years old. 4440 S Hermitage 3 floor, no phone.
                   Heard and saw nothing.
                   #6. MORENA, Paul M/WH 32 years old. 4430 S Hermitage, no phone. Heard and saw
                   nothing.
                   #7. PETROSUS, Charlie M/W 74 years old. 4446 S Hermitage, no phone. Heard and saw
                   nothing.
                   #8. SUARE., Francisco M/WH 13 years old. 4427 S Wood. Lives with mother. Heard
                   and saw nothing.
                   #9. CRUZ, Charlotte F/WH 20 years old. 4440 S Hermitage, telephone #890 5936.
                   Seen building on fire and called the fire department.
                   #10. SUAUREZ, Guillermo M/WH 14 years old. 4427 S Wood St. Telephone #927 1592.
                   Lives with parent. Heard and saw nothing.
                   #11. OSORAO, Lila F/WH 50 years old. 4426 S Hermitage, telephone #376 0986. Heard
                   and saw nothing.

FIRE UNITS ASSGD:  Cheif Altman, Chief Arasgo both of the sixth district.
                   Fourth Dep, Chief Garfity.
                   Engines #49 and 23. ire Ambulance #1.

B & ARSON:         Commander Nichols, Technicians Ricek #4045 & Urban #4201 & Vera #5404

Continued on page three

Page Three

Death Investigation                                                F-105510

A.S.D:        Commander 009 police district. Car #500 on the scene.
              Capt. Thomas Nolan #45. Watch commander of the second watch 009 district.
              Lt. John Collins, watch commander first watch, 009 district.
              Sgt James Knight, beat #910. Beat #933 Officers Danaher #12905 and company.
              Beat #913 Officers Baranski #5557 and McGuire #11973 Paper car.
              Chicago Police Department Crime Lab.

STATEMENTS:   LUPERCIO, Santos Sr. 4448 S Hermitage, no phone.


INVESTIGATION: The reporting detective assigned to the incident by Sgt Invergo of this command
              through normal police channels. Upon arrival at the scene it was noted: The
building was still smoldering and the fire department and other police units were still on the
scene. The reporting had a conversation with the bomb and arson unit personal. They stated th
at this time they had no idea as to the cause of the fire. Samples would be taken from the de
and sent to the lab for analysis.

              A conversation was then had with the Chief of the Fire Department, "ltmab, and h
said that five bodies had been removed from the building and transported to the Holy Cross
Hospital. The fire and police were still searching for one other body. This was later found a
1115 hours.

              A canvass of the neighborhood was then conducted. see format. and no indication
foul play could be uncovered.

              The reporting proceeded to the Holy Cross Hospital and had a conversation with D
Smith. He stated that he pronounced all of the bodies that were brought into the hospital. He
said that all were D.O.A. The remains were then transported to the Fishbein Institute for
post mortems. Dr. Smith further said that Mr Santos Lupercio was admitted to the hospital
intensive care unit with burs and a skull fracture.

              LUPERCIO, Santos Sr. He was interviewed in the intensive care unit and stated in
summary the following: He awoke and the apartment was on fire. He could not get to his family
so he was going to jump out the back and come in the front. When he got to the back window he
fell two floors and struck his head. He was unable to get to his family. He stated that the
first floor is empty and he and his family occupy the second floor. He could not say where the
fire started or how it started.

              Several days later the results from the samples of the debris that were taken
from the scene were returned from the lab. They showed negative for any accelerant.


              Based on the above stated facts it is requested that this incident be classified
as closed, apparent accidental fire deaths.

CLOSED
AREA 3
VIOLENT CRIME

07  APR 1981 13  40

000012

## AFFIDAVIT OF DUANE GLASSCO

I, Duane Glassco, under oath and penalty of perjury as set forth in 735 ILCS 5/1-109, state the following:

1. I am over 18 years old and competent to make this statement.

2. No threats or promises have been made to me. I am making this statement of my own free will.

3. I testified in the case, People v. Kluppelberg, 88 CR 1662. I know James Kluppelberg as Jim. I never liked Jim.

4. Some of the testimony that I gave in Jim's case was not true. In particular, I didn't see Jim go back and forth from Dawn's house to 4448 S. Hermitage on the night of the fire. I didn't see anything about how the fire got started. I was getting high with Michelle and Donnie.

5. In addition, you couldn't see from the attic window at Dawn's house to the back yard or back door of 4448 S. Hermitage because there was a building in the way.

6. Also, Jim never said anything to me about having set the fire. He never told me to shut my mouth or else, and he never said "You know how I am when I feel like I'm losing someone, I do stupid things."

7. I only gave the testimony that I did so I could get a deal on my cases. I got a deal on my charges.

8. Before I gave my testimony, I met with the police and prosecutors. They told me what I needed to say.

9. At some point when I was meeting with the prosecutor, a man came in and had aerial photographs. They took me out of the office, but I overheard them talking about how the aerial photographs showed that you couldn't see from Dawn's house to 4448 S. Hermitage.

10. I did what I had to do to get out.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Duane Glassco

5-17-08

JOHN M. KELLY
NOTARY PUBLIC, STATE OF ILLINOIS
COUNTY OF GRATIOT
MY COMMISSION EXPIRES May 23, 2013
ACTING IN COUNTY OF Gratiot

**EXHIBIT**

B

## AFFIDAVIT OF DAWN GRAMONT

I, Dawn Gramont, under oath and penalty of perjury, state the following:

1.      I am over 18 years old and competent to make this statement.

2.      No threats or promises have been made to me. I am making this statement of my own free will.

3.      On the night of March 23, 1984, I was present with James Kluppelberg, Duane Glassco, Donnie Brittain and Michelle Brittain at my home at 1748 W. 45th Street.

4.      Duane and James didn't like each other.

5.      Duane testified at James' trial that he could see from the second-floor window of my home into the yard of and to the back door of 4448 S. Hermitage Avenue.

6.      It is impossible for Duane to have seen into the yard of and to the back door of 4448 S. Hermitage Avenue because that view was blocked by the house at 4450 S. Hermitage Avenue. A tree also blocked Duane's view of 4448 S. Hermitage Avenue.

7.      In addition, Duane told me he lied on the stand during James' trial in order to get out of jail.

8.      Duane told me "I did what I had to do to get out," or words to that effect. He said he would have faced years in jail had he not lied and that he couldn't face doing that much time.

9.      He later reiterated that he lied in letters to me. I no longer have those letters as they were destroyed in a fire at my home.

10.     My statements to the Grand Jury were not true. I only gave that testimony because I was threatened and hit by police officers.


Dawn Gramont          5-28-08

Subscribed and sworn to me on this 26th day of May, 2008.


Notary Public

OFFICIAL SEAL
JOHN D. REA
Notary Public - State of Illinois
My Commission Expires Dec 07, 2011

EXHIBIT

C

## AFFIDAVIT OF MICHELLE BRITTAIN

I, Michelle Brittain, under oath and penalty of perjury, state the following:

1. I am over 18 years old and competent to make this statement.

2. No threats or promises have been made to me. I am making this statement of my own free will.

3. On the night of March 23, 1984, I was present at 1748 W. 45th Street. I remember being there with my brother Donnie, James Kluppelberg (who I called Jim), Duane Glassco, and Dawn Gramont.

4. At Jim's trial, Duane testified that he could see from the second-floor window of 1748 W. 45th Street into the yard of and to the back door of 4448 S. Hermitage Avenue. That testimony was false.

5. It is impossible for Duane to have seen into the yard of and to the back door of 4448 S. Hermitage Avenue, because that view was blocked by the home at 4450 S. Hermitage Avenue.

6. I believe Duane gave false testimony because he wanted to get a deal on his pending case.

7. There was bad blood between Duane and Jim. They had a hate relationship.

8. Also, no attorney for Jim ever came and talked to me about his case.

_Michelle Brittain_ 5-2-08
Michelle Brittain

Subscribed and sworn to me on this 21st day of May, 2008.

Notary Public

OFFICIAL SEAL
JOHN D. REA
Notary Public - State of Illinois
My Commission Expires Dec 07, 2011

**EXHIBIT**

D

The Exoneration Project
The University of Chicago Law School
6020 South University Avenue
Chicago, Illinois 60637
(773) 834-4488 (tel)
(773) 702-2063 (fax)

May 1, 2008

Dear Ms. Schumacher,

The Chicago Police Department and the Bomb and Arson Unit of the Chicago Police Department were in charge of fire investigations from 1975 until April 1, 1984. During this time frame, the Bomb and Arson Unit determined the cause and origin of fires in the City of Chicago. The Office of Fire Investigations of the Chicago Fire Department was not operational until April 1, 1984.

As a result, the Chicago Fire Department does not possess records, reports, or cause and origin determinations regarding the March 24, 1984 fire that occurred at 4448 South Hermitage because the investigation of this fire was done by the Bomb and Arson Unit and Detectives at the Chicago Police Department.

Sincerely,

Commander Raymond Kolasa
Chicago Fire Department
10 West 35th Street
Chicago, IL 60616
312-745-3862

'08 JUN -1 P3:33

CHICAGO FIRE DEPARTMENT

**EXHIBIT**

E

# E$^x$ponent°

*Failure Analysis Associates°*

Exponent
185 Hansen Court
Suite 100
Wood Dale, Il. 60191

telephone 630-274-3200
facsimile 630-274-3299
www.exponent.com

May 23, 2008

Gayle Horn
The Exoneration Project
312 North May Street
Suite 100
Chicago, Illinois 60607

Subject: People v. James Kluppelberg
Client Reference No. 88 CR 1662
Project No. 0802090.000

Dear Ms. Horn:

On April 3, 2008, Exponent was retained to review and evaluate existing documentation pertaining to the investigation of a house fire, which occurred at approximately 4:00 a.m. on March 24, 1984 at 4448 South Hermitage Avenue, Chicago, Illinois. Six people died in this fire: Elva Lupercio and her five children. James Kluppelberg was tried and convicted for the arson and murder of these victims. Mr. Francis Patrick Burns, Deputy Director of the Chicago Fire Department Office of Fire Investigation, testified on behalf of the State of Illinois. It was Mr. Burns's testimony that this fire was an incendiary fire with its origin at the rear of the house.

Exponent reviewed the available documentation including trial transcripts, police reports, medical examiner's reports, an aerial photograph of the general vicinity of 4448 South Hermitage Avenue, and twelve photographs taken of the scene of the fire. Our objective was to investigate the origin and cause of this fire and to evaluate the opinions offered by Mr. Burns, the fire investigator who testified on behalf of the State of Illinois.

## Background

The subject house was a three story wood-framed structure. The fire consumed the entire structure causing it to collapse during the fire. The fire at the subject house caused fire damage to the houses on both sides of it. Police officers responding to the fire alarm described the house as being fully involved in the fire and observed a man falling from a second story window. It was later determined that this critically injured man was Santos Lupercio, the husband of decedent Elva Lupercio. Police interviews with neighbors indicated that the house was fully involved in flames when they became aware of the fire. The first floor of the subject house was


EXHIBIT

F

Gayle Horn
May 23, 2008
Page 2

reportedly unoccupied, and the Lupercio family occupied the second floor. The Siller family occupied the third floor. They were able to escape out the front door of their apartment.

The Bomb and Arson Squad of the Chicago Police Department conducted an official investigation into the cause of the fire. They took three color photographs and an unspecified number of fire debris samples. They concluded that the cause of the fire could not be determined. The fire debris samples came back negative for accelerant.

Mr. Burns conducted an unofficial inspection of the fire scene with several apprentice fire investigators as a training exercise on March 24, 1984. An unidentified investigator from the Chicago Fire Department took nine black-and-white photographs of the fire scene. Mr. Burns did not write a report summarizing his findings. On July 13, 1989, Mr. Burns testified from memory about his inspection observations and opinions about the cause of the fire.

Exponent takes issue with the opinions and bases that Mr. Burns offered in the trial. These points are discussed in detail in the latter portions of this report. However, the cross-examination of Mr. Burns was especially noteworthy. The factual foundations of his opinions were not challenged adequately. As a result, Mr. Burns's statements went unchallenged despite being contradicted directly by evidence presented in the file material. The following examples are representative, though not exhaustive, of the contradiction in the evidence:

- Mr. Burns indicated that there was no fire load on the first floor of the house, but metal springs consistent with upholstered furniture (or the box springs for a mattress) were evident in two of the fire scene photographs (Photos 8 and 9). Were these items from the first, second or third floor? How did Mr. Burns rule out the possibility that these items came from the first floor?

- Mr. Burns dismissed the possibility that the fire was caused by an electrical malfunction indicating that no electrical components were recovered from the fire scene. However, there is a photograph of a firefighter holding a section of flexible BX electrical cable (Photograph 12). Where was it found? Was it examined?

- Mr. Burns stated that the presence of deep charring of wood leading to large blisters ("alligatoring") indicated the use of an accelerant to start the fire. However, two of the photographs show that these features were on wood structural members, items that would not have been exposed to the early stages of the fire (the hypothetical accelerated portion of the fire). Furthermore, numerous wood members exhibited deep charring (as portrayed in the fire scene photographs). Was accelerant applied to all of these wood members? How was accelerant applied to structural wood members (materials normally covered by flooring, wall or ceiling interior finish)?



Gayle Horn
May 23, 2008
Page 3

- Mr. Burns stated that he saw fire patterns consistent with the use of accelerant, but fire debris samples collected by the City of Chicago Police Department's Bomb and Arson Squad came back negative for accelerant. Was this fact considered by Mr. Burns? How is it that fire patterns created by burning accelerant survived the fire but traces of accelerant did not?

- The investigator from the City of Chicago Police Department's Bomb and Arson Squad concluded in his official report that the origin and cause of the fire could not be determined. As indicated later in this report, NFPA 921 recommends that the cause of a fire be classified as "undetermined" if there is insufficient data upon which to found an opinion; i.e., "undetermined" is a scientifically defensible conclusion. Subsequent police documents classified the fire as accidental. What was the basis for Mr. Burns to contradict this official investigation and its findings?

Exponent reviewed the available file material from the perspective of fire dynamics and scientific fire investigation, a perspective consistent with *NFPA 921 Guide for Fire and Explosion Investigations (2008)*. This change in perspective was also evident with the publication of the fifth edition of John DeHaan's classic textbook, *Kirk's Fire Investigation*, which was released in 2002. Exponent recognizes that we are applying modern standards of practice to a fire that occurred 24 years ago. However, the motivation for the development and publication of NFPA 921 was the recognition that many fire investigators were offering origin and cause opinions that were completely at odds with sound scientific principles. Mr. Burns' trial testimony provided an example of this.

## Burns' Trial Testimony Regarding Fire Patterns

Mr. Burns offered the following testimony regarding the twelve photographs of the fire scene. He claimed that these photographs depicted significant fire patterns that provided a technical basis for his opinions. The photographs are appended to this report.

Photograph/Trial Exhibit #1: In this photograph, it is apparent that the structure at 4448 South Hermitage has failed; the front stairway is seen at the forefront of the photograph. On page 52 of his trial testimony, Mr. Burns states that the damage to an adjacent structure "would indicate that the fire originated back there and towards the rear of the structure." With a pen, Mr. Burns marked this exhibit; he indicated the area of heaviest damage on the adjacent house to the north (4446 South Hermitage).

Photograph/Trial Exhibit #2: Photograph to the south of the front stairway shown in Exhibit #1. Mr. Burns drew in the "V" pattern on the side of the adjacent house to the south of 4448 South Hermitage.



Gayle Horn
May 23, 2008
Page 4

Photograph/Trial Exhibit #3:  Photograph of the same stairway from further away.  Mr. Burns
states that this photograph gives a clearer perspective of the damage area he described in Exhibit
#1.

Photograph/Trial Exhibit #4:  Photograph of an adjacent house showing damage pattern on the
exterior of the house.  Mr. Burns marked this photograph with two "C's" in an effort to show
clapboard siding.

Photograph/Exhibit #5:  This photograph of the house to the south from the rear of the houses
shows an extensive area of fire damage to the main structure with damage to the southern
exposure.  On page 56 of his trial testimony, Mr. Burns states that this photograph "shows the
total destruction of where the fire had completely destroyed the center section of this building,
which would have been the rear section of the substructure."  Additionally, he marked an area of
the photograph with the letter "F" indicating "finger patterns" on the side of the house.

Photograph/Exhibit #6:  General photo of extensively damaged center structure (4448) with
exterior damage to both adjacent structures.  Again, he states that, "you could see the severeness
of the fire at the rear of the substructure (4448) on both of these (adjacent) buildings here".

Photograph/Exhibit #7:  Mr. Burns states that this photograph shows the fire investigators,
"digging out the debris in an effort to determine burn patterns that were found in this section of
the substructure where we thought—at this particular point in time, we thought the fire may
have originated in that area because of the damage to this area."

Photograph/Exhibit #8:  This photograph shows a small section of a heavily charred structural
support beam.  On page 59 of his trial testimony, Mr. Burns states, "This is the heavy deep
alligatoring pattern normally associated with a hot fast burning fire...this is always associated
with fires that generate an extreme high temperature".

Photograph/Exhibit #9:  This photograph shows another section of a charred structural support
beam.  It appears as though the section of the beam to the right is more consumed than the left.
On page 60 of his trial testimony, Mr. Burns states that these are, "large blisters we call them as
versus the small blisters normally associated in fires."

Photograph/Exhibit #10:  This photograph shows firemen working on an elevated section of the
structure.  It appears as though section of the flooring has burned and collapsed behind them.
On page 60 of his trial testimony, Mr. Burns states, "This is the top section and dropped down
into the first section."

Photograph/Exhibit #11:  This photograph shows a group of firemen working in an area, which
might have been in the crawlspace below the first floor.  Mr. Patrick Burns can be seen in this
photograph wearing the white coat.  In this photograph most of the first lower flooring appears
to be missing.



Gayle Horn
May 23, 2008
Page 5

Photograph/Exhibit #12: This photograph is close-up of an area of fire debris. Running through this area appears to be a section of flexible BX electrical cable. This is the only photograph that might possibly be interpreted as a photograph of the area of fire origin. On page 61 of his trial testimony, Mr. Burns stated, "This would be a close-up, Your Honor, of the area that I had just shown in the previous Exhibit (#11), where this is the result of complete destruction of the fire from the heat generated by this fire. Normally, you have small pieces of 2x4, 2x6 or 2x8, but this thing really totally destroyed everything."

The photographs of the fire scene depict a total burn. Any fire patterns created by the incipient fire (the fire associated with the ignition event) were destroyed by the intense fire that not only destroyed the subject house but also damaged the adjacent houses.

## Burns' Origin and Cause Opinions

Mr. Burns' opinions can be reduced to three main points:

1.  On page 63 of his trial testimony, he states that, "The origin of the fire was at the rear section some six to ten feet into the structure on the first floor."

2.  On page 62 of his trial testimony, Mr. Burns states, "Based on the experience that I have and in the examining of burn pattern(s) normally found in arson fires, my personal opinion was this—this fire was a set fire as a result of arson."

3.  On Page 63 of his trial testimony, Mr. Burns states, "I feel that this fire was set by bringing something into this structure and not igniting the ordinary combustible(s) that would normally have been there in this, to sustain a fire of this volume, to keep this type of fire going. Something had to have been applied. There had to be applied here. Something had to be brought in, an accelerant or a trailer or trailers are newspapers or rags or some combustible material to spread the fire from one point to another point. My opinion is that something was brought into this structure and ignited to cause this fire."

Origin determination is typically based on the interpretation of fire patterns. Witness observations can sometimes be informative in this process. In this case, however, neither the fire patterns nor the witness observations provide a reliable foundation upon which to build scientifically defensible opinions. As noted in the section devoted to the fire scene photographs, none of the fire patterns created by the incipient fire survived the conflagration that destroyed the house. Furthermore, by the time the witnesses first observed the fire, it had flashed over and grown to such intensity that it breached the windows/door and began attacking the exterior of the house. The fire could have been burning—and spreading—for a period of time from 15 to 30 minutes depending on the first fuels ignited. Thus, the witness observations do not pertain to the incipient fire.



Gayle Horn
May 23, 2008
Page 6

There is insufficient information to rule out an accidental fire. Burns concluded that either an accelerant or trailer had to be used to cause this fire, but there was no evidence of accelerant (fire debris samples came back negative) and no physical evidence of a trailer. In summary, Burns was not successful in determining the origin or cause of the fire.

## The Bases for Burns' Origin and Cause Opinions

### Basis Number 1

On pages 42-43 of the trial transcript Mr. Burns states, "We examined the debris for observer (sic) indicators that would tell us where the fire originated. And upon doing so, we noticed that there was a large shiny alligatoring, which would indicate a fast spreading fire not a smoldering fire. And we look for the logical destruction of the wooden members comprising of this structure. We found during our fire scene examination, that the majority of the fire was confined to the back or rear end of the structure or the westside of the structure on the first floor. Burn patterns indicated that the fire was intense in this area and it burned through the floor into the crawlspace beneath the fire, beneath the building."

"Large, shiny alligatoring" does not indicate a fast spreading (accelerated) fire. This burn pattern is a feature created when wood burns for a long period of time. The only documentation of these patterns is in photographs numbered 8 and 9. Both photographs show this pattern on a structural member rather than exposed woodwork. If, hypothetically, Burns' premise were true, it would not appear on a primary structural component, which was protected from the incipient stage of the fire. The patterns seen in photographs 8 and 9 have no relevance to where or how this fire started. These patterns were the result of prolonged, intense fire in this area.

### Basis Number 2

On page 44 of his trial testimony, Mr. Burns states, "Now, if you have a structure that burns upwards and the upper portions fall down and they will not ignite a floor, they will suffocate or from the lack of oxygen of the triangle, this would extinguish the fire beneath. And it won't have that unusual burn pattern on the floor. But in this situation, we found burn through, right through the floor and into the sub-structure or sub-basement." He states that this burn-through was observed, "approximately in the center rear section of this structure, just inside the—some six to 10 feet inside the rear door of what was--- there was a rear porch and wooden rear porch that was totally destroyed with the exception of the floor."

In the field of fire dynamics, it is well established that this is an erroneous statement. Contrary to Burns' testimony, fire testing has shown that liquid fuels cannot burn through combustible floors. On the other hand, fire testing has demonstrated that solid fuels, such as "drop-down," can burn holes in floors. The observation of the burn-through in the floor becomes even more



Gayle Horn
May 23, 2008
Page 7

problematic for Burns' opinions when one considers the fire resistance of typical residential construction, which requires interior walls to have a fire resistance rating of 20 to 30 minutes. As a first order approximation, a structure with a fire resistance rating of between 20 and 30 minutes can be expected to withstand a fire exposure of at least that duration before the membrane of the wall (e.g., sheets of gypsum drywall) fails. The structural wood members (e.g., studs, rafters, floor joists) of the house are exposed to flames only after the wall membrane fails. The structural members, in turn, must burn for a significant time period (perhaps 15 to 30 minutes) before they will collapse under the weight of the structure. With Mr. Burns' fire scenario, the fire on the first floor must have burned for at least 35 to 60 minutes before affecting the structural integrity of the house. A fire of this size and duration requires a fuel load substantially greater than the fuel load provided by a gallon of gasoline or an armload of newspaper. A fire of this magnitude would require large quantities of solid fuel equivalent to pieces of upholstered furniture such as chairs, sofas or mattresses. But according to Mr. Burns' testimony, there was no fuel load present on the first floor.

## Basis Number 3

On pages 48-49 of his trial testimony, Mr. Burns states, "Now, the fire emanated from within this building, it caused a specific or a distinct 'V' pattern, what we are calling a 'V' pattern...Now, when you look at the structure, a step back and look at both structures that were adjacent to this subject building and you would find that same 'V' pattern, where the fire had emanated from the subject building to the adjacent building and cause the destruction." On page 52 of his trial testimony, Mr. Burns, referring to the damage on adjacent structures, states, "This would indicate that the fire originated back there towards the rear of the structure."

The "V" patterns observed on exposed surfaces of adjacent structures were inflicted by heat from the primary fire. Mr. Burns argued that the "V" patterns on adjacent exposures indicated the location of the fire origin at the subject building, but Mr. Burns was mistaken. The patterns on adjacent structures only show where the fire vented from the subject house fire and not where the fire originated.

## Basis Number 4

On page 58 of his trial testimony, Mr. Burns states, "We eliminated all the accidental causes because we couldn't find anything that would have been electric, there was no gas...and there were no electrical outlets or anything in that area".

However, on page 58 of Mr. Burns' trial testimony, he admits that there was a space heater in the house. "It was up towards the front in the living room, as I recall", said Burns. "I would imagine it was hauled away with the debris." Potential ignition sources should have been eliminated by consideration of the physical evidence. At a fire scene that is a total burn, as was the case here, the magnitude of physical destruction makes it virtually impossible to find



Gayle Horn
May 23, 2008
Page 8

physical evidence, let alone consider it.  In the absence of evidence, the scientific fire
investigator must state that the cause cannot be determined.

## Exponent Opinions

Based on the fire scene photographs and witness observations summarized in the police
interviews, neither the origin nor cause of this fire can be determined.  NFPA 921 recommends
this classification when there is insufficient data upon which to base a scientifically defensible
opinion.  There is no physical evidence indicating that this was an incendiary fire.

Exponent has based this report on information available at the time of this writing.  If new
information becomes available, Exponent reserves the right to supplement this report.

Sincerely,

Russell A. Ogle, Ph.D., P.E., CSP
Principal Engineer

/km
Enclosures (photographs 1-12)



Number 1.jpg



Number 2.jpg



Number 3.jpg



Number 4.jpg



Number 5.jpg



Number 6.jpg



Number 7.jpg



Number 8.jpg



Number 9.jpg



Number 10.jpg



Number 11.jpg



Number 12.jpg

## AFFIDAVIT OF RUSSELL OGLE

I, Russell Ogle, under oath and penalty of perjury, states as follows:

1.    I am a resident of the State of Illinois and am serving as a retained expert for James Kluppelberg in this action.

2.    The report attached hereto as Exhibit A, dated May 23, 2008, contains my opinions in this case.

3.    Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in the attached report are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

4.    The opinions set forth in the attached report are based upon a reasonable degree of certainty within my field of expertise.


_____
Russell Ogle


SUBSCRIBED and SWORN to before me
this 29th day of May, 2008.


_____
Notary Public


```
OFFICIAL SEAL
NANCY E DICANIO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/23/08
```

# E$^x$ponent*

*Failure Analysis Associates**

Exponent
185 Hansen Court
Suite 100
Wood Dale, IL 60191

telephone 630-274-3200
facsimile 630-274-3299
www.exponent.com

## Russell A. Ogle, Ph.D., P.E., CSP
### Principal Engineer

### Professional Profile

Dr. Russell Ogle is a Principal Engineer in Exponent's Thermal Sciences practice. Dr. Ogle applies his expertise as a chemical engineer to the scientific investigation and prevention of accidents, with particular emphasis on fires, explosions, and chemical releases. He specializes in the investigation of complex industrial accidents where unexpected interactions between people, equipment, computers, and safety systems can have severe consequences. Dr. Ogle has reconstructed complex accident sequences from various sources of evidence including witness interviews, process measurement data, electronic event logs, surveillance videos, laboratory testing, and examination of physical artifacts. Drawing from his diverse accident investigation experience, he has provided hazard and risk analysis services to the chemical, petroleum, natural gas, pharmaceutical, and environmental industries.

Dr. Ogle has investigated hundreds of fires and explosions in industrial, commercial, and residential settings. His investigations have involved the performance evaluation and failure analysis of a wide range of chemical processes and industrial equipment. He is especially interested in the relationship between equipment design, automation and human error. Additionally, Dr. Ogle has demonstrated expertise in evaluating the stability of chemicals and their fire and explosion hazards. He has investigated accidents involving self-heating or thermal runaway of chemicals and unintentional chemical reactions of incompatible materials. Much of his experience with hazardous materials centers on their storage, handling, and transportation requirements.

In addition to his consulting experience, Dr. Ogle has worked in both the defense and environmental industries. In the defense industry, he was responsible for the design, testing, and evaluation of military weapon systems. In the environmental industry, he performed and managed investigations, feasibility studies, and design projects for the cleanup of hazardous waste sites.

### Academic Credentials and Professional Honors

Ph.D., Chemical Engineering, University of Iowa, 1986
B.S., Chemical Engineering, Purdue University, 1980

### Licenses and Registrations

Licensed Professional Engineer, Illinois, #062-026870
Licensed Professional Engineer, Arkansas, #12225
Licensed Professional Engineer, Alabama, #28089E
Certified Safety Professional, #15568

**Publications and Presentations**

Morrison III DR, Ogle RA, Gidaspow D. A new assessment of the finite Biot number correction to thermal ignition tests. American Institute of Chemical Engineers 2007 Annual Meeting, Salt Lake City, UT, November 8, 2007.

Ogle RA, Carpenter AR. Guidelines for identifying, evaluating, and selecting safety instrumented functions. Process Plant Safety Symposium, 2007 Spring National Meeting, American Institute of Chemical Engineers, Houston, TX, April 2007.

Ogle RA, Morrison III DR, Carpenter AR. The relationship between operator error and automation complexity. 2006 Annual Symposium, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October 2006.

Ogle RA, Morrison III DR, Carpenter AR, Su YS. Missed Opportunities in Reactive Chemical Hazard Evaluations. Process Safety Progress 2006; 25:2–7, March.

Morrison III DR, Ogle RA, Viz MJ, Carpenter AR, Su YS. Investigating chemical process accidents: Examples of good practices. Process Safety Progress 2006; 25:71–77, March.

Ogle RA, Morrison III DR, Viz MJ. Emergency response to a non-collision HAZMAT release from a railcar. Process Safety Progress 2005; 24:81–85, June.

Ogle RA, Carpenter AR, Morrison III DR. Lessons learned from fire and explosions involving air pollution control systems. Process Safety Progress 2005; 24:120–125, June.

Morrison III DR, Ogle RA, Viz MJ, Carpenter AR, Su YS. Investigating chemical process accidents: Examples of good practices. Process Plant Safety Symposium, 2005 Spring National Meeting, American Institute of Chemical Engineers, Atlanta, GA, April 11–13, 2005.

Ogle RA, Morrison III DR, Carpenter AR, Su YS. Missed opportunities in reactive chemical hazard evaluations. 39th Annual Loss Prevention Symposium, American Institute of Chemical Engineers Spring National Meeting, April 11–13, 2005.

Ogle RA, Carpenter AR, Morrison III DR. Explosion of a railcar containing toluene diisocyanate waste. Process Safety Progress 2005; 23:316–320, January.

Ogle RA, Megerle M, Morrison III DR, Carpenter AR. Explosion caused by flashing liquid in a process vessel. Journal of Hazardous Materials 2004; 115:133–140.

Ogle RA, Viz MJ, Morrison III DR, Carpenter AR. Bulk transportation of hazardous materials by rail: Lessons learned from non-collision accidents. 2004 Annual Symposium, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October 2004.

Ogle RA, Morrison III DR, Viz MJ. Emergency response to a non-collision Hazmat release from a railcar. 19th Annual CCPS International Conference, Emergency Planning:

E$x$

Preparedness, Prevention and Response; American Institute of Chemical Engineers, Orlando, FL, June 2004.

Ogle RA, Viz MJ, Carpenter AR. Lessons learned from Hazmat accident investigations. 17th Annual AAR/BOE Hazardous Materials Seminar, Association of American Railroads/Bureau of Explosives, Houston, TX, May 2004.

Ogle RA, Carpenter AR, Morrison III DR. Lessons learned from fire and explosions involving air pollution control systems. 38th Annual Loss Prevention Symposium, American Institute of Chemical Engineers, New Orleans, LA, April 2004.

Morrison III DR, MacDonald M, Ogle RA. Analyzing lint deposition within the residential electric clothes dryer. 2004 International Appliance Technical Conference, Lexington, KY, March 2004.

Morrison III DR, MacDonald M, Ogle RA. Assessing electric dryer lint fire cause scenarios. 2004 International Appliance Technical Conference, Lexington, KY, March 2004.

Ogle RA, Carpenter AR, Morrison III DR. Explosion of a railcar containing toluene diisocyanate waste. 18th International CCPS Conference & Workshop: Managing Chemical Reactivity Hazards and High Energy Release Events, American Institute of Chemical Engineers September 25, 2003.

Ogle RA, Haussmann G, Lucas RJ, Carpenter AR, Morrison III DR. The Scientific investigation of arson fire. Paper (with accompanying presentation by Russ Ogle), 2003 DRI Fire and Casualty Seminar, Defense Research Institute, Phoenix, AZ, November 2003.

Ogle RA, Megerle MV, Morrison III DR, Carpenter AR. Explosion caused by a flashing liquid in a process vessel. 2003 Annual Symposium, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October, 2003.

Ogle RA, Carpenter AR. Toxic gas release caused by the thermal decomposition of a bulk powder blend containing sodium dichloroisocyanurate. Process Safety Progress 2003; 22:75–82.

Morrison III DR, Carpenter AR, Ogle. Common causes and corrections for explosions and fires in improperly inerted vessels. Process Safety Progress 2002; 21:142–150.

Ogle RA, Carpenter AR. An accident involving the thermal decomposition of a solid mixture containing sodium dichloro-isocyanurate. AIChE Spring National Meeting, American Institute of Chemical Engineers, New Orleans, LA, March 2002.

Ogle RA, Morrison III DR. Investigation of an acid spill caused by the failure of an air-operated diaphragm pump. Process Safety Progress 2001; 20:41–49

Exˣ™

Ogle RA, Carpenter AR. Lessons learned from fires, flash fires and explosions involving hot work. AIChE Spring National Meeting, American Institute of Chemical Engineers, Houston, TX, 2001.

Ogle RA, Carpenter AR. Lessons learned from fires, flash fires and explosions involving hot work. Process Safety Progress 2001; 20:75–81.

Morrison III DR, Carpenter AR, Ogle RA. Common causes and correction for explosions and fires in improperly inerted vessels. Beyond Regulatory Compliance: Making Safety Second Nature, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, 2001.

Ogle RA. Ethics in forensic chemical engineering. AIChE Spring National Meeting, American Institute of Chemical Engineers, Atlanta, GA, 2000.

Ogle RA. The need for scientific fire investigation. Fire Protection Engineering 2000; Issue No. 8, Fall.

Ogle RA, Morrison III DR. Evaluation of accident investigations conducted by regulatory authorities and advisory agencies. Beyond Regulatory Compliance: Making Safety Second Nature, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October 2000.

Ogle RA. Explosion hazard analysis for an enclosure partially filled with a flammable gas. Process Safety Progress 1999; 18:170–177.

Ogle RA. Explosion risk analysis for a commercial building near a closed landfill. SFPE Symposium on Risk, Uncertainty and Reliability, Society of Fire Protection Engineers, Baltimore, MD, 1999.

Ogle RA, Smith KM, Strack S. Investigation of a boiler explosion caused by a natural gas detonation. American Society of Mechanical Engineers Pressure Vessels and Piping Conference, Boston, MA, 1999.

Ogle RA, Carpenter AR. Fire patterns on combustible flooring. Society of Fire Protection Engineers, 3rd International Conference on Fire Research and Engineering, Chicago, IL, 1999.

Ogle RA, Schumacher JL. Fire patterns on upholstered furniture: Smoldering vs. flaming combustion. Fire Technology 1998; 34:247–265.

Ogle RA, Schumacher JL. Investigation of an explosion and flash fire in a fixed bed reactor. Process Safety Progress 1998; 17:127–133.

Ogle RA, Schumacher JL. Investigation of a steam explosion in a petroleum product storage tank. Process Safety Progress 1998; 17:171–175.

Ogle RA, Schumacher JL. Application of fire testing and modeling in a forensic investigation. Society of Fire Protection Engineers, 2nd International Conference on Fire Research and Engineering, Gaithersburg, MD, 1997.

Ogle RA, Strack S. The role of incident investigation in mechanical integrity programs. American Petroleum Institute, 61st Spring Refining Meeting, Chicago, IL, 1996.

Ogle RA, Brumleve CB, Joyner S. Hydrogeology and remedial action modeling for a superfund site in a glaciated area. Solving Ground Water Problems with Models Conference, National Ground Water Association, Dallas, TX, 1992.

Ogle RA, Peterson EH, Souka OA, Holmquist TJ. The effect of recoil dynamics and soil response on the interior ballistics of a lightweight launcher. 1989 JANNAF Propulsion Meeting, Cleveland, OH, 1989.

Ogle RA, Beddow JK, Vetter AF, Chen LD. An investigation of aluminum dust Explosions. Combustion Science and Technology 1988; 61:75–99, 1988.

Ogle RA. Parametric sensitivity of a mathematical model for closed bomb dust explosions. Chemical and Physical Processes in Combustion, Eastern States Section, The Combustion Institute, Gaithersburg, MD, 1987.

Ogle RA. A new strategy for dust explosion research; a synthesis of combustion theory, experimental design and particle characterization. Ph.D. Dissertation, University of Iowa, 1986.

Ogle RA, Beddow JK, Vetter AF, Chen LD. A new strategy for dust explosion research. 17th Annual Meeting of the Fine Particle Society, San Francisco, CA, 1986.

Ogle RA, Beddow JK, Vetter AF, Chen LD. Dust explosion kinetics. 17th Annual Meeting of the Fine Particle Society, San Francisco, CA, 1986.

Ogle RA, Scholz PD, Beddow JK, Vetter AF. Free molecular electrophoresis of highly dispersed aerosol particles in an isothermal gas. 16th Annual Meeting of the Fine Particle Society, 1985.

Ogle RA, Beddow JK, Vetter AF, Chen LD. Thermal theory of laminar premixed dust flame propagation. Combustion and Flame 1984; 58:77–79.

Ogle RA, Beddow JK, Vetter AF. Applications of symmetry classifiers in morphological analysis. 9th Annual Powder and Bulk Solids Conference/Exhibition, Rosemont, IL, 1984.

Ogle RA, Beddow JK, Vetter AF, Chen LD. Thermal theory of laminar premixed flame propagation. Chemical and Physical Processes in Combustion Eastern States Section: The Combustion Institute, Providence, RI, 1983.

Ex™

Ogle RA, Beddow JK, Vetter AF.  Numerical modeling of dust explosions:  The influence of particle shape on explosion intensity.  Process Technical Program:  International Powder Bulk Solids Handling Process, Rosemont, IL, 1983.

**Professional Affiliations**

- American Chemical Society
- American Institute of Chemical Engineers
- American Society of Safety Engineers
- National Fire Protection Association
- Society of Fire Protection Engineers
- The Instrumentation, Systems and Automation Society

Ex

# GUIDE FOR
# FIRE &
# EXPLOSION
# INVESTIGATIONS

## 2008 EDITION

**Failure Analysis Associates**

185 Hansen Court, Suite 100
Wood Dale, IL 60191
telephone: 630-274-3200
facsimile: 630-274-3299          www.exponent.cor

**EXHIBIT**

_G_



Copyright © 2008 National Fire Protection Association®. All Rights Reserved.

# NFPA® 921

## Guide for

## Fire and Explosion Investigations

### 2008 Edition

This edition of NFPA 921, *Guide for Fire and Explosion Investigations*, was prepared by the Technical Committee on Fire Investigations. It was issued by the Standards Council on December 11, 2007, with an effective date of December 31, 2007, and supersedes all previous editions.

This edition of NFPA 921 was approved as an American National Standard on December 31, 2007.

### Origin and Development of NFPA 921

NFPA 921, *Guide for Fire and Explosion Investigations*, was developed by the Technical Committee on Fire Investigations to assist in improving the fire investigation process and the quality of information on fires resulting from the investigative process. The guide is intended for use by both public sector employees who have statutory responsibility for fire investigation and private sector persons conducting investigations for insurance companies or litigation purposes. The goal of the committee is to provide guidance to investigators that is based on accepted scientific principles or scientific research.

The first edition of the document, issued by NFPA in 1992, focused largely on the determination of origin and cause of fires and explosions involving structures. The 1995 edition of the document included revised chapters on the collection and handling of physical evidence, safety, and explosions. NFPA 907M, *Manual for the Determination of Electrical Fire Causes*, was withdrawn as an individual document and was integrated with revisions into this document as a separate chapter. Elements of NFPA 907M that relate to other chapters of this document were relocated appropriately. New chapters dealing with the investigation of motor vehicle fires, management of major investigations, incendiary fires, and appliances were added.

The 1998 edition of the document included a new chapter on fuel gas systems in buildings and the impact of fuel gases on fire and explosion investigations. The chapter on electricity and fire was rewritten to improve organization, clarify terminology, and add references. In the chapter on fire patterns, several sections were revised. Other revisions were made in the chapter on physical evidence on the subject of preservation of the fire scene and of physical evidence. The edition also included new text regarding ignitible liquid detection canine/handler teams.

The 2001 edition of this document included new chapters on building systems, fire-related human behavior, failure analysis and analytical tools, fire and explosion deaths and injuries, and wildfire investigations. An updated chapter on motor vehicle fires was written. The document was organized to group chapters into subjects that made it more usable.

The 2004 edition of this document included a revision of the document to comply with the new *Manual of Style for NFPA Technical Committee Documents*, and a new chapter titled, "Analyzing the Incident for Cause and Responsibility," a rewrite of the chapter on Legal Considerations, and a revision of the chapter on Recording the Scene.

This, the sixth edition of this document, includes rewrites of Chapter 5, Basic Fire Science; Chapter 6, Fire Patterns; Chapter 17, Origin Determination; Chapter 25, Motor Vehicle Fires; and Chapter 27, Management of Complex Investigations. A new Chapter 28, Marine Fire Investigations, was added to the document.

NFPA and National Fire Protection Association are registered trademarks of the National Fire Protection Association, Quincy, Massachusetts, 02169.

should be classified as undetermined. Determining the cause of a fire and classifying the cause of the fire are two separate processes that should not be confused with each other. *(See Section 18.6.)*

**19.2.1.1 Accidental Fire Cause.** Accidental fires involve all those for which the proven cause does not involve an intentional human act to ignite or spread fire into an area where the fire should not be. When the intent of the person's action cannot be determined or proven to an acceptable level of certainty, the correct classification is undetermined. *(See Section 18.6.)* In most cases, this classification will be clear, but some deliberately ignited fires can still be accidental. For example, in a legal setting, a trash fire might be spread by a sudden gust of wind. The spread of fire was accidental even though the initial fire was deliberate.

**19.2.1.2 Natural Fire Cause.** Natural fire causes involve fires caused without direct human intervention or action, such as fires resulting from lightning, earthquake, and wind.

**19.2.1.3 Incendiary Fire Cause.** The incendiary fire is one intentionally ignited under circumstances in which the person knows that the fire should not be ignited. When the intent of the person's action cannot be determined or proven to an acceptable level of certainty, the correct classification is undetermined. *(See Section 18.6.)*

**19.2.1.4 Undetermined Fire Cause.** Whenever the cause cannot be proven to an acceptable level of certainty, the proper classification is undetermined. *(See Section 18.6.)*

**(A)** Undetermined fire causes include those fires that have not yet been investigated or those that have been investigated, or are under investigation, and have insufficient information to classify further. However, the fire might still be under investigation and the cause may be determined later with the introduction or discovery of new information.

**(B)** In the instance in which the investigator fails to identify the ignition source, the fire need not always be classified as undetermined *(see 18.2.5)*. If the physical evidence established one factor, such as the use of an accelerant, that evidence may be sufficient to establish an incendiary fire cause classification even where other factors such as ignition source cannot be identified. Determinations in the absence of physical evidence of an ignition source may be more difficult to substantiate. Therefore, investigators should strive to remain objective throughout the investigation.

## 19.3 The Cause of Damage to Property Resulting from the Incident.

**19.3.1** The following are considerations that may be utilized in establishing cause of property damage. These factors are divided into two major categories: fire and smoke spread damage and other types of damage.

**19.3.2 Fire/Smoke Spread.** Elements of damage caused by fire or its products of combustion can further be affected by the following conditions:

(1) *Compartmentation.* Effectiveness or failure of confining the fire and smoke by methods of construction or specific passive fire protection assemblies.

(2) *Change of occupancy/hazard.* Change from the original design and use from a lower hazard to a greater hazard without appropriate changes to fire protection, structural, or means of egress features.

(3) *Detection/alarm systems.* Failure to provide timely and effective notice of a fire, resulting in a delay in detection or a delay in notification.

(4) *Human behavior.* This includes intentional or unintentional acts or omissions by people.

(5) *Fire suppression.* Failure of the building fire suppression systems to properly control or mitigate the fire and fire suppression activities may also be factors in fire development or spread.

(6) *Fuel loads.* The type, amount, and configuration of fuels affect fire development and spread.

(7) *Housekeeping.* Poor housekeeping can contribute to fire damage by providing a more easily ignited fuel configuration and may allow more rapid fire/smoke spread. Poor housekeeping can also obstruct access of fire fighters during suppression activities.

(8) *Ventilation.* Fire department ventilation operations, HVAC, and open windows and doors may affect fire growth. Ventilation can also cause smoke and hot gases to move within or from compartments.

(9) *Code violations.* Violations of fire safety codes and standards can increase or cause damage (e.g., leaving fire doors open or penetrations of fire walls).

(10) *Structural failure.* Failure of building components or systems (utility, fire protection, compartmentation, etc.) can increase damage by allowing or causing fire and products of combustion to spread, providing additional fuels, or impeding fire suppression.

**19.3.3 Other Consequential Damage.** Other consequential damage can include loss of utilities, subsequent weather damage, corrosion, contamination, water damage, mold damage, or theft.

## 19.4 The Cause of Bodily Injury or Loss of Life. *(See Chapter 10 and Chapter 23.)*

**19.4.1 Fire/Smoke Spread.** The following are considerations that may be utilized in establishing the fire related cause of deaths or injuries:

(1) *Toxicity.* Deaths or injuries resulting from exposure to products of combustion.

(2) *Hazardous materials.* Deaths or injuries resulting from exposure to hazardous materials released as a result of the fire or explosion incident not directly related to products of combustion.

(3) *Compartmentation.* Casualties resulting from improper design or poor performance of compartmentalization features.

(4) *Change of occupancy/hazard.* Change from the original design and use from a lower hazard to a greater hazard without appropriate changes to fire protection, structural, or means of egress features.

(5) *Detection/alarm systems.* Failure to provide timely and effective notice of a fire, resulting from a delay in detection or a delay in notification, or ineffective notification.

(6) *Human behavior.* Human behavior resulting in casualties may include failure to react, inappropriate reaction to notification, or delay in evacuation *(see Chapter 10)*.

(7) *Fire suppression.* Failure of the building fire suppression systems to properly control or mitigate the fire and fire suppression activities may also be factors in fire injuries or deaths.

(8) *Housekeeping.* Poor housekeeping can contribute to fire injuries by providing a more easily ignited fuel configuration and may allow for more rapid fire/smoke spread. Poor housekeeping can also obstruct access of fire fighters during suppression activities or egress of occupants.

## AFFIDAVIT OF MARSHALL WEINBERG

I, Marshall Weinberg, under oath and penalty of perjury as set forth in 735 ILCS 5/1-109, state the following:

1. I am over 18 years old and competent to make this statement.

2. No threats or promises have been made to me. I am making this statement of my own free will.

3. I represented James Kluppelberg in relation to fire that occurred at 4448 S. Hermitage on March 24, 1984, Cook County Circuit Court case no. 88CR0166201. I was Mr. Kluppelberg's defense attorney from the night of his arrest through his trial.

4. I did not impeach Francis Burns with the Bomb & Arson or Area 3 police reports. This was not trial strategy.

5. I was recently made aware of evidence that existed at the time of trial that I would have found extremely useful in my defense of Mr. Kluppelberg.

6. First, I was unaware of statements made by Isabel Ramos to police investigating the fires at 4504 S. Marshfield Avenue and 4448 S. Hermitage Avenue. A copy of the police reports containing these statements is attached to this affidavit as Exhibit A. Had I had the police report regarding Ms. Ramos' statements to police, I would have used it in my defense of Mr. Kluppelberg at his trial.

7. Second, I was unaware of the existence of aerial photographs of 4448 S. Hermitage and its surrounding neighborhood, such as the one attached to this affidavit as Exhibit B. Had I had this evidence, I would have used it in my defense of Mr. Kluppelberg at his trial.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Marshall Weinberg, Esq.

Subscribed and sworn to me on this 2nd day of June, 2008.

Notary Public

OFFICIAL SEAL
ANDY THAYER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-12-2009

EXHIBIT
H

SUPPLEMENTARY REPORT — TEMP.

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

VICTIM'S NAME (AS SHOWN ON CASE REPORT)

ARTEAGA, Robert

**Incident:**

Arson/Aggravated - intentionally set fire in the two story frame house located at 4504 S. Marshfield and communicated to adjacent and nearby buildings at 4500, 4502, 4508, front and rear structures.   Bt. 913.

**Personnel Assigned:**

| | | |
|---|---|---|
| Det. Nelson | # 16164 | B&A |
| Det. Urban | # 15400 | B&A |
| Det. Vega | # 3464 | B&A |
| Det. Guest | # 10600 | B&A |
| Det. Micek | # 4645 | B&A |
| Det. Jenkins | # 11828 | B&A |
| Lt. Grublsic | # 233 | B&A |
| Commander Nickels | | |
| Det. Tuider | # 5648 | A3/VC |
| Det. McKinley | # 12994 | A3/VG |

**Custody:**

A&A Gang Roster

RAMOS, Isabel          F/H   DOB 8JUL46
4504 S. Marshfield
IR# 637053
CB# 7077053

**Reporting Officers:**

| | | |
|---|---|---|
| Det. Vega # 3464 | B&A | |
| Det. Urban # 15400 | B&A | |
| Det. Micek # 4645 | B&A | |

CLEARED

BOMB-ARSON

EXHIBIT
A

Aggravated
S. Marshfield
F104537

, Time, Location of Arrest:        17 17     24MAR84, 1015 hrs.
            -2 ... 1984                       4640 S. Marshfield

ges:                                          Aggravated Arson

t Branch and Date:                            Br. 44-4, 26MAR84

ted:                                          DNA

estigation:                         On 23MAR84 at 2315 hrs., there was a garage fire
                              at 1840 W. 46th St., RD# F105358. This case
     investigated by Det. Nelson of the Bomb and Arson Unit. On 24MAR84 at 0408 hrs., there
     a fire at 4454 S. Hermitage in which there were six fatalities as a result of the fire.
     fire at 4504 S. Marshfield and these two fires are within a few blocks of one another.
                                    On 24MAR84 at 1015 hrs., Detectives Vega and
on went to 4640 S. Marshfield and located Isabel RAMOS, who was the first floor tenant at
4 S. Marshfield. RAMOS agreed to accompany Detectives Urbon and Vega to the 9th district
talk about the fire in her building. As they were walking on the sidewalk toward the squad
, RAMOS blurted out, without being asked any questions, that she set the fire in her apartment.
. Vega then advised her of her rights and then asked her what had happened in her apartment.
stated that on 23MAR84 she set fire to the kitchen curtains in her apartment and then left
building. RAMOS was brought into the 9th District Tactical Officer where RAMOS was again
rised of her rights by Reporting Detective. In summary, RAMOS stated that she was mad at her
dlord and the woman who lives in the first floor apartment at 4502 S. Marshfield. She was
ry mad and after drinking a few beers, she decided to set fire to her apartment. She took
iece of paper and lit it on fire on her stove burners. She then used the burning paper to
t the kitchen curtains on fire that covered the window that overlooked the back yard. She
n picked up a six pack of Old Style and left the apartment. For the next several hours,
went to different bars on Ashland. Sometime late that night she eventually walked back
her apartment and observed that the building was burned to the ground. Because she had been
inking for several hours, she stated that she did not remember anything after seeing her
ilding burned down, except that she was walking around a lot and somehow ended up at her
at's apartment at 4640 S. Marshfield. At this time she did not remember setting any other
res other than the one in her apartment, but she said she may have set some after viewing
r burned down building. Because of her intoxicated condition, she does not remember what
ppened after finding her building burned down.
                                      It should be noted that RAMOS had to walk on her
p toes. When asked why she was walking in that manner, she stated that her feet hurt her
om doing so much walking last night.
                                   ASA Saul RAJFER arrived at the 9th District and
ain advised RAMOS of her rights and she repeated her story to him. She subsequently gave
handwritten statement of her account of the fire. RAJFER approved charges of Aggravated
son and the original court date was set for 26MAR84 in Branch 44-4.
                                      Because this fire was intentionally set, and
jacent buildings containing occupants were damaged by the fire, Reporting Detective requests
at this case be RECLASSIFIED to ARSON/AGGRAVATED and CLOSED AND CLEARED BY ARREST.

                                    W. Micek #4645
                          Det. W. Micek #4645

proved: _____

CLEARED
BOMB-ARSON





EXHIBIT

B

Case: 1:08-cv-03168 Document #: 1 Filed: 06/02/08 Page 73 of 85 PageID #:73

SUPPLEMENTARY REPORT — TEMP.
USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

VICTIM'S NAME (AS SHOWN ON CASE REPORT)
ARTEAGA, Robert

F — 104537

**Classifications:**

Arson/Aggravated — intentionally set fire in the two story frame house, located at 4500 S. Marshfield and communicated to adjacent and nearby buildings at 4500, 4502, 4508, front and rear structures. Bt. 913.

**Personnel Assigned:**

| | | |
|---|---|---|
| Det. Nelson | # 16164 | B&A |
| Det. Urbon | # 15400 | B&A |
| Det. Vega | # 3464 | B&A |
| Det. Guest | # 10600 | B&A |
| Det. Micek | # 4645 | B&A |
| Det. Jenkins | # 11828 | B&A |
| Lt. Grubisic | # 233 | B&A |
| Commander Nickels | | B&A |
| Det. Tuider | # 5648 | A3/VC |
| Det. McKinley | # 12997 | A3/VC |

ASA Saul Reifer

**Arresting Officers:**

RAMOS, Isabel — F/W — DOB 8/UU/46
4504 S. Marshfield
IR# 632053
CB# 7077053

| | | | |
|---|---|---|---|
| Det. Vega # 3464 | 4645 | 24 MAR 84 | B&A |
| Det. Urbon # 15400 | | | B&A |
| Det. Micek # 4645 | 4645 | | B&A |

CLEARED

BOMB-ARSON

EXHIBIT
H

+ S. Marshfield

F104537

e, Time, Location of Arrest:      17 17      24MAR84, 1015 hrs.
        -2 ... 1994                        4640 S. Marshfield

rges:                                      Aggravated Arson

rt Branch and Date:                        Br. 44-4, 26MAR84

ted:                                       DNA

estigation:                                On 23MAR84 at 2315 hrs., there was a garage fire
                                           at 1840 W. 46th St., RD# F105358. This case
investigated by Det. Nelson of the Bomb and Arson Unit. On 24MAR84 at 0408 hrs., there
a fire at 4454 S. Hermitage in which there were six fataltites as a result of the fire.
fire at 4504 S. Marshfield and these two fires are within a few blocks of one another.
                                           On 24MAR84 at 1015 hrs., Detectives Vega and
on went to 4640 S. Marshfield and located Isabel RAMOS, who was the first floor tenant at
4 S. Marshfield. RAMOS agreed to accompany Detectives Urbon and Vega to the 9th district
talk about the fire in her building. As they were walking on the sidewalk toward the squad
', RAMOS blurted out,without being asked any questions, that she set the fire in her apartment.
. Vega then advised her of her rights and then asked her what had happened in her apartment.
: stated that on 23MAR84 she set fire to the kitchen curtains in her apartment and then left
: building. RAMOS was brought into the 9th District Tactical Officer where RAMOS was again
ised of her rightsby Reporting Detective. In summary, RAMOS stated that she was mad at her
dlord and the woman who lives in the first floor apartment at 4502 S. Marshfield. She was
y mad and after drinking a few beers, she decided to set fire to her apartment. She took
iece of paper and lit it on fire on her stove burners. She then used the burning paper to
: the kitchen curtains on fire that covered the window that overlooked the back yard. She
n picked up a six pack of Old Style and left the apartment. For the next several hours,
went to different bars on Ashland. Sometime late that night she eventually walked back
her apartment and observed that the building was burned to the ground. Because she had been
inking for several hours, she stated that she did not remember anything after seeing her
ilding burned down, except that she was walking around a lot and somehow ended up at her
it's apartment at 4640 S. Marshfield. At this time she did not remember setting any other
res other than the one in her apartment, but she said she may have set some after viewing
r burned down building. Because of her intoxicated condition, she does not remember what
ppened after finding her building burned down.
                                           It should be noted that RAMOS had to walk on her
p toes. When asked why she was walking in that manner, she stated that her feet hurt her
om doing so much walking last night.
                                           ASA Saul RAJFER arrived at the 9th District and
ain advised RAMOS of her rights and she repoated her story to him. She subsequently gave
handwritten statement of her account of the fire. RAJFER approved charges of Aggravated
son and the original court date was set for 26MAR84 in Branch 44-4.
                                           Because this fire was intentionally set, and
jacent buildings containing occupants were damaged by the fire, Reporting Detective requests
at this case be RECLASSIFIED to ARSON/AGGRAVATED and CLOSED AND CLEARED BY ARREST.

                                           Det. W. Micek #4645

proved: _____



CLEARED
BOMB-ARSON

701

Winchester.
Members of the four committees are ... Arnold Grief of St. Michael's, Raymond Michalski, Marianne Wroblewski, and Thomas ... Edward LaPre,
**ARRANGEMENTS COMMITTEE** Martin of Martin Florists, Rev. Joseph Mytych of SS. Doyle. Gertrude Obirek



# BACK OF THE YARDS

# JOURNAL

*Serving the Southwest Side*

McKINLEY PARK — TOWN OF LAKE — BRIDGEPORT
GAGE PARK — CANARYVILLE — SOUTH BRIGHTON PARK

Offices ... 7366

**VOL. 52 NO. 13**     **WEDNESDAY, MARCH 28, 1984**     Circulat...

# Two tragic fires; six perish, many homeless

A wave of sympathy has poured out for the victims of the two tragic fires that occurred last Friday and Saturday. A mother and her five children perished in the second fire. Approximately 65 people were left homeless from both blazes.

About 1:30 p.m. Friday, a fire broke out in a building at 4504 S. Marshfield and quickly spread to 4502 and 4500 S. Marshfield destroying all three buildings and heavily damaging the building south of 4504.

Sunday, police arrested a resident of the 4504 address and charged her with aggravated arson.

Isabel Ramos, 37, admitted she set fire to the building because she was troubled and had an argument with her landlady.

Early Saturday, about 4 a.m. the second fire broke out it 4448 S. Hermitage claiming the six victims, destroying the building and two adjacent to it.

Dead are Elva-Luz Lupercio, 27, and the children: Santos Jr., 10; Sonia, 8; Crisobal, 6; Yadira, 4; and Anabel, 3.

The husband and father of the family, Santos Sr., 30, was injured after leaping from the second floor apartment.

Lt. James Morrison, a Fire Dep't. spokesman, said that he family was asleep when the fire broke out and that San-

tos Sr. tried to save them but the flames were too great.

It was surmised that he tried to get out and find another entrance to rescue his family. He is in critical condition at Holy Cross hospital.

The Police Bomb and Arson squad, which was called and reacted quickly to the earlier Marshfield fire, was on the scene again and conducting an investigation into the second fire.

Regarding the Hermitage fire, Lt. Joseph Grubisic of the Police Bomb and Arson Squad said the investigation is continuing and nothing will be left to the imagination.

"There was no evidence of an accelerant," he said, "but that doesn't eliminate arson."

The unit is also pursuing a possible link to the Marshfield fire. Isabel Ramos, who admitted setting that fire, has not been eliminated as a suspect in the second fire, he said.

Lt. Grubisic urges residents who may know anything about the cause of this fatal fire or who have information about any fire to call the ARSON HOTLINE at 922-2323.

"No names have to be given," he said. "We will respect their wishes."

Deputy Fire Commissioner Altman was in charge of the fire fighting operations, along with 15th Battalion Chief Fisher.

More than 10 pieces of equipment were reported at the scene including Engines 49, 65, 116, 23, and 123; and Trucks 33, 52, 18, 41, and 8.

Among the police officials at the fire scene were Ninth District Commander Timothy Daly, Ninth District Watch

(Continued on page 2)

## Columnist Navarro writes on fires, p. 14

# *Fire Victims set at Drovers*

Patrick J. Salmon, executive secretary of the Back of the Yards Neighborhood Council, 1751 W. 47th st., has announced that a special Fire Victims Fund has been established at Drovers Bank of Chicago, 47th and Ashland.

The fund has been set up to aid the victims of the two tragic fires that happened last weekend at 45th and Marshfield and 44th and Hermitage. Six perished and approximately 65 persons were left homeless.

"Their greatest need is money," Salmon said, "to relocate and put their lives together again.

"We will appreciate any funds that can be donated to this worthy cause."

Funds can be sent to Drovers Bank, 47th and Ashland, Chicago, IL., 60609.



## First check for

Patrick J. Salmon (right), executive secretary of Council, accepts the first check for Fire Victims elected committeeman of the 12th Ward Regula 20. At left is Dan Marquez, aide to Molaro.



...ave and heavy smoke billow from building at 4504 S. Marshfield last Friday afternoon as firefighters attempt to ...ll the blaze, which quickly spread to three other buildings, destroying all four. Arson was suspected and a woman ...nt later admitted to police that she set the fire.

(Journal photo by Gary Matula)



Firefighters from 10 units comb rubble of a house that stood at 4448 S. Hermit... day morning. A mother and her five children perished in the blaze. The Police ...

## Help locate fire victims

The estimated 65 victims left homeless by the two fires last Friday and Saturday have ...

## ...ree health exams ...il 3 at BYNC



BYNC to pick

**EXHIBIT**

J

BACK OF THE YARDS JOURNAL

Wednesday, March 28, 1984

MARKET

# Arson unit probes both fires

(Continued from page 1)

Commanders Captain Thomas Nolan and Lt. John Collins, the bomb and arson unit, three beat cars, and four squadrols.

Also providing help to the victims were representatives from the Back of the Yards Council, Department of Human Services and the Red Cross.

Fourth District Deputy Chief Penick was in charge of operations at the earlier Marshfield fire. Among the units there were snorkel 3 and engine 39.

The Lupercios were married in Mexico in 1973 and came to the United States in 1977.

Three years ago, the family moved into the building on Hermitage.

Neighbors and friends said the Lupercios were very well liked.

Santos worked at the Midwest Nut and Seed factory.

They took part in activities at Seward school, which the older children attended.

They were planning to eventually return to Mexico, where the burial for the six victims will take place.

The first firemen at the scene find flames and dense smoke billowing from a home at 4504 S. Marshfield last Friday afternoon. Fanned by a steady breeze, the flames soon engulfed adjoining buildings at 4502 and 4500 S. Marshfield.

(Journal photo by Gary Matula)





## Heroic effort...

Ninth District Police Officers Richard Barajas and Connie Mendoza (above), and Larry Orpik rescued an elderly woman from a fire which destroyed four homes in the 4500 block of S. Marshfield Friday afternoon.

Three Ninth District Police Officers are credited with rescuing an elderly woman during the Friday afternoon fire that destroyed four buildings in the 4500 block of South Marshfield and left some 37 persons homeless.

Officers Richard Barajas, Connie Mendoza, and Larry Orpik were among the first to arrive on the scene after the fire broke out around 1:30 p.m.

Officer Mendoza said that she and Barajas were on patrol in the area when a police tactical unit called the fire in.

Arriving on the scene, the officers immediately entered buildings adjacent to the frame home at 4504 S. Marshfield where the fire originated to alert residents.

An elderly woman living in a second floor rear apartment of the corner building, 4503 S. Marshfield, apparently was sleeping and did not immediately respond.

Officer Mendoza said that she was directing traffic away from the fire scene when she saw officers Barajas and Orpik motioning for the woman to come down.

"The porch was caving in already," Barajas said, "She was stunned, she didn't know what was happening."

Despite the intense heat

## Police arrest youth for garage fire

A 16-year-old high school student was arrested last Saturday night and charged with arson after witnesses placed him at the scene of a garage fire in the 1800 block of West 46th street.

The police said that Lt. Keating, of the Chicago Fire Department, told them that while fighting the fire he was informed by a witness that the boy had been in the alley at the rear of the garage when it was on fire, before the Fire Department was called.

According to police, the witness said that at approximately 11:10 p.m. he saw the boy and another youth at the rear of the garage.

The witness told police that the boys fled when they saw him. He said that he noticed smoke coming from furniture which was piled against the garage and started on fire.

Two other witnesses came from a friend's house after seeing the smoke and attempted to extinguish the fire, the police said. The police were taken to the boy's house by the witnesses, where he was in formed of the allegation and placed under arrest.

He was turned over to the Area Three Youth Division for processing and court referral.

## 'Volunteer Youth Fingerprint Program'

BACK OF THE YARDS JOURNAL

Wednesday, March 28, 1984

# Who is burning these houses?

## BY JAVIER NAVARRO

While observing the ruins of what remains after the fire at 4448 S. Hermitage, Mr. Pat Salmon, of the Back of the Yards Council asked, just as are the residents of the area, "How is it possible that there is someone out there capable of starting a fire, knowing that in that building, among the residents are many children, and yet, at a time when all are sleeping?"

Up to now, Sunday, the 25th, there does not seem to be an answer.

Both fires, the one at 45th and Marshfield, Friday afternoon and the one on 44th and Hermitage during the early hours of Saturday morning, have abruptly shaken the residents of this heavily-populated area.

There are suspicions that both fires were set intentionally, that there may be an arson maniac on the loose, whose motives for committing such a crime are unknown to anyone.

Note: A resident of the 4504 S. Marshfield building was later charged with arson in that first fire.)

Another suspicion may be that the fire that killed the Lupercio family may be related to an old feud between two men, whose motives remain unknown. Commander Timothy Daly of the 9th Police District arrived within minutes of the blaze and when I approach-

ed him, several hours later, I was able to appreciate the fact that he was quite upset over the magnitude of the tragedy. The firefighters were still looking for bodies among the debris.

Then, Commander Nunn informed me that 6 persons had lost their lives, among them 5 children, between the ages of 3 and 10 years, as well as their mother, Elva Luz, 28 years. Their father, Santos, remains in Holy Cross Hospital in critical condition.

Never has this neighborhood felt a tragedy as terrible as this. This is all that was missing. Now not only must we deal with the proliferation of gangs in our community, but also with an arsonist on the loose, and it is at these dramatic moments that the question is asked, why is there not more participation, more unity, more brotherhood and more interest in one over another?

If in fact those fires were caused intentionally, which I would not doubt, how is it possible that someone knowing the person or persons responsible for this act, would not denounce them?

If in fact it was an arson, the person committing the crime undoubtedly lives near by, and must have friends. Usually, these cowards brag about the crimes they have commi-

ted as if it were a joke.

Someone out there knows who is responsible for this crime and, for cowardice or indifference, does not open his mouth. If this is the case, this concealer, through his silence and complicity about the crime, becomes an accomplice of the crime.

Most people are good and respectable persons, yet we have a few bad apples in our neighborhood. Will the assassin remain without punishment?

The police continue to investigate the case intensively and sooner or later the one responsible for this tragic loss of lives and homes will be caught. But, in the meantime, this disgrace can be repeated.

The Back of the Yards Council is sponsoring a "FIRE VICTIMS FUND" and contributions can be mailed or taken to: "FIRE VICTIMS FUND," Drovers Bank 47th & So. Ashland, Chicago, Illinois 60609.

The Back of the Yards Council at 1751 W. 47th st. (Wood) 2nd fl., has available smoke alarms for $8.15. We urge every household to install at least one alarm, (preferably more depending on the size of the home). It can mean the difference between life and death.

Javier Navarro, PO Box 09234 Chgo. IL., 60609.

## Federal Savings

509

0442

## Is year's money a bite out of last year's taxes.

### By opening an IRA at Standard Federal by April 16th.

An IRA at Standard Federal lets you and your spouse deduct up to $4,000 off last year's income tax return. Using this year's

# T.A.S.C.

**Administrative Offices:**
1500 North Halsted • Chicago, Illinois 60622 • (312) 787-0208
**Please Reply To:**

**TREATMENT ALTERNATIVES TO STREET CRIMES**

**Offices in:**
Belleville, Chicago, Edwardsville, Geneva, Joliet, Murphysboro, Peoria, Rock Island, Rockford, Skokie, Springfield, Urbana, and Waukegan

November 30, 1988

The Honorable Joseph Urso
Circuit Court of Cook County
2600 S. California Ave.
Chicago, IL. 60608

*AURELIA PUCINSKI*
*CLERK OF THE*
*CRIMINAL COURT*

Re: Case #87-CR-11692, 93, Duane Glassco    STATUS CALL:    12/1/88

Dear Sir:

On ___9/17/88___ TASC referred ___Mr. Glassco___ to ___Holding Pattern___ treatment at ___TASC Headquarters___.

Treatment progress has been carefully monitored. The following is a summary of the Client's treatment plan and treatment progress for ___October 1988___

**TREATMENT PLAN:**

___2___ Scheduled counseling sessions(s)    *per month*

___1___ Scheduled urine monitoring(s)    *to date*    ___n/a___ Scheduled breath test(s)

**URINALYSIS RESULTS (DRUG):**

___0___ Negative report(s) indicating the ABSENCE of illegal drugs

___1___ Positive report(s) indicating the PRESENCE of illegal drugs

**BREATH TEST OR URINALYSIS RESULTS (ALCOHOL):**

___n/a___ % of Blood/alcohol level

___n/a___ Negative report(s) indicating the ABSENCE of alcohol

___n/a___ Positive report(s) indicating the PRESENCE of alcohol

**CLINIC ATTENDANCE:**

___0___ In attendance for all scheduled clinic appointment(s)

___3___ Unexcused absence(s) for scheduled clinic appointment(s)

___0___ Excused absence(s)    (See explanation below)

**COMMENTS:** *Mr. Glassco has not kept any of his scheduled appointments with TASC. He was scheduled to be referred for out-patient aftercare, but, has not come in. On 9/23/88, Mr. Glassco provided urine for analysis and the results were positive (Opiates and Cocaine). Mr. Glassco has missed two (2) jeopardy meetings and is currently in third jeopardy status. On 11/28/88, TASC received a call from Mr. Glassco who stated he has been incarcerated since 10/6/88, on an Intensive Probation Violation. TASC*

Sincerely,

*Jill Safford*

TASC Case Manager  *Jill Safford*

cc:    *Ms. Constance Reynolds, Probation Officer*
      *The Honorable Michael Close, Skokie*
      *Client File*

JS:kak

**EXHIBIT**
K

C-P-1
4/24/84

Page 2

November 30, 1988

The Honorable Joseph Urso
Circuit Court of Cook County
2600 S. California Ave.
Chicago, IL. 60608

Re:  Case #87-CR-11692, 93, Duane Glassco        STATUS CALL:  12/1/88

COMMENTS: CONT.

is awaiting Your Honor's permission to discharge Mr. Glassco unsuccessfully.



**Administrative Offices:**
1500 North Halsted • Chicago. Illinois 60622 • (312) 787-0208
**Please Reply To:**

TREATMENT ALTERNATIVES TO STREET CRIMES

Offices in:
elleville, Chicago, Edwardsville, Geneva, Joliet, Murphysboro. Peoria, Rock Island, Rockford, Skokie, Springfield, Urbana. and Waukegan

January 24, 1989

The Honorable Joseph Urso
Circuit Court of Cook County
2600 S. California Ave.
Chicago, IL. 60608



Dear Sir:

This is to inform you of a probationer's failure to satisfy the requirements of the TASC program effective _____1/24/89_____.

**Probationer's Name:** Duane Glassco

**Date of Birth:** June 29, 1964

**Case Number(s):** #87-CR-11692 & 93

**Probation and Jurisdiction and Conditions:** Four years Chapter 38 probation, TASC, Open In-Patient Mandate. **Jurisdiction Dates: 2/9/88 to 2/9/92.**

TASC understands that the probationer's unsuccessful completion of substance abuse treatment under the supervision of the TASC program constitutes a failure to comply with the orders and conditions of the probation. TASC further understands that the Probation Department, upon receipt of this notification, may initiate the violation of probation.

Attached hereto is TASC's official Treatment Summary Record for the above named probationer. This summary sets forth the measures taken by TASC and describes the circumstances which led to the expulsion.

Sincerely,

Jill Safford
TASC Case Manager

cc: Constance Reymonds, Probation Officer
    The Honorable Michael, Skokie
    Janelle Prueter, Case Management Coordinator
    Client File

JS:kak

## TREATMENT SUMMARY REPORT:

**3/17/88**
On 3/17/88, TASC referred Mr. Duane Glassco to residential treatment at HRDI's Roseland Residence in Chicago, IL. An initial treatment plan was designed for him which consisted of two individual and group counseling sessions a week and randomly urinalysis screenings a month. He was also to attend Narcotics Anonymous, Cocaine Anonymous and Alcoholics Anonymous meetings.

**3/18/88 to 8/9/88**
Mr. Glassco was oriented to TASC criteria and residential treatment expectations. Initial reports indicated Mr. Glassco made the necessary adjustment to residential treatment. He began attending G.E.D. classes and Narcotics Anonymous, Cocaine Anonymous and Alcoholics Anonymous meetings on a regular basis. On 8/8/88, TASC was informed by the Unit Director (Ms. Cecilia Bozeman) that Mr. Glassco had been allowed to go to court on a child support case, and had been taken into custody. After following up on the case, TASC learned Mr. Glassco had been released from custody. He arranged child support payments and was allowed to continue with treatment. Urinalysis reports for this period were negative indicating the absence of illegal and illicit substances.

**8/10/88 to 1/24/89**
Mr. Glassco continued to make progress in treatment. He secured part-time employment during this period and was an active participant in his treatment regiment. On 9/17/88, Mr. Glassco successfully completed the residential phase of treatment. On 9/23/88, Mr. Glassco reported to TASC Headquarters to provide urine for analysis. The results were positive (Opiates, Amphetamines and Cocaine). Mr. Glassco began to miss his scheduled appointments at TASC Headquarters. Mr. Glassco made no contact with TASC. On 11/28/88, Mr. Glassco contacted TASC to state he had been incarcerated since 10/6/88, on an intensive probation violation. TASC contacted the Cook County Intensive Probation Department who verified Mr. Glassco's claim. TASC continued to appear in court on Mr. Glassco's case. However, since Mr. Glassco is incarcerated and has been unable to fulfill his TASC Obligations. Mr. Glassco is being unsuccessfully discharged from TASC supervision.

**Summary:**
According to TASC criteria, a client who is incarcerated exceeding 30 days will be unsuccessfully discharged from TASC supervision. Consequently, Mr. Duane Glassco was unsuccessfully discharged from TASC on 1/24/89. On 1/24/89, TASC notified the Adult Probation Department of Mr. Glassco's unsuccessful termination from TASC.

Please notify the TASC Case Management Unit of any VOP dates at 787-0208.

EXHIBIT

L

| STATEMENT OF | ☐ ACCUSED | ☐ WITNESS | | DATE OF STATEMENT |
| --- | --- | --- | --- | --- |
| | ☒ COMPLAINANT | ☐ VICTIM | | 3 February 1988 |

CHICAGO POLICE DEPARTMENT

| NAME OF PERSON INTERVIEWED | | | | SEX | RACE | DATE OF BIRTH | AGE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Dawn Gramont | | | | F | W | 7 March 65 | 22 |

| ADDRESS | TELEPHONE NO. | OCCUPATION |
| --- | --- | --- |
| 3629 South Parnell, 1st Floor | mother's 847-7987 | Housewife |

| DEPARTMENT MEMBER — STAR NO. | EMPLOYEE NO. | SOCIAL SECURITY NO. | DATE OF APPOINTMENT | UNIT/ASSIGNMT. | NO. OF MONTHS IN PRESENT ASSIGNMT. |
| --- | --- | --- | --- | --- | --- |
| | | | | | |

| PLACE OF INTERVIEW | TIME OF INTERVIEW |
| --- | --- |
| Office of Professional Standards | 0930 |

INVESTIGATORS
F. Sanders, #6

OTHER PERSONS PRESENT
None.

---

Q. Could you please relate to me, in summary, what occurred on 22 January 1988, at approximately 11:30am, in the State's Attorney's Office, 26th and California?

A. It started at about 7:30am that morning. Three plainclothes officers picked me up at home and took me to 39th and California. They had a summons to appear in court that day. They wanted to question me about James Kluppelberg, he's the father of one of my children, and the arson in 1984. At 39th and California, two of them took me to a room on the 3rd floor and asked me questions. Then one of the officers said he had a personal vengeance toward James, those were his exact words, and that he was going to see him sit for life one way or the other. He told me what to say during the grand jury testimony. I had explained to him that James couldn't have started the fire, because he was at home with me and some friends. But he said I was going to say that James climbed a pole and cut some wires to start the fire or else he was going to make sure that my kids got hurt. The other officer kept going in and out of the room; he never talked like this to me. Then at about 10:30, I'm not sure, we went to 26th and California. The same two officers took me to the State's Attorney's office. After awhile we went into the State's Attorney's office, I think his name was Patrick Rogers. He

---

| SIGNATURE OF PERSON INTERVIEWED | INVESTIGATOR'S INITIALS | C.R. NO. |
| --- | --- | --- |
| Dawn Gramont | fjs | 159563 |
| 4.116-A (Rev. 5/84) | | ATTACHMENT NO. |

| ICAGO POLICE DEPARTMENT | | PAGE | OF |
|---|---|---|---|
| ATEMENT OF | Dawn Gramont | 2 | 4 |

said he had to leave the room for awhile, and when he left, the
same officer who had threatened me told me that I was going to make
the statements in court that he told me. I told him I didn't want
to go along with him, and he said wasn't I forgetting what he was
going to do to me and my kids. Then he pushed my head against
the door and said I better do what he said. I had my earrings in
my hands, and then he hit me with his flashlight on my right hand once
and told me to stop playing with my earrings. Then a little while
later the State's Attorney came in and asked me questions which I lied
to. I told him what the officer told me to say. Then we went down to
the court for the grand jury testimony. When I went in, the State's
Attorney, the same one from upstairs, asked me questions and I lied,
gave the same answers as upstairs. Then it was dismissed and I went
home.

Q. Did you get home on your own or did the same officers who picked you
up drive you home?

A. The officer that had pushed me and threatened me took me home.

Q. Did you have any verbal or physical contact with the officer after
leaving the grand jury?

A. No.

Q. Do you know the name of the officer who struck you and threatened you?

A. No. The day before this happened, I had a card left at home from
a Rusnac and Smith from Area 3 Violent Crimes. I'm not sure if these
were the same people who picked me up. I never called them, because
my attorney, he's also James' attorney, told me not to talk to anybody.

Q. Had you ever seen the officer who struck you prior to the date in questic

| SIGNATURE OF PERSON INTERVIEWED | INVESTIGATOR'S INITIALS fjs | C.R. NO. 159563 |
|---|---|---|
| PD-44.116-B (5/84) | | ATTACHMENT NO. 4 |

**CHICAGO POLICE DEPARTMENT**

| STATEMENT OF | | PAGE | OF |
|---|---|---|---|
| Dawn Gramont | | 3 | 4 |

1  A. Yes. I'm pretty sure he was the same officer who did the investigation

2  in 1984.

3  Q. Can you describe this officer?

4  A. He's white, tall, maybe 6' or 6'2", medium, grey hair, late 30's

5  or early 40's, no glasses. His hair was stringy and kind of long.

6  Q. Can you describe the other officer who was present during the questioni

7  A. White, about 5'8", dark brown hair, kind of stocky, in his 40's.

8  Q. Did this officer have any physical contact with you at any time?

9  A. No, nothing. He was nice. He's the one that first started asking

10  questions. I told him I didn't know anything and he just said okay

11  and left it.

12  Q. Could you positively identify the officer who struck you if you

13  viewed photos?

14  A. I'm not sure about photos. I could definitely pick him out in person.

15  When we were in the State's Attorney's office, the two officers told

16  the State's Attorney that they wanted to know what happens on the case,

17  that they were the ones in charge of the investigation.

18  Q. Do you know the status of the case at this time?

19  A. He's been indicted on six counts of murder and I know he goes to trial

20  on February 17.

21  Q. When is the last time you had contact with James?

22  A. I saw him Monday, this week. I usually see him every other week.

23  He's been at 26th and California for about 3 or 4 weeks. He has

24  no idea that I went before a grand jury. It would blow his mind.

25  James and I haven't been living together since late 1984.

26

| SIGNATURE OF PERSON INTERVIEWED | INVESTIGATOR'S INITIALS | C.R. NO. |
|---|---|---|
| Dawn Gramont | fjs | 159563 |
| CPD-44.116-B (5/84) | | ATTACHMENT NO. 4 |

CHICAGO POLICE DEPARTMENT

STATEMENT OF      Dawn Gramont      PAGE 4

1  Q. Was anyone ~~ever~~ present at the State's Attorney's office ~~premises~~ who

2     may have witnessed the officer push you and strike you?

3  A. There was a woman outside the office, I'm not sure if she saw or not.

4  Q. Was the other officer present?

5  A. No. He had gone to check on another case. I was alone in the room

6     with the taller officer.

7  Q. Did you receive any injuries from the incident?

8  A. A bump on the head. And my hand hurt for a couple of days. But I

9     didn't need to go the doctor.

0  Q. When you called in the complaint on the date of the incident, why didn't

1     you present the allegations regarding the threats made by the police

2     officer who struck you?

3  A. I called from James' mother's house. I didn't want them to know that

4     I had gone before the grand jury. They still don't know. The only

5     ones that know are my lawyer and my mother.

6                 END OF STATEMENT 1050 hours

7

8

9

0

1

2

3

4

5

6

SIGNATURE OF PERSON INTERVIEWED    *Dawn Gramont*

INVESTIGATOR'S INITIALS   fjs

C.R. NO. 159563

PD-44.116-B (5/84)

ATTACHMENT NO. 4