F I L E D

JUN - 2 2008
Jun 2 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

United States of America ex rel. )
JAMES KLUPPELBERG (N50320), )

    Petitioner, )

    vs. )

TERRY McCANN, Warden )

    Respondent. )

**08CV3168**

c **JUDGE MAROVICH**

**MAG.JUDGE KEYS**

Case Number of State Court **JUDGE MAROVICH**
Conviction: 88 CR 1662

**MAGISTRATE JUDGE KEYS**

**MOTION FOR LEAVE TO STAY PETITION AND HOLD IN
ABEYANCE SHOULD COURT DEEM CLAIMS UNEXHAUSTED**

Now Comes Petitioner, JAMES KLUPPELBERG, by and through his attorneys, THE

EXONERATION PROJECT, and moves for clarification of how he should proceed:

**Introduction**

1.    On March 20, 1990 James Kluppelberg was wrongfully convicted of an arson

and related six-person homicide that he did not commit.

2.    The fire occurred in March 1984 at 4448 S. Hermitage Avenue. After the

police spoke to witnesses and examined the physical evidence, the police department closed the

case as an "accidental" fire.

3. It was not until nearly four years later, when the man who would become the

State's star witness was facing multiple felony charges, that the case reappeared. Duane Glassco

was arrested in November 1987 for burglary, theft and violation of probation. He spoke to the

police in December 1987 regarding the fire, and the State's Attorney in January 1988. Within

days of that conversation, former Chicago Police Commander Jon Burge, armed with Mr.

Glassco's inculpatory statements, announced that Mr. Kluppelberg had been arrested.

4.    Mr. Glassco, a career criminal, drug addict and a personal enemy of Mr. Kluppelberg's, testified pursuant to a plea deal. Mr. Glassco said that despite being high on cocaine on the night in question and despite four years having passed, he remembered seeing Mr. Kluppelberg going back and forth to 4448 S. Hermitage from an attic window in a nearby house.

5.    Although Mr. Glassco's testimony seemed unbelievable, the trial court credited his account. It was not until May 2008 that Mr. Glassco agreed to tell the truth. Mr. Glassco recanted his testimony, averring that he lied "to get out" out of jail. See Glassco Aff. ¶ 10, attached as Exhibit A. He explained that he could not have seen what he said that he saw because there was a building blocking his view of 4448 S. Hermitage from the attic window. See id. ¶¶ 4-5. Indeed, aerial photographs of the area -- which the State possessed prior to Mr. Kluppelberg's trial but failed to turn over to the defense -- confirm the impossibility of the view that Mr. Glassco claimed to have had. See id. ¶ 9.

6.    The only other evidence used to inculpate Mr. Kluppelberg was the testimony of the State's arson expert, Francis Burns. Mr. Burns allegedly viewed the fire at 4448 S. Hermitage in March 1984 when he was part of a non-operational fire division. According to Mr. Burns, he and his apprentices went to 4448 S. Hermitage as a training exercise. Although Mr. Burns purportedly determined at the scene that the fire was incendiary, he took no notes, made no reports and never indicated to anyone in the police department -- which was charged with fire investigations in Chicago at the time -- that he thought the fire was an arson.

7.    Five years later Mr. Burns testified from memory that the fire was incendiary based on alleged burn patterns he said that he had seen. Those burn patterns have all been debunked by modern arson science. See Report by Dr. Russell Ogle, May 23, 2008, attached as Exhibit B. In short, they are meaningless.

2

8.     The State's entire case rested on the shoulders of Mr. Glassco and Mr. Burns. Without their testimony, the State has no proof that the fire was an arson and nothing to tie Mr. Kluppelberg to the fire.

9.     Moreoever, additional significant new evidence that has arisen since Mr. Kluppelberg's trial makes clear that Mr. Kluppelberg is absolutely innocent of the crime for which he was convicted.  Most notably, Mr. Kluppelberg has located information regarding a woman, Isabel Ramos, who confessed to police in March 1984 that she may have started the fire at 4448 S. Hermitage.  See Police Report, RD # 104537, attached as Exhibit C; "Two tragic fires; six perish, many homeless," Back of the Yards Journal, March 28, 1984, at 1 and Javier Navarro, "Who is burning these houses?," Back of the Yards Journal, March 28, at 14, attached as Group Exhibit D.  On March 24, 1984, Ms. Ramos was arrested by detectives for starting a nearby fire at 4504 S. Marshfield just hours before the fire at 4448 S. Hermitage.  See Exhibits C and D. Because of the proximity in the time and location of the fires and the striking parallels in the destruction wrought by the two fires, Ms. Ramos was questioned about both: she flatly confessed to having started the Marshfield fire and admitted that she also may have started the fire at 4448 S. Hermitage.  See Exhibit C.  As a result, Ms. Ramos was arrested by Detective Kenneth Urbon -- the very same detective who was responsible for investigating the fire at 4448 S. Hermitage -- and convicted.

10.     Despite the obvious exculpatory nature of the information regarding Ms. Ramos' confession, none of it (including the police report that memorialized her confession) was ever turned over to Mr. Kluppelberg.  Had it been, it would have been damning for the prosecution.

3

**The Courts Are Inconsistent in Ruling on Whether Claims
Based on New Evidence are Deemed Exhausted**

11.    As demonstrated above, since his post-conviction petition was denied, Mr.

Kluppelberg has uncovered significant new evidence demonstrating his innocence:  Most

notably, Mr. Glassco has recanted his false trial testimony and Mr. Kluppelberg has located

information relating to Ms. Ramos that was unconstitutionally suppressed by the State.  In his

federal habeas petition, Mr. Kluppelberg has raised several claims relating to this new evidence

that were not raised in his state proceedings below.  See Habeas Pet., Grounds Four, Five, Seven,

Eight and Nine.

12.    Under these circumstances, it is unclear whether Mr. Kluppelberg would be

considered to have exhausted his remedies in State court.

13.    A claim is exhausted if, at the time the petitioner files the federal petition, there

is no avenue available in the state judicial system for reviewing the merits of the claim.  28

U.S.C. § 2254(c).  Generally speaking, this requirement "does not mean that the prisoner has to

'invoke any possible avenue of state court review,' such as repetitive post-conviction petitions

and extraordinary remedies."  Moore v. Casperson, 345 F.3d 474, 485 (7th Cir. 2003) (quoting

O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999)) (emphasis in original); see also O'Sullivan,

526 U.S. at 844 ("Thus, we have not interpreted the exhaustion doctrine to require prisoners to

file repetitive petitions.").

14.    The courts, however, have been inconsistent in their treatment of whether a

petitioner is required to file a successive state court petition where new evidence -- that could not

have been procured sooner -- arises.  For example, in United States ex. rel. Strong v. Hulick, 530

F. Supp. 2d 1034, 1043 (N.D. Ill. 2008), the court found that the petitioner had acquired new

evidence that he could not have discovered and presented in time to include in his original state

4

post-conviction petition. As a result, Strong held that the claims based on that new evidence were not exhausted, and the court stayed and held petitioner's federal habeas petition in abeyance while the petitioner sought state review. Id.

15.    In contrast, in Crivens v. Roth, 172 F.3d 991, 995 (7th Cir. 1999), the Seventh Circuit held that a federal habeas petitioner had exhausted his state remedies despite presenting a Brady claim and attendant new evidence for the first time in his federal habeas petition. In Crivens, after the petitioner had completed direct review of his conviction, he discovered new evidence regarding a witness' criminal background that had not been previously disclosed by the State. The courts held that Mr. Crivens had exhausted his State remedies despite not having brought the Brady claim below. Id. ("Although he did not file for postconviction relief, we conclude that Mr. Crivens has exhausted his state remedies because Illinois' strict res judicata rules would almost certainly bar him from being heard on his claims, see Gornick v. Greer, 819 F.2d 160, 161 (7th Cir. 1987), and because he can establish cause and prejudice for his failure to raise at least one of them before the Illinois courts."). The court additionally found that the petitioner's Brady claim was not procedurally defaulted because the petitioner demonstrated good cause for failing to bring the claim sooner. Crivens, 172 F.3d at 995-96.

### Mr. Kluppelberg's Petition Should be Stayed if Claims are Unexhausted

16.    Because courts cannot consider mixed petitions containing both exhausted and unexhausted claims, see Rose v. Lundy, 455 U.S. 509 (1982), if this Court is inclined to find that Mr. Kluppelberg's claims relating to the new evidence described above are unexhausted, Mr. Kluppelberg requests permission to stay this federal habeas petition and hold it in abeyance while he litigates those claims in State court.

17.    A federal district court "has discretion to stay [a] mixed petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then return to federal court for review of his perfected petition." Rhines v. Weber, 544 U.S. 269, 271-72 (2005). Indeed, it may be considered an abuse of discretion for a district court to refuse to grant a stay "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious and there is no indication that the petitioner engaged in intentionally dilatory tactics." Id. at 278. Such is the case here.

18.    The claims that Mr. Kluppelberg has not raised in State court all derive out of new evidence that he uncovered within the past couple of months and could not have discovered sooner because of the state's misconduct -- e.g., the recantation of Duane Glassco and the confession of Isabel. Cf. Strong, 530 F. Supp. 2d at 1043 (finding good cause where petitioner was raising claims based on new evidence).[1] As such, Mr. Kluppelberg has good cause for his failure to exhaust. To find otherwise would be a perversion of justice: it would penalize Mr. Kluppelberg for failing to uncover information that the State should have disclosed to him nearly 20 years ago.

---

[1]    In addition, since filing his post-conviction petition in 1994, and in light of substantial advances in arson science, Mr. Kluppelberg has acquired a report by an arson expert, Dr. Russell Ogle. Mr. Ogle examined the police reports, trial transcripts and photographs of the fire -- i.e., the evidence that was already before the state court during trial -- and opined that there was no physical evidence indicating that this was an incendiary fire. See Exhibit B. Under Vasquez v. Hillery, 474 U.S. 254, 259 (1986), and its progeny, a petitioner may supplement and clarify the record with additional affidavits, more sophisticated statistical analyses and expert reports. See id. (finding that expert analysis of evidence already before the court is not new evidence); Castaneda v. Partida, 430 U.S. 482, 496 n.12 (1977) (granting habeas corpus relief based on statistical data and analyses generated by Supreme Court sua sponte); Boyko v. Parke, 259 F.3d 781, 789 (7th Cir. 2001) (attaching transcript that was not included in post-conviction petition did not fundamentally alter claim such that it was not exhausted). Mr. Kluppelberg believes that Mr. Ogle's report falls squarely within Vasquez's confines. If this Court, however, should determine otherwise, Mr. Kluppelberg too requests permission to stay and abey his petition to include this new evidence in a successive state post-conviction petition.

19.    Additionally, Mr. Kluppelberg's potentially unexhausted claims are
meritorious. With regard to Mr. Glassco's recantation, Mr. Kluppelberg has raised two claims:
first, that the State called Mr. Glassco to testify despite knowing that his testimony was perjured
and second, that the State withheld aerial photographs that would have proven that Mr. Glassco
could not have seen what he said that he saw. Mr. Glassco was the State's key witness and the
only person who put Mr. Kluppelberg anywhere near the scene of the fire. As a result, the Judge
held that his testimony was "critical" to her finding Mr. Kluppelberg guilty. Had the court
known that Mr. Glassco was perjuring himself or had Mr. Kluppelberg had the photographs
directly refuting Mr. Glassco's testimony, the entirety of the State's case would have been
undermined.  Cf. United States v. Agurs, 427 U.S. 97, 103 (1972) ("A conviction obtained by
the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is
any reasonable likelihood that the false testimony could have affected the judgment of the
jury."); United States v. Boyd, 55 F.3d 239, 242-46 (7th Cir. 1995) (finding due process violation
where government knew that witnesses were either using drugs or drug dealing but allowed
testimony to the contrary to go uncorrected).

20.    With regard to Ms. Ramos, the State failed to disclose evidence that it had in its
possession that Ms. Ramos confessed to possibly having set the fire for which Mr. Kluppelberg
was convicted. That evidence was clearly exculpatory under Brady v. Maryland, 373 U.S. 83
(1963). Indeed, like Brady, the suppressed evidence consisted of a confession from another
suspect. See Brady, 373 U.S. at 84-86.

21.    Moreover, the failure to disclose Ramos' confession was highly prejudicial.
The evidence against Mr. Kluppelberg was extremely weak: it consisted of a career criminal and
known liar stating that Mr. Kluppelberg was at the scene of the fire and an alleged arson expert

who viewed the scene in 1984, took no notes, made no reports, yet remembered the fire five years later and remembered that the fire was an arson. The State's arson expert's finding was, of course, memorialized nowhere, directly contradicted by the police, who, after performing the official investigation closed the fire as an accident, and is now contradicted once again by modern arson science. Being able to argue that the crime was committed by someone else -- indeed, someone else who had set a fire two blocks away just hours before and who confessed to possibly having set the one for which Mr. Kluppelberg was convicted -- would have been extremely powerful evidence to present at trial and likely would have changed the court's ruling. Cf. Strickler v. Greene, 527 U.S. 263, 288 (1999) (finding Brady violation where there is "a reasonable probability that the result of the trial would have been different"); Watkins v. Miller, 92 F.Supp.2d 824, 829 (N.D. Ind. 2000) (finding that where evidence against defendant was thin, failure to disclose that another person had failed polygraph relating to crime was Brady violation).

22. Finally, in failing to raise these claims in State court, Mr. Kluppelberg in no way engaged in dilatory tactics. To the contrary, he just learned of this new evidence that was previously suppressed by the State. It is only because of the State's misconduct that his litigation has been in any way delayed.

**Conclusion**

23. Mr. has brought this motion and filed a protective federal habeas petition to ensure that his rights are protected and that he will have an opportunity to litigate claims deriving out of new evidence that he has recently secured. If this Court should deem the claims Mr. Kluppelberg raised in his federal habeas petition based on this new evidence to be unexhausted -- and the petition therefore mixed -- Mr. Kluppelberg requests permission to stay his petition and

hold it in abeyance while he litigates those issues in state court. As Mr. Kluppelberg has demonstrated above, he has met the threshold for the stay and abey procedure and therefore requests the same.

WHEREFORE, Petitioner respectfully requests that this Court stay his federal habeas petition and hold it in abeyance should the Court deem his claims to be unexhausted.

Respectfully Submitted,

Jon Loevy
Russell Ainsworth
Cadence Mertz (711 License No. 2008LS00125)
Ashley Schumacher (711 License No. 2008LS00127)
THE EXONERATION PROJECT
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 834-4488 (phone)
(773) 702-2063 (fax)

## AFFIDAVIT OF DUANE GLASSCO

I, Duane Glassco, under oath and penalty of perjury as set forth in 735 ILCS 5/1-109, state the following:

1. I am over 18 years old and competent to make this statement.

2. No threats or promises have been made to me. I am making this statement of my own free will.

3. I testified in the case, People v. Kluppelberg, 88 CR 1662. I know James Kluppelberg as Jim. I never liked Jim.

4. Some of the testimony that I gave in Jim's case was not true. In particular, I didn't see Jim go back and forth from Dawn's house to 4448 S. Hermitage on the night of the fire. I didn't see anything about how the fire got started. I was getting high with Michelle and Donnie.

5. In addition, you couldn't see from the attic window at Dawn's house to the back yard or back door of 4448 S. Hermitage because there was a building in the way.

6. Also, Jim never said anything to me about having set the fire. He never told me to shut my mouth or else, and he never said "You know how I am when I feel like I'm losing someone, I do stupid things."

7. I only gave the testimony that I did so I could get a deal on my cases. I got a deal on my charges.

8. Before I gave my testimony, I met with the police and prosecutors. They told me what I needed to say.

9. At some point when I was meeting with the prosecutor, a man came in and had aerial photographs. They took me out of the office, but I overheard them talking about how the aerial photographs showed that you couldn't see from Dawn's house to 4448 S. Hermitage.

10. I did what I had to do to get out.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Duane Glassco

5·17·08

JOHN M. KELLY
NOTARY PUBLIC, STATE OF ILLINOIS
COUNTY OF GRATIOT
MY COMMISSION EXPIRES May 27, 2013
ACTING IN COUNTY OF Gratiot

**EXHIBIT**

A

E$^x$ponent˙

*Failure Analysis Associates*˙

Exponent
185 Hansen Court
Suite 100
Wood Dale, IL 60191

telephone 630-274-3200
facsimile 630-274-3299
www.exponent.com

May 23, 2008

Gayle Horn
The Exoneration Project
312 North May Street
Suite 100
Chicago, Illinois 60607

Subject:   People v. James Kluppelberg
           Client Reference No. 88 CR 1662
           Project No. 0802090.000

Dear Ms. Horn:

On April 3, 2008, Exponent was retained to review and evaluate existing documentation
pertaining to the investigation of a house fire, which occurred at approximately 4:00 a.m. on
March 24, 1984 at 4448 South Hermitage Avenue, Chicago, Illinois. Six people died in this
fire: Elva Lupercio and her five children. James Kluppelberg was tried and convicted for the
arson and murder of these victims. Mr. Francis Patrick Burns, Deputy Director of the Chicago
Fire Department Office of Fire Investigation, testified on behalf of the State of Illinois. It was
Mr. Burns's testimony that this fire was an incendiary fire with its origin at the rear of the
house.

Exponent reviewed the available documentation including trial transcripts, police reports,
medical examiner's reports, an aerial photograph of the general vicinity of 4448 South
Hermitage Avenue, and twelve photographs taken of the scene of the fire. Our objective was to
investigate the origin and cause of this fire and to evaluate the opinions offered by Mr. Burns,
the fire investigator who testified on behalf of the State of Illinois.

## Background

The subject house was a three story wood-framed structure. The fire consumed the entire
structure causing it to collapse during the fire. The fire at the subject house caused fire damage
to the houses on both sides of it. Police officers responding to the fire alarm described the house
as being fully involved in the fire and observed a man falling from a second story window. It
was later determined that this critically injured man was Santos Lupercio, the husband of
decedent Elva Lupercio. Police interviews with neighbors indicated that the house was fully
involved in flames when they became aware of the fire. The first floor of the subject house was


EXHIBIT

B

Gayle Horn
May 23, 2008
Page 2

reportedly unoccupied, and the Lupercio family occupied the second floor. The Siller family occupied the third floor. They were able to escape out the front door of their apartment.

The Bomb and Arson Squad of the Chicago Police Department conducted an official investigation into the cause of the fire. They took three color photographs and an unspecified number of fire debris samples. They concluded that the cause of the fire could not be determined. The fire debris samples came back negative for accelerant.

Mr. Burns conducted an unofficial inspection of the fire scene with several apprentice fire investigators as a training exercise on March 24, 1984. An unidentified investigator from the Chicago Fire Department took nine black-and-white photographs of the fire scene. Mr. Burns did not write a report summarizing his findings. On July 13, 1989, Mr. Burns testified from memory about his inspection observations and opinions about the cause of the fire.

Exponent takes issue with the opinions and bases that Mr. Burns offered in the trial. These points are discussed in detail in the latter portions of this report. However, the cross-examination of Mr. Burns was especially noteworthy. The factual foundations of his opinions were not challenged adequately. As a result, Mr. Burns's statements went unchallenged despite being contradicted directly by evidence presented in the file material. The following examples are representative, though not exhaustive, of the contradiction in the evidence:

- Mr. Burns indicated that there was no fire load on the first floor of the house, but metal springs consistent with upholstered furniture (or the box springs for a mattress) were evident in two of the fire scene photographs (Photos 8 and 9). Were these items from the first, second or third floor? How did Mr. Burns rule out the possibility that these items came from the first floor?

- Mr. Burns dismissed the possibility that the fire was caused by an electrical malfunction indicating that no electrical components were recovered from the fire scene. However, there is a photograph of a firefighter holding a section of flexible BX electrical cable (Photograph 12). Where was it found? Was it examined?

- Mr. Burns stated that the presence of deep charring of wood leading to large blisters ("alligatoring") indicated the use of an accelerant to start the fire. However, two of the photographs show that these features were on wood structural members, items that would not have been exposed to the early stages of the fire (the hypothetical accelerated portion of the fire). Furthermore, numerous wood members exhibited deep charring (as portrayed in the fire scene photographs). Was accelerant applied to all of these wood members? How was accelerant applied to structural wood members (materials normally covered by flooring, wall or ceiling interior finish)?

Ex™

Gayle Horn
May 23, 2008
Page 3

- Mr. Burns stated that he saw fire patterns consistent with the use of accelerant, but fire debris samples collected by the City of Chicago Police Department's Bomb and Arson Squad came back negative for accelerant. Was this fact considered by Mr. Burns? How is it that fire patterns created by burning accelerant survived the fire but traces of accelerant did not?

- The investigator from the City of Chicago Police Department's Bomb and Arson Squad concluded in his official report that the origin and cause of the fire could not be determined. As indicated later in this report, NFPA 921 recommends that the cause of a fire be classified as "undetermined" if there is insufficient data upon which to found an opinion; i.e., "undetermined" is a scientifically defensible conclusion. Subsequent police documents classified the fire as accidental. What was the basis for Mr. Burns to contradict this official investigation and its findings?

Exponent reviewed the available file material from the perspective of fire dynamics and scientific fire investigation, a perspective consistent with *NFPA 921 Guide for Fire and Explosion Investigations (2008)*. This change in perspective was also evident with the publication of the fifth edition of John DeHaan's classic textbook, *Kirk's Fire Investigation*, which was released in 2002. Exponent recognizes that we are applying modern standards of practice to a fire that occurred 24 years ago. However, the motivation for the development and publication of NFPA 921 was the recognition that many fire investigators were offering origin and cause opinions that were completely at odds with sound scientific principles. Mr. Burns' trial testimony provided an example of this.

## Burns' Trial Testimony Regarding Fire Patterns

Mr. Burns offered the following testimony regarding the twelve photographs of the fire scene. He claimed that these photographs depicted significant fire patterns that provided a technical basis for his opinions. The photographs are appended to this report.

Photograph/Trial Exhibit #1: In this photograph, it is apparent that the structure at 4448 South Hermitage has failed; the front stairway is seen at the forefront of the photograph. On page 52 of his trial testimony, Mr. Burns states that the damage to an adjacent structure "would indicate that the fire originated back there and towards the rear of the structure." With a pen, Mr. Burns marked this exhibit; he indicated the area of heaviest damage on the adjacent house to the north (4446 South Hermitage).

Photograph/Trial Exhibit #2: Photograph to the south of the front stairway shown in Exhibit #1. Mr. Burns drew in the "V" pattern on the side of the adjacent house to the south of 4448 South Hermitage.



Gayle Horn
May 23, 2008
Page 4

Photograph/Trial Exhibit #3:  Photograph of the same stairway from further away.  Mr. Burns states that this photograph gives a clearer perspective of the damage area he described in Exhibit #1.

Photograph/Trial Exhibit #4:  Photograph of an adjacent house showing damage pattern on the exterior of the house.  Mr. Burns marked this photograph with two "C's" in an effort to show clapboard siding.

Photograph/Exhibit #5:  This photograph of the house to the south from the rear of the houses shows an extensive area of fire damage to the main structure with damage to the southern exposure.  On page 56 of his trial testimony, Mr. Burns states that this photograph "shows the total destruction of where the fire had completely destroyed the center section of this building, which would have been the rear section of the substructure."  Additionally, he marked an area of the photograph with the letter "F" indicating "finger patterns" on the side of the house.

Photograph/Exhibit #6:  General photo of extensively damaged center structure (4448) with exterior damage to both adjacent structures.  Again, he states that, "you could see the severeness of the fire at the rear of the substructure (4448) on both of these (adjacent) buildings here".

Photograph/Exhibit #7:  Mr. Burns states that this photograph shows the fire investigators, "digging out the debris in an effort to determine burn patterns that were found in this section of the substructure where we thought—at this particular point in time, we thought the fire may have originated in that area because of the damage to this area."

Photograph/Exhibit #8:  This photograph shows a small section of a heavily charred structural support beam.  On page 59 of his trial testimony, Mr. Burns states, "This is the heavy deep alligatoring pattern normally associated with a hot fast burning fire...this is always associated with fires that generate an extreme high temperature".

Photograph/Exhibit #9:  This photograph shows another section of a charred structural support beam.  It appears as though the section of the beam to the right is more consumed than the left.  On page 60 of his trial testimony, Mr. Burns states that these are, "large blisters we call them as versus the small blisters normally associated in fires."

Photograph/Exhibit #10:  This photograph shows firemen working on an elevated section of the structure.  It appears as though section of the flooring has burned and collapsed behind them.  On page 60 of his trial testimony, Mr. Burns states, "This is the top section and dropped down into the first section."

Photograph/Exhibit #11:  This photograph shows a group of firemen working in an area, which might have been in the crawlspace below the first floor.  Mr. Patrick Burns can be seen in this photograph wearing the white coat.  In this photograph most of the first lower flooring appears to be missing.

$\mathbb{E}x^{\text{™}}$

Gayle Horn
May 23, 2008
Page 5

Photograph/Exhibit #12:  This photograph is close-up of an area of fire debris.  Running through this area appears to be a section of flexible BX electrical cable.  This is the only photograph that might possibly be interpreted as a photograph of the area of fire origin.  On page 61 of his trial testimony, Mr. Burns stated, "This would be a close-up, Your Honor, of the area that I had just shown in the previous Exhibit (#11), where this is the result of complete destruction of the fire from the heat generated by this fire.  Normally, you have small pieces of 2x4, 2x6 or 2x8, but this thing really totally destroyed everything."

The photographs of the fire scene depict a total burn.  Any fire patterns created by the incipient fire (the fire associated with the ignition event) were destroyed by the intense fire that not only destroyed the subject house but also damaged the adjacent houses.

## Burns' Origin and Cause Opinions

Mr. Burns' opinions can be reduced to three main points:

1. On page 63 of his trial testimony, he states that, "The origin of the fire was at the rear section some six to ten feet into the structure on the first floor."

2. On page 62 of his trial testimony, Mr. Burns states, "Based on the experience that I have and in the examining of burn pattern(s) normally found in arson fires, my personal opinion was this—this fire was a set fire as a result of arson."

3. On Page 63 of his trial testimony, Mr. Burns states, "I feel that this fire was set by bringing something into this structure and not igniting the ordinary combustible(s) that would normally have been there in this, to sustain a fire of this volume, to keep this type of fire going.  Something had to have been applied.  There had to be applied here.  Something had to be brought in, an accelerant or a trailer or trailers are newspapers or rags or some combustible material to spread the fire from one point to another point.  My opinion is that something was brought into this structure and ignited to cause this fire."

Origin determination is typically based on the interpretation of fire patterns.  Witness observations can sometimes be informative in this process.  In this case, however, neither the fire patterns nor the witness observations provide a reliable foundation upon which to build scientifically defensible opinions.  As noted in the section devoted to the fire scene photographs, none of the fire patterns created by the incipient fire survived the conflagration that destroyed the house.  Furthermore, by the time the witnesses first observed the fire, it had flashed over and grown to such intensity that it breached the windows/door and began attacking the exterior of the house.  The fire could have been burning—and spreading—for a period of time from 15 to 30 minutes depending on the first fuels ignited.  Thus, the witness observations do not pertain to the incipient fire.

E𝓍™

Gayle Horn
May 23, 2008
Page 6

There is insufficient information to rule out an accidental fire. Burns concluded that either an accelerant or trailer had to be used to cause this fire, but there was no evidence of accelerant (fire debris samples came back negative) and no physical evidence of a trailer. In summary, Burns was not successful in determining the origin or cause of the fire.

## The Bases for Burns' Origin and Cause Opinions

### Basis Number 1

On pages 42-43 of the trial transcript Mr. Burns states, "We examined the debris for observer (sic) indicators that would tell us where the fire originated. And upon doing so, we noticed that there was a large shiny alligatoring, which would indicate a fast spreading fire not a smoldering fire. And we look for the logical destruction of the wooden members comprising of this structure. We found during our fire scene examination, that the majority of the fire was confined to the back or rear end of the structure or the westside of the structure on the first floor. Burn patterns indicated that the fire was intense in this area and it burned through the floor into the crawlspace beneath the fire, beneath the building."

"Large, shiny alligatoring" does not indicate a fast spreading (accelerated) fire. This burn pattern is a feature created when wood burns for a long period of time. The only documentation of these patterns is in photographs numbered 8 and 9. Both photographs show this pattern on a structural member rather than exposed woodwork. If, hypothetically, Burns' premise were true, it would not appear on a primary structural component, which was protected from the incipient stage of the fire. The patterns seen in photographs 8 and 9 have no relevance to where or how this fire started. These patterns were the result of prolonged, intense fire in this area.

### Basis Number 2

On page 44 of his trial testimony, Mr. Burns states, "Now, if you have a structure that burns upwards and the upper portions fall down and they will not ignite a floor, they will suffocate or from the lack of oxygen of the triangle, this would extinguish the fire beneath. And it won't have that unusual burn pattern on the floor. But in this situation, we found burn through, right through the floor and into the sub-structure or sub-basement." He states that this burn-through was observed, "approximately in the center rear section of this structure, just inside the—some six to 10 feet inside the rear door of what was—there was a rear porch and wooden rear porch that was totally destroyed with the exception of the floor."

In the field of fire dynamics, it is well established that this is an erroneous statement. Contrary to Burns' testimony, fire testing has shown that liquid fuels cannot burn through combustible floors. On the other hand, fire testing has demonstrated that solid fuels, such as "drop-down," can burn holes in floors. The observation of the burn-through in the floor becomes even more

Gayle Horn
May 23, 2008
Page 7

problematic for Burns' opinions when one considers the fire resistance of typical residential construction, which requires interior walls to have a fire resistance rating of 20 to 30 minutes. As a first order approximation, a structure with a fire resistance rating of between 20 and 30 minutes can be expected to withstand a fire exposure of at least that duration before the membrane of the wall (e.g., sheets of gypsum drywall) fails. The structural wood members (e.g., studs, rafters, floor joists) of the house are exposed to flames only after the wall membrane fails. The structural members, in turn, must burn for a significant time period (perhaps 15 to 30 minutes) before they will collapse under the weight of the structure. With Mr. Burns' fire scenario, the fire on the first floor must have burned for at least 35 to 60 minutes before affecting the structural integrity of the house. A fire of this size and duration requires a fuel load substantially greater than the fuel load provided by a gallon of gasoline or an armload of newspaper. A fire of this magnitude would require large quantities of solid fuel equivalent to pieces of upholstered furniture such as chairs, sofas or mattresses. But according to Mr. Burns' testimony, there was no fuel load present on the first floor.

## Basis Number 3

On pages 48-49 of his trial testimony, Mr. Burns states, "Now, the fire emanated from within this building, it caused a specific or a distinct 'V' pattern, what we are calling a 'V' pattern...Now, when you look at the structure, a step back and look at both structures that were adjacent to this subject building and you would find that same 'V' pattern, where the fire had emanated from the subject building to the adjacent building and cause the destruction." On page 52 of his trial testimony, Mr. Burns, referring to the damage on adjacent structures, states, "This would indicate that the fire originated back there towards the rear of the structure."

The "V" patterns observed on exposed surfaces of adjacent structures were inflicted by heat from the primary fire. Mr. Burns argued that the "V" patterns on adjacent exposures indicated the location of the fire origin at the subject building, but Mr. Burns was mistaken. The patterns on adjacent structures only show where the fire vented from the subject house fire and not where the fire originated.

## Basis Number 4

On page 58 of his trial testimony, Mr. Burns states, "We eliminated all the accidental causes because we couldn't find anything that would have been electric, there was no gas...and there were no electrical outlets or anything in that area".

However, on page 58 of Mr. Burns' trial testimony, he admits that there was a space heater in the house. "It was up towards the front in the living room, as I recall", said Burns. "I would imagine it was hauled away with the debris." Potential ignition sources should have been eliminated by consideration of the physical evidence. At a fire scene that is a total burn, as was the case here, the magnitude of physical destruction makes it virtually impossible to find

E$x$™

Gayle Horn
May 23, 2008
Page 8

physical evidence, let alone consider it. In the absence of evidence, the scientific fire
investigator must state that the cause cannot be determined.

## Exponent Opinions

Based on the fire scene photographs and witness observations summarized in the police
interviews, neither the origin nor cause of this fire can be determined. NFPA 921 recommends
this classification when there is insufficient data upon which to base a scientifically defensible
opinion. There is no physical evidence indicating that this was an incendiary fire.

Exponent has based this report on information available at the time of this writing. If new
information becomes available, Exponent reserves the right to supplement this report.

Sincerely,

Russell A. Ogle, Ph.D., P.E., CSP
Principal Engineer

/km
Enclosures (photographs 1-12)

E𝒳™



Number 1.jpg



Number 2.jpg



Number 3.jpg



Number 4.jpg



Number 5.jpg



Number 6.jpg



Number 7.jpg



Number 8.jpg



Number 9.jpg



Number 10.jpg



Number 11.jpg



Number 12.jpg

## AFFIDAVIT OF RUSSELL OGLE

I, Russell Ogle, under oath and penalty of perjury, states as follows:

1.    I am a resident of the State of Illinois and am serving as a retained expert for James Kluppelberg in this action.

2.    The report attached hereto as Exhibit A, dated May 23, 2008, contains my opinions in this case.

3.    Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in the attached report are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

4.    The opinions set forth in the attached report are based upon a reasonable degree of certainty within my field of expertise.

_____
Russell Ogle

SUBSCRIBED and SWORN to before me
this 29th day of May, 2008

_____
Notary Public

OFFICIAL SEAL
NANCY E. DICANIO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/23/08

**E$^x$ponent***

*Failure Analysis Associates*

Exponent
185 Hansen Court
Suite 100
Wood Dale, IL 60191

telephone 630-274-3200
facsimile 630-274-3299
www.exponent.com

## Russell A. Ogle, Ph.D., P.E., CSP
### Principal Engineer

### Professional Profile

Dr. Russell Ogle is a Principal Engineer in Exponent's Thermal Sciences practice. Dr. Ogle applies his expertise as a chemical engineer to the scientific investigation and prevention of accidents, with particular emphasis on fires, explosions, and chemical releases. He specializes in the investigation of complex industrial accidents where unexpected interactions between people, equipment, computers, and safety systems can have severe consequences. Dr. Ogle has reconstructed complex accident sequences from various sources of evidence including witness interviews, process measurement data, electronic event logs, surveillance videos, laboratory testing, and examination of physical artifacts. Drawing from his diverse accident investigation experience, he has provided hazard and risk analysis services to the chemical, petroleum, natural gas, pharmaceutical, and environmental industries.

Dr. Ogle has investigated hundreds of fires and explosions in industrial, commercial, and residential settings. His investigations have involved the performance evaluation and failure analysis of a wide range of chemical processes and industrial equipment. He is especially interested in the relationship between equipment design, automation and human error. Additionally, Dr. Ogle has demonstrated expertise in evaluating the stability of chemicals and their fire and explosion hazards. He has investigated accidents involving self-heating or thermal runaway of chemicals and unintentional chemical reactions of incompatible materials. Much of his experience with hazardous materials centers on their storage, handling, and transportation requirements.

In addition to his consulting experience, Dr. Ogle has worked in both the defense and environmental industries. In the defense industry, he was responsible for the design, testing, and evaluation of military weapon systems. In the environmental industry, he performed and managed investigations, feasibility studies, and design projects for the cleanup of hazardous waste sites.

### Academic Credentials and Professional Honors

Ph.D., Chemical Engineering, University of Iowa, 1986
B.S., Chemical Engineering, Purdue University, 1980

### Licenses and Registrations

Licensed Professional Engineer, Illinois, #062-026870
Licensed Professional Engineer, Arkansas, #12225
Licensed Professional Engineer, Alabama, #28089E
Certified Safety Professional, #15568

02/08

## Publications and Presentations

Morrison III DR, Ogle RA, Gidaspow D.  A new assessment of the finite Biot number correction to thermal ignition tests.  American Institute of Chemical Engineers 2007 Annual Meeting, Salt Lake City, UT, November 8, 2007.

Ogle RA, Carpenter AR.  Guidelines for identifying, evaluating, and selecting safety instrumented functions.  Process Plant Safety Symposium, 2007 Spring National Meeting, American Institute of Chemical Engineers, Houston, TX, April 2007.

Ogle RA, Morrison III DR, Carpenter AR.  The relationship between operator error and automation complexity.  2006 Annual Symposium, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October 2006.

Ogle RA, Morrison III DR, Carpenter AR, Su YS.  Missed Opportunities in Reactive Chemical Hazard Evaluations.  Process Safety Progress 2006; 25:2–7, March.

Morrison III DR, Ogle RA, Viz MJ, Carpenter AR, Su YS.  Investigating chemical process accidents: Examples of good practices.  Process Safety Progress 2006; 25:71–77, March.

Ogle RA, Morrison III DR, Viz MJ.  Emergency response to a non-collision HAZMAT release from a railcar.  Process Safety Progress 2005; 24:81–85, June.

Ogle RA, Carpenter AR, Morrison III DR.  Lessons learned from fire and explosions involving air pollution control systems.  Process Safety Progress 2005; 24:120–125, June.

Morrison III DR, Ogle RA, Viz MJ, Carpenter AR, Su YS.  Investigating chemical process accidents: Examples of good practices.  Process Plant Safety Symposium, 2005 Spring National Meeting, American Institute of Chemical Engineers, Atlanta, GA, April 11–13, 2005.

Ogle RA, Morrison III DR, Carpenter AR, Su YS.  Missed opportunities in reactive chemical hazard evaluations.  39th Annual Loss Prevention Symposium, American Institute of Chemical Engineers Spring National Meeting, April 11–13, 2005.

Ogle RA, Carpenter AR, Morrison III DR.  Explosion of a railcar containing toluene diisocyanate waste.  Process Safety Progress 2005; 23:316–320, January.

Ogle RA, Megerle M, Morrison III DR, Carpenter AR.  Explosion caused by flashing liquid in a process vessel.  Journal of Hazardous Materials 2004; 115:133–140.

Ogle RA, Viz MJ, Morrison III DR, Carpenter AR.  Bulk transportation of hazardous materials by rail: Lessons learned from non-collision accidents.  2004 Annual Symposium, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October 2004.

Ogle RA, Morrison III DR, Viz MJ.  Emergency response to a non-collision Hazmat release from a railcar.  19th Annual CCPS International Conference, Emergency Planning:

$E\mathcal{x}^{™}$

Preparedness, Prevention and Response; American Institute of Chemical Engineers, Orlando, FL, June 2004.

Ogle RA, Viz MJ, Carpenter AR. Lessons learned from Hazmat accident investigations. 17th Annual AAR/BOE Hazardous Materials Seminar, Association of American Railroads/Bureau of Explosives, Houston, TX, May 2004.

Ogle RA, Carpenter AR, Morrison III DR. Lessons learned from fire and explosions involving air pollution control systems. 38th Annual Loss Prevention Symposium, American Institute of Chemical Engineers, New Orleans, LA, April 2004.

Morrison III DR, MacDonald M, Ogle RA. Analyzing lint deposition within the residential electric clothes dryer. 2004 International Appliance Technical Conference, Lexington, KY, March 2004.

Morrison III DR, MacDonald M, Ogle RA. Assessing electric dryer lint fire cause scenarios. 2004 International Appliance Technical Conference, Lexington, KY, March 2004.

Ogle RA, Carpenter AR, Morrison III DR. Explosion of a railcar containing toluene diisocyanate waste. 18th International CCPS Conference & Workshop: Managing Chemical Reactivity Hazards and High Energy Release Events, American Institute of Chemical Engineers September 25, 2003.

Ogle RA, Haussmann G, Lucas RJ, Carpenter AR, Morrison III DR. The Scientific investigation of arson fire. Paper (with accompanying presentation by Russ Ogle), 2003 DRI Fire and Casualty Seminar, Defense Research Institute, Phoenix, AZ, November 2003.

Ogle RA, Megerle MV, Morrison III DR, Carpenter AR. Explosion caused by a flashing liquid in a process vessel. 2003 Annual Symposium, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October, 2003.

Ogle RA, Carpenter AR. Toxic gas release caused by the thermal decomposition of a bulk powder blend containing sodium dichloroisocyanurate. Process Safety Progress 2003; 22:75–82.

Morrison III DR, Carpenter AR, Ogle. Common causes and corrections for explosions and fires in improperly inerted vessels. Process Safety Progress 2002; 21:142–150.

Ogle RA, Carpenter AR. An accident involving the thermal decomposition of a solid mixture containing sodium dichloro-isocyanurate. AIChE Spring National Meeting, American Institute of Chemical Engineers, New Orleans, LA, March 2002.

Ogle RA, Morrison III DR. Investigation of an acid spill caused by the failure of an air-operated diaphragm pump. Process Safety Progress 2001; 20:41–49

Ogle RA, Carpenter AR. Lessons learned from fires, flash fires and explosions involving hot work. AIChE Spring National Meeting, American Institute of Chemical Engineers, Houston, TX, 2001.

Ogle RA, Carpenter AR. Lessons learned from fires, flash fires and explosions involving hot work. Process Safety Progress 2001; 20:75–81.

Morrison III DR, Carpenter AR, Ogle RA. Common causes and correction for explosions and fires in improperly inerted vessels. Beyond Regulatory Compliance: Making Safety Second Nature, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, 2001.

Ogle RA. Ethics in forensic chemical engineering. AIChE Spring National Meeting, American Institute of Chemical Engineers, Atlanta, GA, 2000.

Ogle RA. The need for scientific fire investigation. Fire Protection Engineering 2000; Issue No. 8, Fall.

Ogle RA, Morrison III DR. Evaluation of accident investigations conducted by regulatory authorities and advisory agencies. Beyond Regulatory Compliance: Making Safety Second Nature, Mary Kay O'Connor Process Safety Center, Texas A&M University, College Station, TX, October 2000.

Ogle RA. Explosion hazard analysis for an enclosure partially filled with a flammable gas. Process Safety Progress 1999; 18:170–177.

Ogle RA. Explosion risk analysis for a commercial building near a closed landfill. SFPE Symposium on Risk, Uncertainty and Reliability, Society of Fire Protection Engineers, Baltimore, MD, 1999.

Ogle RA, Smith KM, Strack S. Investigation of a boiler explosion caused by a natural gas detonation. American Society of Mechanical Engineers Pressure Vessels and Piping Conference, Boston, MA, 1999.

Ogle RA, Carpenter AR. Fire patterns on combustible flooring. Society of Fire Protection Engineers, 3rd International Conference on Fire Research and Engineering, Chicago, IL, 1999.

Ogle RA, Schumacher JL. Fire patterns on upholstered furniture: Smoldering vs. flaming combustion. Fire Technology 1998; 34:247–265.

Ogle RA, Schumacher JL. Investigation of an explosion and flash fire in a fixed bed reactor. Process Safety Progress 1998; 17:127–133.

Ogle RA, Schumacher JL. Investigation of a steam explosion in a petroleum product storage tank. Process Safety Progress 1998; 17:171–175.

Ogle RA, Schumacher JL. Application of fire testing and modeling in a forensic investigation. Society of Fire Protection Engineers, 2nd International Conference on Fire Research and Engineering, Gaithersburg, MD, 1997.

Ogle RA, Strack S. The role of incident investigation in mechanical integrity programs. American Petroleum Institute, 61st Spring Refining Meeting, Chicago, IL, 1996.

Ogle RA, Brumleve CB, Joyner S. Hydrogeology and remedial action modeling for a superfund site in a glaciated area. Solving Ground Water Problems with Models Conference, National Ground Water Association, Dallas, TX, 1992.

Ogle RA, Peterson EH, Souka OA, Holmquist TJ. The effect of recoil dynamics and soil response on the interior ballistics of a lightweight launcher. 1989 JANNAF Propulsion Meeting, Cleveland, OH, 1989.

Ogle RA, Beddow JK, Vetter AF, Chen LD. An investigation of aluminum dust Explosions. Combustion Science and Technology 1988; 61:75–99, 1988.

Ogle RA. Parametric sensitivity of a mathematical model for closed bomb dust explosions. Chemical and Physical Processes in Combustion, Eastern States Section, The Combustion Institute, Gaithersburg, MD, 1987.

Ogle RA. A new strategy for dust explosion research; a synthesis of combustion theory, experimental design and particle characterization. Ph.D. Dissertation, University of Iowa, 1986.

Ogle RA, Beddow JK, Vetter AF, Chen LD. A new strategy for dust explosion research. 17th Annual Meeting of the Fine Particle Society, San Francisco, CA, 1986.

Ogle RA, Beddow JK, Vetter AF, Chen LD. Dust explosion kinetics. 17th Annual Meeting of the Fine Particle Society, San Francisco, CA, 1986.

Ogle RA, Scholz PD, Beddow JK, Vetter AF. Free molecular electrophoresis of highly dispersed aerosol particles in an isothermal gas. 16th Annual Meeting of the Fine Particle Society, 1985.

Ogle RA, Beddow JK, Vetter AF, Chen LD. Thermal theory of laminar premixed dust flame propagation. Combustion and Flame 1984; 58:77–79.

Ogle RA, Beddow JK, Vetter AF. Applications of symmetry classifiers in morphological analysis. 9th Annual Powder and Bulk Solids Conference/Exhibition, Rosemont, IL, 1984.

Ogle RA, Beddow JK, Vetter AF, Chen LD. Thermal theory of laminar premixed flame propagation. Chemical and Physical Processes in Combustion Eastern States Section: The Combustion Institute, Providence, RI, 1983.

Ex™

Ogle RA, Beddow JK, Vetter AF. Numerical modeling of dust explosions: The influence of particle shape on explosion intensity. Process Technical Program: International Powder Bulk Solids Handling Process, Rosemont, IL, 1983.

**Professional Affiliations**

- American Chemical Society
- American Institute of Chemical Engineers
- American Society of Safety Engineers
- National Fire Protection Association
- Society of Fire Protection Engineers
- The Instrumentation, Systems and Automation Society

$E\mathcal{x}$™

Case 1:08-cv-03168   Document 5   Filed 06/02/2008   Page 32 of 36

SUPPLEMENTARY REPORT — TEMP.
USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

VICTIM'S NAME (AS SHOWN ON CASE REPORT)
ARTEAGA, Robert

**(NARRATIVE (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)**

Arson/Aggravated — intentionally set fire in the two story frame house
located at 4504 S. Marshfield and communicated to adjacent and nearby
buildings at 4500, 4502, 4508, front and rear structures. Bt. 913.

Personnel Assigned:

| | | |
|---|---|---|
| Det. Nelson | # 16164 | B&A |
| Det. Urbon | # 15400 | B&A |
| Det. Vega | # 3464 | B&A |
| Det. Guest | # 10600 | B&A |
| Det. Micek | # 4645 | B&A |
| Det. Jenkins | # 11828 | B&A |
| Lt. Grubisic | # 233 | B&A |
| Commander Nickels | | |
| Det. Tuider | # 5648 | A3/VG |
| Det. McKinley | # 12951 | A3/VG |

CB# 7077053

ASA Saul Roffer

RAMOS, Isabel        F/H        DOB 8JU146
4504 S. Marshfield
IR# 639053

Arresting Officers:

| | | |
|---|---|---|
| Det. Vega | # 3464 | B&A |
| Det. Urbon | # 15400 | B&A |
| Det. Micek | # 4645 | B&A |

CLEARED
BOMB - ARSON

EXHIBIT
C

aggravated
+ S. Marshfield
F104537

e, Time, Location of Arrest:      17 17

-2 APR 1994

24MAR84, 1015 hrs.
4640 S. Marshfield

rges:

Aggravated Arson

rt Branch and Date:

Br. 44-4, 26MAR84

ted:

DNA

estigation:

On 23MAR84 at 2315 hrs., there was a garage fire at 1840 W. 46th St., RD# F105358. This case investigated by Det. Nelson of the Bomb and Arson Unit. On 24MAR84 at 0408 hrs., there a fire at 4454 S. Hermitage in which there were six fatalities as a result of the fire. fire at 4504 S. Marshfield and these two fires are within a few blocks of one another.

On 24MAR84 at 1015 hrs., Detectives Vega and on went to 4640 S. Marshfield and located Isabel RAMOS, who was the first floor tenant at 4 S. Marshfield. RAMOS agreed to accompany Detectives Urbon and Vega to the 9th district talk about the fire in her building. As they were walking on the sidewalk toward the squad ·, RAMOS blurted out,without being asked any questions, that she set the fire in her apartment. . Vega then advised her of her rights and then asked her what had happened in her apartment. : stated that on 23MAR84 she set fire to the kitchen curtains in her apartment and then left : building. RAMOS was brought into the 9th District Tactical Officer where RAMOS was again ·ised of her rightsby Reporting Detective. In summary, RAMOS stated that she was mad at her ndlord and the woman who lives in the first floor apartment at 4502 S. Marshfield. She was ·y mad and after drinking a few beers, she decided to set fire to her apartment. She took ·iece of paper and lit it on fire on her stove burners. She then used the burning paper to : the kitchen curtains on fire that covered the window that overlooked the back yard. She ·n picked up a six pack of Old Style and left the apartment. For the next several hours, ·went to different bars on Ashland. Sometime late that night she eventually walked back ·her apartment and observed that the building was burned to the ground. Because she had been ·inking for several hours, she stated that she did not remember anything after seeing her ·ilding burned down, except that she was walking around a lot and somehow ended up at her ·t's apartment at 4640 S. Marshfield. At this time she did not remember setting any other ·res other than the one in her apartment, but she said she may have set some after viewing ·r burned down building. Because of her intoxicated condition, she does not remember what ·ppened after finding her building burned down.

It should be noted that RAMOS had to walk on her ·p toes. When asked why she was walking in that manner, she stated that her feet hurt her ·om doing so much walking last night.

ASA Saul RAJFER arrived at the 9th District and ·ain advised RAMOS of her rights and she repeated her story to him. She subsequently gave ·handwritten statement of her account of the fire. RAJFER approved charges of Aggravated ·son and the original court date was set for 26MAR84 in Branch 44-4.

Because this fire was intentionally set, and ·jacent buildings containing occupants were damaged by the fire, Reporting Detective requests ·at this case be RECLASSIFIED to ARSON/AGGRAVATED and CLOSED AND CLEARED BY ARREST.

W. Kicek #4645

proved: _____

CLEARED
BOMB-ARSON



Case 1:08-cv-03160ONS Document 5    Filed 06/02/2008    Page 34 of 36

the _e. michael Panto; Social Center, Matti and    and Lucien merav;    Eugene Winner, Brother Richard Wirtz of Im-    NUMIN
Winchester.    maculate, Brother    Dolores    Edward Pris
Members of the four committees are as follows:    Rev. Armand Gress of St. Michael's, Raymond    Michael's, Marianne Wroblewski, and Thomas    zak, Denise Rossc
**ARRANGEMENTS COMMITTEE**    Martin of Martin Florists, Rev. Joseph Mytych of SS.    Doyle.    Gertrude Obirek.





BACK OF THE YARDS

# JOURNAL

Serving the Southwest Side

McKINLEY PARK — TOWN OF LAKE — BRIDGEPORT

GAGE PARK — CANARYVILLE — SOUTH BRIGHTON PARK

**VOL. 52 NO. 13**    **WEDNESDAY, MARCH 28, 1984**    **Circulat**

# Two tragic fires; six perish, many homeless

A wave of sympathy has poured out for the victims of the two tragic fires that occurred last Friday and Saturday. A mother and her five children perished in the second fire. Approximately 65 people were left homeless from both blazes.

About 1:30 p.m. Friday, a fire broke out in a building at 504 S. Marshfield and quickly spread to 4502 and 4500 Marshfield destroying all three buildings and heavily damaging the building south of 4504.

Sunday, police arrested a resident of the 4504 address and charged her with aggravated arson.

Isabel Ramos, 37, admitted she set fire to the building because she was troubled and had an argument with her landlady.

Early Saturday, about 4 a.m. the second fire broke out at 4448 S. Hermitage claiming the six fire victims, destroying the building and two adjacent to it.

Dead are Elva-Luz Lupercio, 27, and the children: Santos Jr., 10; Sonia, 8; Crisabel, 6; Yadira, 4; and Anabel, 3.

The husband and father of the family, Santos Sr., 30, was injured after leaping from the second floor apartment.

Lt. James Morrison, a Fire Dep't. spokesman, said that the family was asleep when the fire broke out and that San-

tos Sr. tried to save them but the flames were too great.

It was surmised that he tried to get out and find another entrance to rescue his family. He is in critical condition at Holy Cross hospital.

The Police Bomb and Arson squad, which was called and reacted quickly to the earlier Marshfield fire, was on the scene again and conducting an investigation into the second fire.

Regarding the Hermitage fire, Lt. Joseph Grubisic of the Police Bomb and Arson Squad said the investigation is continuing and nothing will be left to the imagination.

"There was no evidence of an accelerant," he said, "but that doesn't eliminate arson."

The unit is also pursuing a possible link to the Marshfield fire. Isabel Ramos, who admitted setting that fire, has not been eliminated as a suspect in the second fire, he said.

Lt. Grubisic urges residents who may know anything about the cause of this fatal fire or who have information about any fire to call the ARSON HOTLINE at 922-2323.

"No names have to be given," he said. "We will respect their wishes."

Deputy Fire Commissioner Altman was in charge of the fire fighting operations, along with Fifth Battalion Chief Fisher.

More than 10 pieces of equipment were reported at the scene including Engines 49, 65, 116, 28, and 123, and Trucks 35, 52, 18, 41, and 8.

Among the police officials at the fire scene were Ninth District Commander Timothy Daly, Ninth District Watch

(Continued on page 2)

## Columnist Navarro writes on fires, p. 14

# *Fire Victims set at Drovers*

Patrick J. Salmon, executive secretary of the Back of the Yards Neighborhood Council, 1751 W. 47th st., has announced that a special Fire Victims Fund has been established at Drovers Bank of Chicago, 47th and Ashland.

The fund has been set up to aid the victims of the two tragic fires that happened last weekend at 45th and Marshfield and 44th and Hermitage. Six perished and approximately 65 persons were left homeless.

"Their greatest need is money," Salmon said, "to relocate and put their lives together again.

"We will appreciate any funds that can be donated to this worthy cause."

Funds can be sent to Drovers Bank, 47th and Ashland, Chicago, IL., 60609.



## *First check for*

Patrick J. Salmon (right), executive secretary of Council, accepts the first check for Fire Victims elected committeeman of the 12th Ward Regula 20. At left is Dan Marques, aide to Molaro.



Flames and heavy smoke billow from building at 4504 S. Marshfield last Friday afternoon as firefighters attempt to kill the blaze, which quickly spread to three other buildings, destroying all four. Arson was suspected and a woman was later admitted to police that she set the fire.

*(Journal photo by Gary Matula)*



Firefighters from 10 units comb rubble of a house that stood at 4448 S. Hermit day morning. A mother and her five children perished in the blaze. The Police B

# Free health exams April 3 at BYNC field, 47th-Damen

## Help locate fire victims

The estimated 65 victims left homeless by the two fires last Friday and Saturday have



BYNC to pick

**EXHIBIT**

D

# Arson unit probes both fires

(Continued from page 1)

Commanders Captain Thomas Nolan and Lt. John Collins, the bomb and arson unit, three beat cars, and four squadrolls.

Also providing help to the victims were representatives from the Back of the Yards Council, Department of Human Services and the Red Cross.

Fourth District Deputy Chief Pentek was in charge of operations at the earlier Marshfield fire. Among the units there were snorkel 3 and engine 39.

The Lupercios were married in Mexico in 1973 and came to the United States in 1977.

Three years ago, the family moved into the building on Hermitage.

Neighbors and friends said the Lupercios were very well liked.

Santos worked at the Midwest Nut and Seed factory.

They took part in activities at Seward school, which the older children attended.

They were planning to eventually return to Mexico, where the burial for the six victims will take place.

The first firemen at the scene find flames and dense smoke billowing from a home at 4504 S. Marshfield last Friday afternoon. Fanned by a steady breeze, the flames soon engulfed adjoining buildings at 4502 and 4500 S. Marshfield.
(Journal photo by Gary Matula)

Ninth District Police Officers Richard Barajas and Connie Mendoza (above), and Larry Orpik rescued an elderly woman from a fire which destroyed four homes in the 4500 block of S. Marshfield Friday afternoon.

## *Heroic effort...*

Three Ninth District Police Officers are credited with rescuing an elderly woman during the Friday afternoon fire that destroyed four buildings in the 4500 block of South Marshfield and left some 37 persons homeless.

Officers Richard Barajas, Connie Mendoza, and Larry Orpik were among the first to arrive on the scene after the fire broke out around 1:30 p.m.

Officer Mendoza said that she and Barajas were on patrol in the area when a police tactical unit called

the fire in.

Arriving on the scene, the officers immediately entered buildings adjacent to the frame home at 4504 S. Marshfield where the fire originated to alert residents.

An elderly woman living in a second floor rear apartment of the corner building, 4500 S. Marshfield, apparently was sleeping and did not immediately respond.

Officer Mendoza said that she was directing traffic away from the fire scene when she saw officers Barajas and Orpik motioning for the woman to come down.

"The porch was caving in already," Barajas said. "She was stunned, she didn't know what was happening."

Despite the intense heat

# Police arrest youth for garage fire

A 16-year-old high school student was arrested last Saturday night and charged with arson after witnesses placed him at the scene of a garage fire in the 1800 block of West 46th street.

The police said that Lt. Keating, of the Chicago Fire Department, told them that while fighting the

fire he was informed by a witness that the boy had been in the alley at the rear of the garage when it was on fire, before the Fire Department was called.

According to police, the witness said that at approximately 11:10 p.m. he saw the boy and another youth at the rear of the garage.

The witness told police that the boys fled when they saw him. He said that he noticed smoke coming from furniture which was piled against the garage and started on fire.

Two other witnesses came from a friend's house after seeing the smoke and attempted to extinguish the

fire, the police said.

The police were taken to the boy's house by the witnesses, where he was informed of the allegation and placed under arrest.

He was turned over to the Area Three Youth Division for processing and court referral.

# *'Volunteer Youth Fingerprint Program'*

Alderman Patrick M.

dren are victims of parental

written consent of the par-

ed to call Alderman Huels

Wednesday, March 28, 1984

# Who is burning these houses?

BY JAVIER NAVARRO

While observing the ruins of what remains after the fire at 4448 S. Hermitage, Mr. Pat Salmon, of the Back of the Yards Council asked, just as are the residents of the area, "How is it possible that there is someone out there capable of starting a fire, knowing that in that building, among the residents are many children, and yet, at a time when all are sleeping"

Up to now, Sunday, the 25th, there does not seem to be an answer.

Both fires, the one at 45th and Marshfield, Friday afternoon and the one on 44th and Hermitage during the early hours of Saturday morning, have abruptly shaken the residents of this heavily-populated area.

There are suspicions that both fires were set intentionally, that there may be an arson maniac on the loose, whose motives for committing such a crime are unknown to anyone.

Note: A resident of the 4504 S. Marshfield building was later charged with arson in that first fire.

Another suspicion may be that the fire that killed the Lupercio family may be related to an old feud between two men, whose motives remain unknown. Commander Timothy Daly of the 9th Police District arrived within minutes of the blaze and when I approach-

ed him, several hours later, I was able to appreciate the fact that he was quite upset over the magnitude of the tragedy. The firefighters were still looking for bodies among the debris.

Then, Commander Nunn informed me that 6 persons had lost their lives, among them 5 children, between the ages of 3 and 10 years, as well as their mother, Elva Luz, 28 years. Their father, Santos, remains in Holy Cross Hospital in critical condition.

Never has this neighborhood felt a tragedy as terrible as this. This is all that was missing. Now not only must we deal with the proliferation of gangs in our community, but also with an assonist on the loose, and it is at these dramatic moments that the question is asked, why is there not more participation, more unity, more brotherhood and more interest in one over another?

If in fact those fires were caused intentionally, which I would not doubt, how is it possible that someone knowing the person or persons responsible for this act, would not denounce them?

If in fact it was an arson, the person committing the crime undoubtedly lives near by, and must have friends. Usually, these cowards brag about the crimes they have commit-

ted as if it were a joke.

Someone out there knows who is responsible for this crime and, for cowardness or indifference, does not open his mouth. If this is the case, this concealer, through his silence and complicity about the crime, becomes an accomplice of the crime.

Most people are good and respectable persons, yet we have a few bad apples in our neighborhood. Will the assassin remain without punishment?

The police continue to investigate the case intensively and sooner or later the one responsible for this tragic loss of lives and homes will be caught. But, in the meantime, this disgrace can be repeated.

The Back of the Yards Council is sponsoring a "FIRE VICTIMS FUND" and contributions can be mailed or taken to: "FIRE VICTIMS FUND," Drovers Bank 47th & So. Ashland, Chicago, Illinois 60609.

The Back of the Yards Council at 1751 W. 47th st. (Wood) 2nd fl., has available smoke alarms for $8.15. We urge every household to install at least one alarm, (preferably more depending on the size of the home). It can mean the difference between life and death.

Javier Navarro, PO Box 09234 Chgo., IL., 60609.

BACK OF THE YARDS JOURNAL

...ederal Savings

...09

...3442

...s year's money
...a bite out of last
year's taxes.

By opening an IRA
at Standard Federal
by April 16th.

An IRA at Standard Federal lets you and your spouse deduct up to $4,000 off last year's income tax return. Using this year's